**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NORDEA INVESTMENT MANAGEMENT AB v. TEVA PHARMACEUTICAL INDUSTRIES LTD., et. al. | No. 3:18-cv-01681 (SRU) |
| THIS DOCUMENT RELATES TO: | |
| STATE OF WISCONSIN INVESTMENT BOARD, | No. 3:22-cv-00106 (SRU) |
| Plaintiff,<br>v. | **JURY TRIAL DEMANDED** |
| TEVA PHARMACEUTICAL INDUSTRIES, LTD., EREZ VIGODMAN, EYAL DESHEH, SIGURDUR OLAFSSON, DEBORAH GRIFFIN, and KÅRE SCHULTZ, | June 12, 2023 |
| Defendants. | |

**AMENDED COMPLAINT FOR VIOLATIONS OF THE**
**FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 2

II.     JURISDICTION AND VENUE ........................................................................ 11

III.    PARTIES ............................................................................................................ 12

IV.     SUMMARY OF THE FRAUD ......................................................................... 14

        A.    Regulation of the Generic Pharmaceutical Industry ............................ 14

        B.    Teva's Generics Business Struggled Before The Relevant Period ....... 18

        C.    Teva Adopts An Undisclosed Price-Hike Strategy In Early 2013 ........ 18

        D.    Teva Expands The Price-Hike Strategy In 2014.................................... 26

        E.    Teva's ADS Price Soars Providing The "Currency" Needed To
              Pursue The "Transformational" Actavis Acquisition ........................... 34

        F.    The Price-Hike Strategy Nears Its End In Late 2015 ........................... 37

        G.    Teva Is Forced To End The Price-Hike Strategy In Early 2016, But
              Denies It Is Facing Any Pricing Pressure ............................................ 42

        H.    The Truth Begins To Emerge ................................................................ 49

        I.    Teva's Collusion With Other Generic Drug Manufacturers................. 57

V.      FALSE AND MISLEADING STATEMENTS AND OMISSIONS.............. 65

        A.    Misrepresentations Regarding Pricing.................................................. 66

        B.    Misrepresentations Regarding Price Competition ............................... 103

        C.    False Denials of Participation in Collusive Conduct ........................... 107

        D.    Defendants Violated Their Duty To Disclose Trends In Pricing......... 110

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER.......................................... 112

VII.    LOSS CAUSATION......................................................................................... 131

VIII.   PRESUMPTION OF RELIANCE .................................................................. 145

IX.     NO SAFE HARBOR ....................................................................................... 146

X.      COUNTS.......................................................................................................... 147

Plaintiff State of Wisconsin Investment Board ("SWIB") brings this action under the Securities Exchange Act of 1934 ("Exchange Act") against Teva Pharmaceutical Industries, Ltd. ("Teva" or the "Company") and certain of Teva's former and current officers and directors (collectively, "Defendants") to recover damages for losses Plaintiff has suffered in connection with its acquisition of Teva securities between January 19, 2016 and May 10, 2019, inclusive.

Except as to allegations specifically pertaining to Plaintiff, all allegations herein are based upon the investigation undertaken by Plaintiff's counsel. Counsel's investigation included the review and analysis of (i) public filings made by Teva and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); (ii) press releases and other publications disseminated by Teva and other related parties and non-parties; (iii) news articles, shareholder communications, conference call transcripts, and postings on Teva's website concerning the Company's public statements; (iv) securities and generic drugs pricing data; (v) consultations with relevant experts; (vi) pleadings and other filings in or related to Teva, including the consolidated securities class action pending against Defendants in this District captioned, *Ontario Teachers' Pension Board v. Teva Pharmaceutical Industries Ltd., et al.,* No. 3:17-cv-00558 (SRU) (D. Conn.) (the "Class Action"), the civil antitrust enforcement action captioned, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724, No. 2:16-md-02724 (CMR) (E.D. Pa.), and the criminal antitrust action captioned, *United States of America v. Teva Pharmaceuticals USA, Inc. and Glenmark Pharmaceuticals, Inc., USA*, No. 2:20-cr-00200 (RBS) (E.D. Pa.); and (vii) other publicly available information.

Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants named herein or are exclusively

within their custody or control.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity to conduct discovery.

## I.    INTRODUCTION

1.    Teva is a leading manufacturer of generic drugs and among the world's twenty largest pharmaceutical companies. This action arises out of Teva's material misstatements and omissions to investors regarding the reasons for its extraordinary turnaround and success in the generic drug business.  Specifically, this action alleges two separate but interrelated frauds that occurred between February 6, 2014 and May 10, 2019, inclusive (the "Relevant Period").  First, an undisclosed "Price-Hike Strategy," in which Teva and its former senior executives systematically and deliberately implemented large price increases on dozens of generic drugs, which senior Teva executives then misrepresented, denied and concealed in public statements to investors.  Second, Teva's role as the central participant in an industrywide conspiracy to allocate market share and fix prices for hundreds of generic drugs, which senior Teva executives similarly concealed and then denied in public statements to investors.  In all, the wrongdoing encompassed over one-third of Teva's entire generics portfolio.

2.    Teva's misconduct has spawned extensive litigation.  The U.S. Department of Justice ("DOJ") has brought criminal charges against Teva and a half dozen other generic drug manufacturers, the Attorneys General ("AGs") of virtually every state in the nation have brought civil antitrust enforcement actions against Teva and twenty-five other generic drug makers, and consumers and third party payors have brought myriad class actions and individual antitrust suits, which have been consolidated in a multi-district litigation pending in the Eastern District of Pennsylvania.  The sweeping misconduct has been described by Connecticut's Attorney General as "the biggest corporate cartel in history," "an attack on the American people," and "a massive

2

fraud that focuses on the drugs that we take every day." Teva's anticompetitive conduct not only drove up the costs of healthcare, but also operated as a fraud on Plaintiff and other investors who were led to believe that Teva's growth and strong financial performance were the result of superior, sustainable, and sound business practices. In reality, the opposite was true. Teva's success was the product of large, systemic, and collusive price increases across wide swaths of its generics portfolio, often with price hikes in excess of 100% made both individually and in unison with purported competitors.

3.      In the years leading up to the Relevant Period, Teva faced headwinds that threatened its financial performance and business prospects. By the start of 2013, both sales and profits of the Company's leading generic drugs were slipping due to increasing competition, and the Company's most profitable specialty drug was on the brink of losing its exclusivity. As a result, Teva's stock price was flat and underperforming its peers. Under pressure to turn the Company around, beginning in mid-2013 Teva began to collude with other generic drug companies to fix prices and allocate market share for hundreds of generic drugs. In addition to collusive price hikes, Teva unilaterally raised prices on dozens of additional generic drugs. The impact of the Price-Hike Strategy and collusion with other market participants was striking. Teva reaped at least $2.3 billion in inflated profits attributable solely to price increases on generic drugs.

4.      Not surprisingly, the billions of dollars in inflated profits drove a quick rebound in the Company's financial performance and stock price. By the end of 2013, Teva's U.S. generics business regained its status as the Company's most lucrative business, with 14% top-line revenue growth and 50% gross margins. By the first quarter of 2014, Teva's stock price also sharply rebounded, posting a 32% sequential increase—its largest quarterly rally in nearly a decade.

5.      For years, Teva and its senior executives successfully concealed Teva's Price-Hike

3

Strategy and price collusion from investors, regulators, and the public at-large.  As the generics business rebounded, Teva's then-existing management – including Defendants Erez Vigodman ("Vigodman"), Eyal Desheh ("Desheh"), and Sigurdur Olafsson ("Olafsson"), the Company's former Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and President and CEO of the Global Generic Medicines Group, respectfully – attributed the turnaround to legitimate causes, while quieting any suggestion that it was driven by price increases.  At every opportunity, Vigodman, Olafsson, and Desheh trumpeted Teva's many "competitive advantages" that purportedly spurred a reversal in its previously struggling generic drug business, and emphasized factors other than price as contributing to Teva's generics performance, including lower expenses, new product launches, and the breadth of its product portfolio.  Defendant Desheh hailed Teva's turnaround as "nothing short of a revolution."

6.    Teva's executives were motivated to inflate the prices of Teva securities in order to make a "transformative" acquisition that the Company otherwise could not afford. As Defendant Desheh, Teva's CFO, stated in January 2014, within 12 to 24 months, Teva's "stock price will go up and we'll be able to use our share as a currency … to fund transactions" that would transform Teva into an even more dominant force in generics.  Defendant Vigodman, Teva's CEO, also sought to make a transformative acquisition upon assuming leadership in February 2014, the start of the Relevant Period.  Just as Desheh predicted, within 18 months, Teva announced it was acquiring Actavis for $40 billion the very day that Teva shares reached all-time high of $72.  But Teva still did not have enough cash, as the price tag equated to roughly 20 years of Teva's recent average profits. To close the gap, Teva would raise the remaining shortfall from investors.

7.    In 2014, as the Price-Hike Strategy accelerated, Teva began reporting "excellent" results in its U.S. generics business that went from "slowing fundamentally" to "highly profitable."

4

For example, Teva reported year-over-year increases of 30-40% in generic profits for the first three quarters of 2014, with the Price-Hike Strategy contributing over $470 million in inflated profits. However, rather than reveal the true driving force behind Teva's newfound success, Vigodman, Desheh, and Olafsson attributed Teva's financial performance to sound business strategies such as lower expenses, improved management, better portfolio selection, and new product launches. Trumpeting the "profound change in the generics business," Vigodman told investors that "we started 2014 with a clear message, clear focus, getting the house in order first, solidifying the foundation of Teva," and pointed to strong growth in generic operating profit during 2014. Securities analysts enthusiastically credited these statements to the Company's turnaround, reporting that Teva's "story is reversing … much faster than previously anticipated" with the Company on the brink of "reestablish[ing] dominance in its core generic business."



8.      By-mid 2015, generic drug pricing was coming under increasing public scrutiny. Yet, as concerns grew about the skyrocketing cost of generic drugs and regulators began launching investigations into the price increases experienced by wholesalers, Teva continued to silence any

suggestion that the Company's performance was driven by price increases or collusive conduct. Teva executives repeatedly highlighted the "***intense competition***" in the generic drug marketplace. Teva's former CEO, Defendant Vigodman, specifically assured investors in October 2015 that "we're very … responsible in everything that portends to prices on the Generics side" and "***all the improvements you see in our – in margins is not driven by price***" but rather "quantities and by mix and by efficiency measures."   Vigodman underlined that was a "***very important message***" for investors to understand in assessing Teva's expanding margins during the prior two years. The former head of Teva's Generics division, Defendant Olafsson, stated unequivocally that: "***There is no inflation in the generic price***." When asked at an investor conference in early 2016, "So what is the secret sauce?" he replied: "It's not very complex… [its] with our business, with the size of our portfolio, with the flexibility of our manufacturing network with the industry-leading position in the market. ***People that say that… there's a big generic price inflation, are simply wrong***."   Defendant Desheh, Teva's CFO, similarly told investors to ignore the "***noise around pricing issues***" because "***[o]ur exposure to all these things is very minimal . . . . Teva was not associated with any of that***."

9.      In truth, Teva's "revolutionary" turnaround was built on a massive fraud. Substantial facts support the now ubiquitous allegations that Teva systematically increased prices across a broad swath of its generics portfolio and colluded with other generic manufacturers to fix the prices and allocate markets for hundreds of generic drugs—in what government prosecutors have described as "the largest cartel in the history of the United States."

10.      <u>First</u>, as set forth in the Class Action, Teva imposed price increases at least 76 times on at least 60 generic drugs during the Relevant Period. The Class Action sets forth detailed analyses confirming that, for at least two dozen drugs, the prices (i) moved in near-perfect unison

6

among a cadre of supposed competitors, (ii) increased suddenly and simultaneously at each drug company, and (iii) increased by exponential amounts, including abrupt and unprecedented spikes following industry conferences and other events attended by Teva and its alleged co-conspirators. Teva's senior officers considered and approved each increase, and then carefully tracked the profits generated on a daily, weekly, and quarterly basis. Over the Relevant Period, the financial impact of the strategy was staggering, totaling over $2.3 billion in profits attributable solely to these price increases. Notably, the inflated profit analysis from the Class Action is likely understated because it is based on fewer price increases than Teva imposed. Combining the Class Action analysis with allegations from the AG's enforcement action, Teva implemented 119 price increases on 104 drugs during the Relevant Period, over one-third of the Company's entire generics portfolio. *See* Appendix A.

11.    <u>Second</u>, there is no non-collusive explanation for the sudden, synchronized increases in Teva's generic drug prices – there was no supply shortage, production problem, or sudden increase in demand for these drugs during the Relevant Period. The price hikes were not precipitated by competitors leaving the market. Moreover, the markets for these drugs are highly susceptible to collusion – they are dominated by only a few companies and this market concentration lends itself to collusion. The market for these drugs featured several other characteristics that facilitated collusion: demand for the drugs was inelastic, with miniscule increases or reductions in the quantities sold even after massive and sudden price hikes; the drugs were commodity-like products – generic drugs in which the only distinguishing factor for purchasers was price; the drugs lacked a viable substitute; the market had high barriers to entry; and information sharing and price discovery were common. Finally, the drug prices did not decrease following the initial price increases as one would expect if the sudden price increases

reflected temporary supply shortages, cost increases or other benign market explanations.

12.    Teva's extraordinary price increases for these generic drugs would also have been against Teva's economic self-interest absent the existence of a price-fixing scheme. Generic drugs are commodity products.  Absent price collusion, if one manufacturer raises the price of a given drug, its competitors will seek to increase their own market share by selling the drug to the first manufacturer's customers at lower prices. Indeed, under the "maximum allowable cost" pricing regime that governs much of the U.S. generic pharmaceutical market, drug cost reimbursements from insurance companies are capped at a certain price, and if a drug manufacturer raises its prices above this cap while its competitors do not, the reimbursements for the higher priced drug will cease.  Thus, it would not be in any drug manufacturer's interest to increase the prices of its generic drugs unless it had an agreement with the other manufacturers that they would do the same.

13.    Third, the suspicious price increases by Teva and other drug manufacturers have spawned a slew of governmental investigations and enforcement actions that have begun to reveal a broad, well-coordinated and long-running series of schemes to fix prices or allocate markets for numerous generic drugs.  They have also revealed that Teva was, in fact, a central participant in the illegal anticompetitive schemes.

14.    In October 2014, Congress initiated an inquiry, calling for testimony from Teva and other competitors to explain the egregious price spikes. Teva, however, refused to appear or to even produce documents.  Shortly thereafter, Congress called on the U.S. Government Accountability Office to conduct an audit of Medicare expenditures on generic drugs, the Connecticut AG issued subpoenas, and the DOJ launched a criminal investigation. Those inquiries ultimately ballooned from narrowly focused probes into specific drugs and manufacturers to an ongoing industry-wide investigation that has already produced guilty pleas from top executives

who have admitted to colluding and conspiring with Teva.

15.     In May 2019, the AGs filed a 524-page complaint that alleged Teva to be at the center of a massive price-fixing scheme involving approximately 112 drugs with 19 manufacturer co-conspirators (the "May 2019 Complaint").  The bombshell filing includes extensive and extraordinary facts substantiating the scheme, which were developed through the AG's nearly five-year investigation that included: (i) thousands of documents produced by dozens of companies and individuals throughout the generic drug industry; (ii) a phone call database consisting of more than 11 million phone call records from hundreds of individuals at the defendant companies and other generic manufacturers; and (iii) information provided by confidential informants.  The scope and severity of the misconduct detailed in the May 2019 Complaint—the largest cartel in the history of the United States," in the words of government prosecutors—went far beyond anything imaginable when the AGs filed their first enforcement action in December 2016.

16.     What's more, Teva now faces criminal charges brought by the federal government. On August 25, 2020, Teva was charged by the DOJ for its participation in three separate conspiracies with three rival drug makers to suppress and eliminate competition by agreeing to fix prices, allocate customers, and rig bids for numerous generic drugs. The DOJ's Second Superseding Indictment details Teva's role in these conspiracies and includes information provided by cooperating witnesses, including a former Teva executive, detailing the existence and nature of the conspiracies from as early as May 2013 until approximately December 2015. According to an August 2021 filing by Teva's co-defendant, Glenmark Pharmaceuticals, the government's criminal prosecution of Teva has expanded, with the DOJ seeking to present at trial "a broad attack on the generics industry writ large." Notably, Teva and Glenmark are the *only* generic drug manufacturers charged by the DOJ that have not already pleaded guilty or otherwise

9

admitted to engaging in generic price-fixing, bid rigging, and collusion.

17.     The truth about Teva's undisclosed Price-Hike Strategy and collusion with other generic drug makers was gradually revealed to investors through a series of disclosures beginning in August 2016 and continuing through May 2019.  These disclosures took a variety of forms, including government subpoenas and enforcement actions, media reports, poor earnings announcements, multi-billion dollar write-downs, credit downgrades, and other disclosures speaking to the deterioration of Teva's business and the materialization of other serious risks to the Company after the conspiracy unraveled.  Upon each disclosure, Teva's share price declined causing Plaintiff to suffer losses.

18.     With each disclosure, Teva also staunchly denied charges of generic price inflation and misled investors about the Company's exposure to the accompanying price erosion.  Yet, as Teva's troubles mounted, top executives were inexplicably fired or "resigned."  Defendant Olafsson was fired on December 5, 2016.  Defendant Vigodman was terminated in February 2017, and Defendant Desheh departed in June 2017.  On August 3, 2017, in the first financial report issued after the departures of Desheh, Vigodman, and Olafsson (the architects of the Price-Hike Strategy), Teva announced disappointing results due to "accelerated price erosion" in its U.S. generics business and wrote down more than $6 billion of goodwill.

19.     Without the Price-Hike Strategy available to drive increased profits, Teva's ability to service its over $30 billion in debt also rattled the markets.  Credit-rating agencies downgraded the Company's debt to just above "junk" and after 30 years of maintaining or increasing its dividend, Teva's largely reconstituted Board of Directors and senior management were forced to slash the Company's dividend by 75%. Teva was a profoundly weaker company than investors were led to believe, and the price of Teva securities continued to plummet.

20.    On February 8, 2018, Teva announced another staggering $10 billion goodwill impairment related to its generics business.  The Company's press release disclosed "further deterioration in the U.S. generics market and economic environment" and "further limitations on our ability to influence generic medicines pricing in the long term," including "pricing challenges due to government regulation."  The prices of Teva securities continued to tumble.

21.    Finally, on May 10, 2019, the AGs filed their 524-page complaint revealing numerous previously undisclosed facts regarding the size, scope, and nature of the conspiracy, including Teva's role as a central actor and "consistent participant."  On this news, Teva's share price fell another 15%, capping a staggering 80% decline from its Relevant Period high.

22.    In total, as the truth about Teva's Price-Hike Strategy and anticompetitive conduct emerged, the price of Teva ADSs declined from an all-time high of $72 per share to less than $11.30 per share, wiping out over $48 billion in shareholder market capitalization.

23.    The revelation of this fraud has caused SWIB significant economic harm. SWIB brings this action under state and federal securities laws to recover the damages from losses it suffered as a result of Defendants' securities fraud.

## II.    <u>JURISDICTION AND VENUE</u>

24.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

25.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, venue is proper pursuant to 28 U.S.C. § 1391.

26.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telecommunications, and the facilities of the New York Stock Exchange ("NYSE").

## III.    PARTIES

### A.    Plaintiff

27.     Plaintiff SWIB is an independent agency of the State of Wisconsin, created in 1951, responsible for investing the assets of the Wisconsin Retirement System, the State Investment Fund, and other trust funds established by the State of Wisconsin.  As of September 30, 2021, SWIB held over $140 billion in assets.  During the Relevant Period, SWIB purchased or acquired Teva ADSs, 2.8% Senior Notes due July 21, 2023 ("2023 Notes"), and 3.15% Senior Notes due October 1, 2026 ("2026 Notes"), including on the NYSE, at prices that were artificially inflated by the materially false and misleading statements and omissions of material fact complained of herein, held such securities through one or more of the corrective disclosure events alleged herein, and suffered damages as a result.

### B.    Defendants

28.     Defendant Teva Pharmaceutical Industries Ltd., the world's largest generic drug manufacturer, is incorporated in Israel with its executive offices at 5 Basel Street, Petach Tikva, 4951033, Israel. During the Relevant Period, Teva's wholly-owned subsidiary Teva Pharmaceuticals USA, Inc. ("Teva USA") had its principal offices at 1090 Horsham Road, North Wales, Pennsylvania, 19454. Teva ADSs trade on the NYSE under the symbol "TEVA."  Teva Notes are also traded in the United States, including on the NYSE.

29.     Teva has two reporting segments to its business, specialty medicines and generic medicines. During the Relevant Period, Teva's generic medicines segment contributed

12

approximately one half of the Company's revenues. Teva's U.S. generics business, in turn, comprised approximately one half of overall generics revenues.

30.    Defendant Erez Vigodman served as Teva's President and CEO from February 11, 2014 to February 6, 2017 and as a Teva Director from June 22, 2009 to February 6, 2017. Vigodman signed and certified certain of Teva's alleged false and misleading reports on Forms 20-F and Forms 6-K filed with the SEC during the Relevant Period, as well as the Notes Registration Statements. Vigodman also made false and misleading statements on numerous conference calls with investors and analysts, specifically alleged herein.  Vigodman possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings during his tenure alleged herein to be false and misleading.

31.    Defendant Eyal Desheh served as Teva's CFO from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, a period during which he served as Teva's Interim CEO and Interim President. Desheh signed and certified certain of Teva's false and misleading reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as well as the Notes Registration Statements filed with the SEC. Desheh also made false and misleading statements on numerous conference calls with investors and analysts, as alleged herein.  Desheh possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings during his tenure alleged herein to be false and misleading.

32.    Defendant Sigurdur Olafsson served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016. Olafsson made false and misleading statements on numerous conference calls with investors and analysts, as alleged herein. Olafsson possessed the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings during this tenure alleged herein to be false and misleading.

33.     Defendant Deborah Griffin ("Griffin") served as Teva's SVP and Chief Accounting Officer (Principal Accounting Officer) from August 2013 to February 2021.  She also served as VP and CFO of Teva USA during the Relevant Period.  While at Teva, Griffin possessed the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings during her tenure alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting.  In addition, Griffin signed the Notes Registration Statements.

34.     Defendant Kåre Schultz ("Schultz") served as the President and Chief Executive Officer of Teva from November 1, 2017 to December 2022. Schultz also served on the Company's Board of Directors from November 1, 2017 to December 2022.  Schulz signed and certified certain of Teva's alleged false and misleading reports on Forms 10-K and Forms 10-Q filed with the SEC during the Relevant Period. Schultz possessed the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings during his tenure alleged herein to be false and misleading.

35.     Defendants Vigodman, Desheh, Olafsson, Griffin, and Schultz are referred to herein collectively as the "Executive Defendants."

## IV.     SUMMARY OF THE FRAUD

### A.     Regulation of the Generic Pharmaceutical Industry

36.     Generic pharmaceutical drugs – drugs that are pharmaceutically equivalent in dosage, form, route of administration, strength or concentration and have the same active ingredients as the reference-listed brand name drug – save consumers and our healthcare system tens of billions of dollars annually because they introduce competition into a market where little previously existed. When a high-priced branded drug comes off patent, generic drugs offer the prospect of lower prices and greater access to healthcare for all consumers in the United States.  In

14

a January 31, 2012 report, the Government Accounting Office ("GAO") noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand name drug."

37.     Generic drugs have long been referred to as one of the few "bargains" in the U.S. healthcare system and, historically, healthcare experts have said that cost savings from the growing number of generic drugs have gone a long way toward keeping the lid on overall increasing healthcare costs. This was the way the generic drug market was intended to work, and has generally worked, since the implementation of the Hatch-Waxman Act in 1984.

38.     The Hatch-Waxman Act, formally titled the Drug Price Competition and Patent Term Restoration Act, was intended to balance two interests: encouraging drug innovation and promoting competition between brand and generic drugs in order to lower drug prices. To encourage innovation, the Hatch-Waxman Act gave branded drug manufacturers longer periods of market exclusivity. To promote competition, the law simplified the regulatory hurdles for bringing generic drugs to market and eliminated the prior requirement that generic drug companies file costly New Drug Applications ("NDA") to obtain U.S. Food and Drug Administration ("FDA") approval. Under the revised process, generic drug companies can instead file an Abbreviated New Drug Application ("ANDA"). A generic drug company that submits an ANDA generally is not required to include clinical trial data to establish the safety and efficacy of the drug. Instead, the generic drug company can rely on the safety and efficacy data supplied by the original NDA holder.

39.     A generic drug must meet certain bioequivalence and pharmaceutical equivalence standards set by the FDA to ensure that the generic drug is essentially an exact substitute for the brand-name drug. To receive FDA approval through an ANDA, a generic drug must contain the same active ingredient, in the same dosage form, in the same strength, to be bioequivalent to the

15

reference listed drug (*i.e.*, the original brand-name version approved by the FDA through an NDA). The FDA uses a review process to ensure that brand-name and generic drugs that are rated "therapeutically equivalent" have the same clinical effect and safety profile. According to the FDA: "Products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."[1]   The FDA assigns generics that are deemed to be therapeutically equivalent to their brand-name counterparts an "AB" rating. Even drugs that are bioequivalent, but that do not share the same dosage form, are not AB-rated.

40.     The Hatch-Waxman Act also provides a 180-day exclusivity period for the first generic drug company that files an ANDA and simultaneously challenges the validity of the patent for a brand-name drug. This exclusivity period, which allows the generic drug company to market its generic version free from competition, is intended to spur generic drug companies to provide alternatives to brand-name drugs. When generic drugs enter the market, they are often priced well below the brand-name drugs and quickly take a large market share from the brand-name drug company. The first generic drug will generally be priced 15% to 20% below the brand-name drug. Once the exclusivity period ends and more generic versions enter the market, the price of the generic drugs continues to fall and their combined share of the market for that drug, relative to the brand-name equivalent, continues to grow. The price of the generic versions of a given drug can fall to as little as 10% to 20% of the original price for the brand-name drug. This competition allows purchasers to buy the generic equivalent of a brand-name drug at substantially lower prices.

---

[1] *See* U.S. Department of Health and Human Services – Food and Drug Administration ("Orange Book"), Approved Drug Products with Therapeutic Equivalence Evaluations vii (37th ed. 2017).

41. The price differential between a brand-name drug and the generic equivalents, and the proportion of the market captured by the brand-name versus the generics, generally follows a predictable pattern. Specifically, the first generic to enter the market is generally priced 15% to 20% lower than the brand-name drug. As more approved generics enter the market, the price of the generics generally declines in both absolute terms and in relation to the brand-name drug for around five years. Eventually, the price of the generic drugs reaches an equilibrium price point, at or close to the manufacturers' marginal production costs, resulting in significant savings for consumers, insurers and employers.

42. Between 2005 and 2014, generic drugs saved the U.S. healthcare system more than $1.6 trillion dollars. Since the Hatch-Waxman Act was passed, generic drugs have moved from being less than 20% of prescriptions filled in the United States to 80% of prescriptions filled. In their complaint, the AGs cite a study that found that in 2011 alone, generic drugs saved $193 billion for consumers.

43. The maximum allowable cost ("MAC") pricing regime also serves to control drug prices. Under this regime, individual states or pharmacy benefits managers ("PBMs") – third party administrators of prescription drug programs – establish the MAC for drug products using a variety of different inputs and formulas. If the cost for a pharmacy to dispense a given drug exceeds the MAC, the pharmacy will either opt to substitute a less expensive version, if available, or sell the drug at a loss to service the patient. The MAC framework incentivizes pharmacies to fill prescriptions with the least expensive, therapeutically equivalent version of a drug to maximize their potential profits.

44. In short, the U.S. regulatory structure for generic drugs, and the entrance of generic drugs into a given market should, in theory, result in patients paying the lowest price for the drug that a competitive market can bear.

**B.   Teva's Generics Business Struggled Before The Relevant Period**

45. Before the Relevant Period, Teva's generics segment struggled. In August 2013, then-CEO Dr. Jeremy Max Levin ("Levin") acknowledged that the U.S. generics business had been "slowing fundamentally" for years. To offset the slowdown in the generics segment, Levin announced a strategy to focus on Teva's other business segment, branded drugs.

46. However, Levin was abruptly fired on October 30, 2013, after just eighteen months as CEO. Levin was succeeded by CFO Defendant Desheh. Stepping into the role of interim-CEO, Desheh was enthusiastic about Teva's prospects, as was Chairman Phillip Frost, who told analysts that his friends were buying "hundreds of millions of dollars" of Teva shares.

47. By the beginning of 2014, Desheh's optimism became more strident as he announced Teva's motivation to make a major acquisition, predicting that within 12 to 24 months Teva's "stock price will go up and we'll be able to use our share as a currency … to fund transactions." As Defendant Vigodman took the helm as new CEO in February 2014, analysts reported that he also supported engaging in a significant acquisition.

**C.   Teva Adopts An Undisclosed Price-Hike Strategy In Early 2013**

48. Unknown to investors, however, by early 2013 Teva had adopted the Price-Hike Strategy—a nonpublic strategy to systematically increase prices across dozens of drugs in its generics drug portfolio. Teva's decisions to increase prices came from the top levels of the Company. According to former Teva employees interviewed in the Class Action, under an established review and approval procedure, any price increases required the approval of the Chief Operating Officer ("COO") of Teva USA, Maureen Cavanaugh ("Cavanaugh"), or an executive

18

above her.  After being approved by Cavanaugh or other Teva senior executives, several price increases would often be grouped together and rolled out on the same day. Generic drug revenues were tracked by Teva executives, including Olafsson, Griffin, Cavanaugh, and Oberman.   This process is meticulously documented in the now-unsealed complaints filed in the AGs May 2019 Complaint, which is being prosecuted by fifty-two U.S. states and territories, as well as the District of Columbia. The AGs' investigation is being led by Connecticut's AG, whose office has conducted an ongoing seven-year investigation that has encompassed the review of thousands of documents, millions of phone records, and interviews of dozens of individuals presently or formerly associated with Teva or other generic drug manufacturers.

49.     The allegations that follow are based on the information provided by the former Teva employees interviewed in the Class Action (verified by Plaintiff's counsel), detailed information provided in the AGs Action (including internal documents produced by Teva and other generic drug manufacturers reproduced, in part, below), or both. Discovery in this matter is expected to provide substantial evidentiary support for these allegations.

50.     A group of Teva employees, led by Kevin Galownia[2] ("Galownia"), had the day-to-day responsibility of analyzing the pricing for Teva's generic drugs (the "Pricing Group").  Teva tracked its drug prices, sales and revenue data in an internal database system provided by Oracle Corporation (the "Oracle Database" or "ERP System").  Members of the Pricing Group, who would have to provide detailed reviews and documentation of price reductions, were instructed via emails or in meetings to implement a price increase with little or no justification.  While the directions often came from Galownia, he did not have the authority to make price-increase

---

[2] Galownia has served as Teva's VP of Pricing Operations since January 2018.  Galownia formerly served as Teva's Senior Director, Marketing from January 2010 to March 2014, and its Senior Director, Marketing Operations from September 2014 to December 2017.

decisions himself; those decisions came from above. Once implemented, Teva notified its customers via a letter, and would circulate a copy to employees whose work would be impacted by the increase. The expected profits from the price increases were then incorporated into the Company-wide Oracle Database, to which then CEO Allan Oberman[3] ("Oberman"), Defendant Olafsson (who joined Teva in July 2014), Cavanaugh, and Griffin each had access. The Oracle Database generated daily or weekly "scorecards" that Oberman (and later Olafsson), Griffin, and Cavanaugh would receive that reported generic drug revenues, which included the inflated profit, and tracked whether Teva was on schedule to meet forecasts.

51.     These internal Teva scorecards tracked profits against financial budgets and a long-term "work plan" which was prepared annually and contained forecasts for the coming three to five years. As to the generics segment, Oberman (and later Olafsson), Cavanaugh, and Griffin were responsible for assembling the work plan, and Oberman and Olafsson were responsible for presenting it to Teva's executive committee in Israel, which included Vigodman and Desheh. During each quarter, a document called a Latest Best Estimate ("LBE") was prepared, with the involvement of Oberman (and later Olafsson), Cavanaugh, and Griffin, detailing whether forecasts were met, or whether there was a "hole" between the forecasted profits and reality. The LBE reports were sent to Teva's executive committee in Israel.

52.     During the Relevant Period, Defendants told investors that Teva's increased profits came from ordinary business strategies, such as cost cutting and new product launches, and repeatedly denied that Teva was engaged in price increases, let alone disclose that those increases were fueling the Company's profits. Defendants concealed the Price-Hike Strategy because it was

---

[3] Oberman served as President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014.

inherently risky, unsustainable, and could subject Teva to government and law enforcement scrutiny, if not prosecution.

53.     The Price-Hike Strategy was unsustainable and risky because the U.S. generic drug market was designed to be highly competitive.  Generic drugs are effectively a commodity, fully interchangeable and identical in every respect, except for price. Wholesale customers solicit pricing though a "blind" bidding process. Thus, even if Teva increased its prices, the profits could be short lived if other manufacturers undercut Teva's price to secure more market share. Moreover, because generic drugs are an essential part of the lives of millions of Americans, large increases in prices would (and did) garner public criticism and Congressional action. Additionally, many of Teva's price increases occurred in unison with competitors. Whether illegal or not, such pricing behavior is indicative of a lack of competition, if not collusion, and could (and did) come under investigation by the authorities.  Had Teva disclosed that its core business strategy was to aggressively increase prices on generic drugs, investors would have valued the Company very differently from one with a core strategy based on fundamental growth and cost cutting, as Defendants Teva, Vigodman, Olafsson, and Desheh falsely proclaimed.

54.     Teva's Price-Hike Strategy was well-suited for concealment. The generics industry is highly opaque. Neither Teva nor any of its peers disclosed to the investing public any information concerning individual drug prices, changes or amounts of revenues per drug, let alone the profits from any particular drug.

55.     To calculate the profits yielded by Teva's undisclosed Price-Hike Strategy, counsel in the Securities Class Action engaged econometric experts. According to the operative Class Action complaint:

- The investigation comprised multiple distinct econometric analyses, including regression analyses that ultimately took into account thousands of data points.

- The analysis screened Teva's entire generic drug portfolio during the relevant period to identify Wholesale Acquisition Cost ("WAC") increases of at least 50%. The data was accessed via private, subscription-only databases costing tens of thousands of dollars annually. Next, any price increases plausibly connected to supply shortages or other economic anomalies were removed from the set.

- To isolate inflated profit for each drug, the analysis first determined the drug's price per unit had Teva not made the increase. To do so, the drug's specific pricing history was analyzed using a regression analysis that determined the price through the Relevant Period had prevailing drug-specific pricing trends continued. The analysis further took into account CPI inflation for prescription drugs and empirical measures of the trend in average pricing for prescription drugs over the five-year period preceding the analysis.

- Calculating inflated profit, i.e., the difference between Teva's actual revenues (with the price increase) and the revenues that would have been earned at each drug's price without the increase, involved accounting on a month-by-month basis for (i) Teva's sales quantities; and (ii) the discounts and rebates, unique to each drug, that Teva would provide to customers, which varied over time.

- Sales volumes were derived by reference to figures reported in a subscription database. Through another regression analysis, it was confirmed that the price and volume for each drug exhibited no statistically meaningful relationship, meaning that as pricing changed, volume of sales did not change.

- Teva's discounts and rebates were unavailable. Thus, the level of discounts and rebates was determined by analyzing, on a month-by-month basis over the relevant period, multiple data points from a number of subscription and other industry datasets that reflected average pricing and sales volume data. This analysis was unique for each drug and captured fluctuations over time.

56. In April 2013, Teva hired Nisha Patel ("Patel") as its Director of Strategic Customer Marketing. Patel was part of Teva's Pricing Group, which implemented the Price-Hiking Strategy at the direction of senior management.

57.     On July 3, 2013, Teva began to implement the Price-Hike Strategy by raising the prices of twenty-one different drugs.

| | Price Increase -- Agenda |
|---|---|
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler; ███████████████████████████ |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

1) Price increase effective Wednesday, 7/3/2013

2) List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

**Source:  AG's May 2019 Complaint, ¶625[4]**

58.     On July 16, 2013, after receiving approval from COO Cavanaugh, Patel scheduled a "Price Increase Discussion" with members of Teva's sales and pricing teams to discuss an increase in the price of Enalapril Maleate:

---

[4] The non-public version of the May 2019 Complaint was originally filed under seal and many of the graphics references in this complaint (including the graphic above) were completely redacted in the original public filing. The non-public version of the complaint was unsealed on June 21, 2019. *See Connecticut et al v. Teva Pharmaceuticals USA, Inc.*, No. 2:19-cv-02407 (E.D. Pa.), ECF Nos. 3, 48.



**Source: AG's May 2019 Complaint ¶659**

59.    On August 9, 2013, Teva commenced "Round 2" of the Price-Hiking strategy,

raising prices on twelve different drugs. Two days prior, Patel sent an email to Galownia

attaching a spreadsheet summarizing the August 9 increases, which Patel had prepared for COO

Cavanaugh:

24

## Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase |
|---|---|
| AMILORIDE HCL/HCTZ TABLETS | 53% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% |
| CLEMASTINE FUMARATE TABLETS | 76% |
| DICLOFENAC TABLETS | 302% |
| DILTIAZEM HCL TABLETS | 90% |
| DOXAZOSIN MESYLATE TABLETS | 1031% |
| ETODOLAC ER TABLETS | 198% |
| ETODOLAC TABLETS | 414% |
| KETOPROFEN CAPSULES | 146% |
| KETOROLAC TABLETS | 268% |
| PRAVASTATIN TABLETS | 653% |
| TOLMETIN SODIUM CAPSULES | 80% |

Source: AG's May 2019 Complaint, ¶667

60.     These price increases had a significant impact on Teva's financial results. In an estimate prepared by Patel for her bosses titled, "Total Net Upside after Credits," Patel presented the impact of the July 3, 2013 price increases, plus an August 9, 2013 price increase on pravastatin, on Teva's quarterly revenue, concluding that such price increases added nearly $1 billion per quarter to Teva's bottom line:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

Source: AG's May 2019 Complaint, ¶721

61.     Many of the price increases in July and August were implemented together with Teva's competitors, who also made price increases on these drugs. Some increases represented an increase of over **ten times** the original price.

62.     According to an analysis conducted by an economic expert engaged by the Class Action plaintiffs, in just the last two quarters of 2013, Teva's Price-Hike Strategy produced as much as $250 million in inflated profit. Notably, this amount is likely significantly **understated**

25

given that the Class Action alleges only eighteen price increases during this period, and not thirty-four, as uncovered by the AGs' investigation.

63.     The profit generated by Teva's price increases went directly to the Company's bottom line as generics required no additional research and development ("R&D") or sales and marketing ("S&M") expenses. According to the Class Action, these 2013 price-hiked drugs would contribute as much as $875 million in inflated profit to Teva's bottom line by the end of the Relevant Period—a figure that Teva, itself, calculated as much higher. According to internal Teva documents uncovered by the AGs, price increases for just 23 drugs were designed to add almost *one billion dollars* of "net upside after credits" for *each quarter* they were in effect.

64.     Teva executives closely tracked this inflated profit via the scorecards, LBE reports, and work plan.  This reporting structure ensured that Teva's senior management team was regularly kept apprised of the significant price increases in the Company's generics portfolio and the large profits generated thereby.  Indeed, all of these price increases had to be approved by COO Cavanaugh.

### D.     Teva Expands The Price-Hike Strategy In 2014

65.     By early 2014, the increases in U.S. generic drug prices was a topic of public concern.  For example, on January 8, 2014, the National Community Pharmacists Association requested that Congress launch an investigation into rising generic prices, writing that "[o]ver the last six months … many of our members across the U.S. [] have seen huge upswings in generic drug prices."  As news of large price increases on certain generic drugs trickled out to the public, Defendants Teva, Vigodman, Desheh, and Olafsson made increasingly misleading statements to cover their tracks, including by falsely attributing Teva's rising generics profits to other, legitimate, sources.

66.    For example, at the start of the Relevant Period, February 6, 2014, Teva issued a press release announcing its Q4 and full year 2013 financial results. Those results included a 14% increase in U.S. generics revenue for the fourth quarter, which Teva attributed to "higher sales" volume, reduced expenses, and "exclusive launches" of new generic drugs. The release omitted to mention this newfound year-over-year ("YOY") improvement was largely driven by price increases.  This pattern would repeat throughout the Relevant Period.

67.    During the accompanying February 6, 2014 earnings call, Desheh announced that Teva would increase its quarterly dividend by 5%, noting that the "U.S. generic business is highly profitable" and Teva had an "excellent second half [of 2013] in the United States [generics] business." Oberman, CEO of U.S. generics followed and explained that "at the gross profit levels that [Desheh] was talking about, [the U.S. generics business] is a very valuable business to Teva, and we see it continuing to be on a go-forward basis."  These statements stood in stark contrast to Levin's assessment just months earlier that the generics business was "slowing fundamentally."

68.    The improved financial results were well received by investors and analysts. On February 6, 2014, a BMO Capital Markets analyst wrote that generic sales "came in above … our expectations and consensus"; "we think 4Q results are a high-quality beat with revenue and EPS coupled with an improvement in margins year over year…. Teva shares should be bolstered by today's positive earnings announcement."

69.    What investors and analysts did not, and could not, know was that Desheh, Oberman, and the Company's SEC filings had concealed the Price-Hike Strategy, and that, in the fourth quarter of 2013, the thirty-four price increases made pursuant to the strategy generated the entirety of Teva's YOY gain in U.S. generics revenue.

70.     The positive and promising performance of Teva's U.S. generics business triggered a long and steep increase in Teva's ADS price during 2014 and 2015.  Indeed, by early March 2014, the price of Teva's ADSs had risen from the $30s to above $48. The increased price of the ADSs was critical to achieving Defendant Desheh's expressed intention to use the ADSs as "currency" to make a major acquisition.  On a March 4, 2014 investor conference call, Desheh explained that while the Company could not previously use its ADSs as "currency" to fund an acquisition when the share price traded below $40, with the "change[s] over the past few months" Teva had extracted "itself [from] … a corner" bringing it closer to a large acquisition.  By the beginning of April 2014, Teva's ADS price had surpassed $54, a dramatic increase of nearly 20% since the start of the Relevant Period.  As a National Alliance Securities analyst reported, Teva's ADSs had "the Best YTD" 2014 performance relative to its peers, a stark contrast to how Teva had "dramatically underperformed in 2013."

71.     The inflated profits generated by Teva's undisclosed Price-Hike Strategy continued to drive the Company's reported financial results throughout 2014.  On May 1, 2014, Teva announced surprisingly positive results driven by its generics segment, including a $117 million YOY increase from Q1 2013 profits.  Defendants Teva and Desheh falsely attributed the Company's generics profit growth to changed composition of revenues and "new product launches," omitting that the Price-Hike Strategy had generated at least $120 million that quarter.

72.     The 2014 work plan, which was being reviewed by the executive committee in August 2013, would have included the expected profits from the July and August 2013 price increases. Cavanaugh, Griffin, and Oberman were each provided on a daily or weekly basis scorecards that tracked whether Teva's actual results met or exceeded the work plan forecasts. Vigodman and Desheh also were provided documents reflecting the impact of the inflated profits

28

as they compared actual revenues versus the work plan through the LBE reports disseminated throughout the quarter.

73.    Analysts reacted positively to Teva's surprising and rapid turn-around. Cowen and Company analysts wrote, "The bottom line is that this story is reversing (for the positive) much faster than previously anticipated, and the belief that 'growth' could reemerge is very real." J.P. Morgan predicted an "upside to near/longer term EPS" because of Teva "taking several steps to regain its generic leadership including … focusing more heavily on portfolio selection and management."

74.    Patel memorialized, in January 2014, Teva's strategy for continuing to increase generic drug prices during 2014. This strategy was known, understood, and authorized by individuals at Teva at much higher levels than Patel, including by COO Cavanaugh.  In a document titled, "2014 Pricing Strategy Brainstorm," Patel outlined Teva's plan for implementing more price increases:

> **2014 Pricing Strategy Brainstorm**
>
> - Lead more increases
> - Candidate Identification:
>   - Exclusive items
>   - Number of competitors; Target 2-4 total players, where quality of competitor is high
>   - Teva has majority share and quality of competitors is high - lead
>   - Competitors with long term supply issues
>   - Competitors exiting market
>   - Low or limited financial exposure
>   - Adjust  pricing in accordance with volume (secondary, dual, etc)
> - Follow market pricing promptly
>   - Delayed reactions erode pricing
>   - Teva is the market leader. Ability to react to market changes should be reflective of reputation.

**Source: AG's May 2019 Complaint, ¶740**

75.    In accordance with this strategy, in April 2014 Teva increased the prices of more than twenty generic drugs. All such increases coincided with price increases carried out by Teva's competitors. Following the established process for implementing price increases, Cavanaugh and

29

Griffin would have approved these price increases, and would have tracked the inflated profits generated through the scorecards. According to an analysis conducted by the Class Action counsel, by the end of the second quarter, these new price hikes alone would generate as much as $50 million in inflated profit, and as much as $395 million by the end of the Relevant Period.  Again, however, these figures are likely understated, as the Class Action alleges increases on only twelve drugs, when in fact Teva increased the price on twenty-three drugs on April 4, 2014.  The price hikes on those drugs, listed below (together with columns indicating whether Teva "led" the price increase or "followed" a co-conspirator's price hike), ranged from *two to more than five times*.[5]

| Product Description | Lead/Follow | Competitors |
| --- | --- | --- |
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

**Source: AG's May 2019 Complaint, ¶748**

---

[5] In addition to the drugs listed in the table above, Teva increased the price of Anagrelide HCL Capsules on April 4, 2014, as set forth in the Class Action analysis.

76.     An internal Teva analysis conducted a few weeks after Teva's April 4, 2014 price increases showed that the price increases would result in an annual net increase in sales for Teva of over $214 million.

77.     On July 1, 2014, Teva hired Olafsson as President and CEO of the Company's Global Generic Medicines Group.  Before joining Teva, Olafsson served in various roles at Actavis from 2003 to 2014, including as its President from 2010 to 2014. By Summer 2014, the rising cost of generic drugs was increasingly becoming a matter of public attention. On July 8, 2014, The *New York Times* published an article titled, "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise," highlighting that the price of digoxin, a decades-old drug (not made by Teva) had nearly doubled since late 2013. Within days, Connecticut's AG William Tong ("Tong") launched a non-public investigation into the companies that manufactured digoxin, including subpoenas issued to Teva competitors Impax and Lannett on July 14 and 15, 2014, respectively.

78.     Shortly thereafter, on July 31, 2014, Teva announced its Q2 2014 financial results, including YOY profit increases in its generic segment of $156 million that the Company continued to attribute to legitimate business strategies. Jefferies analysts observed: "we continue to see signs of recovery for Teva's US generic business, which posted a strong 10% Y/Y gain," "Solid Q2." Piper Jaffray increased its price target for Teva from $48 to $55 because of "meaningful growth drivers for … [the] generics businesses," and the "[s]teady performance for U.S. generics."

79.     In truth, the Price-Hike Strategy had generated as much as $160 million in inflated profit, accounting for *all* of the YOY increase in profit reported for Teva's global generics division.

80.     Teva continued to report increasingly positive results driven by its U.S. generics business, even amid continued scrutiny of certain price increases in the industry. The AGs served Par Pharmaceuticals with a subpoena on August 6, 2014.  On October 2, 2014, Congress sent

letters to Teva and 16 of its peers. The letter, addressed personally to Vigodman, sought information on "the underlying causes of recent increases in the price of [Teva's] drugs." Vigodman never responded, as any truthful answer would have required him to reveal the Price-Hike Strategy.

81.    Griffin and Cavanaugh implemented another thirty price increases on July 1 and August 28, 2014 pursuant to the Price-Hike Strategy, at least twenty-three of which Teva coordinated with peer manufacturers. The increases would have been recorded in the Oracle Database and reflected in the daily scorecards and LBE reports.  These thirty price increases would generate at least $50 million in inflated profit.

82.    The July 1, 2014 price increase related to various formulations of Fluocinonide. Teva's price increases largely followed the June 3, 2014 price increase on this drug by Taro, Teva's purported "competitor.".  The subject formulations of Fluocinonide are listed below.

| Formulation | Percentage Increase to WAC |
|---|---|
| Fluocinonide 0.05% Cream | 206 – 754% |
| Fluocinonide 0.05% Gel | 155 – 255% |
| Fluocinonide 0.05% Ointment | 206 – 483% |
| Fluocinonide Emollient-Based 0.05% Cream | 160 – 430% |

**Source: AG's May 2019 Complaint, ¶832**

83.    The prices increases that Teva implemented on August 28, 2014, covered a broader scope of drugs and required greater collusion with Teva's purported "competitors."  These other drug companies and several representatives of Teva – including Cavanaugh and Patel – attended a conference in Boston between August 23-26, 2014. Just days later, on August 28, Teva raised the WAC (*i.e.*, the price) on several drugs as follows:[6]

---

[6] In addition to the price hikes listed in the table above, Teva raised the price of seven other drugs on August 28, 2014, including Meperidine HCL Tablets, Nefazodone Tablets, Mexiletine Capsules, Cromolyn Sodium Inhalant, Fosinopril Tablets, Megestrol Acetate Tablets, and Tolmetin Sodium Capsules, as set forth in the Class Action analysis.

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (34%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (59%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (52%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (54%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (43%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (52%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33%); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 32% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Dava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (57%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

**Source: AG's May 2019 Complaint, ¶846**

84.     As with the prior price hikes, the projected inflated profits from the July and August 2014 price hikes would have been input into the Oracle Database and reflected in the daily scorecards and LBE reports. The price hikes implemented through August 2014 generated at least $193 million in inflated profits in Q3 2014.

85.     On October 30, 2014, Teva released favorable Q3 2014 results, driven by a YOY increase in generic segments profits of $160 million, or 40%, which the Company falsely attributed to a reduction in expenses. Analysts again reacted positively to Teva's financial results, and Teva's ADS price continued to rise. A Cowen analyst noted, Teva's "Operations Are Improving, Cash Flows Are Accelerating." Piper Jaffray remarked, "Importantly, operating profit … for the generics segment during the quarter was up 40% versus the same period a year ago." Morgan Stanley increased its price target for Teva from $57 to $61, stating, "We are encouraged by progress that Teva is making on global generics under Siggi Olafsson." Fueled by Teva's surging

33

generics profits, by early November 2014, the price of Teva's ADS reached over $58 per share, a nearly 50% increase from their price of $40 per share at the start of the year.

86.     On February 5, 2015, Teva filed Q4 and full year 2014 financial results with the SEC, again stating positive results driven by the generics segment.  The positive results for the generic segment included a YOY profit increase of $47 million, or 9%, and a full year profit increase of $480 million as compared to 2013, that Teva again attributed to cost savings and other legitimate business factors.  In reality, in Q4 2014 alone, Teva made as much as $219 million in inflated profit.  Teva made inflated profit of nearly $700 million for the full year 2014, or 144% of the reported YOY increase in generic profit for the whole Company.  All these results would have been reflected internally in the work plan, the scorecards, and the LBE reports distributed to Defendants Vigodman, Desheh, Olafsson, and Griffin.

87.     The table below provides Teva's inflated profit for 2014, as calculated by the Class Action, which does not take into account all of Teva's price increases set forth in the AGs Action:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Inflated Profit | $120 | $160 | $193 | $219 | $693 |

### E.     Teva's ADS Price Soars Providing The "Currency" Needed To Pursue The "Transformational" Actavis Acquisition

88.     Teva implemented another sixteen price increases in January 2015, at least nine of which were coordinated with other manufacturers. Each was subject to the same rigorous internal review and approval process that included Defendants Vigodman, Desheh, Olafsson, Oberman, Griffin, and Cavanaugh.  The inflated profits were captured in the daily and weekly scorecards and intra-quarter LBE reports that Griffin, Cavanaugh, and Olafsson circulated to Vigodman and Desheh to track whether forecasts were being met.  By the end of the first quarter of 2015, the

sixteen price increases undertaken in that quarter would generate at least $48 million in inflated profit; the Price-Hike Strategy overall would generate at least $228 million in the quarter.

89.    Twelve of the price increases in January 2015 were reflected in Teva's price increase spreadsheet, which was then maintained by Galownia. The spreadsheet identified the drugs listed below, and others, along with the price increase and the reasons for the increase:

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 193% Increase | Follow Competitor -DRL & Actavis | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead -Semi-Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead -Semi-Exclusive | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor- DRL | Dr. Reddy's (34%); Accord (17%); INT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor- Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead -Limited Competition | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 90% Increase | Lead -Semi-Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead -Semi-Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead- Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor - Actavis | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

Source: AG's May 2019 Complaint, ¶889

90.    The four additional drugs on which Teva increased the price in January 2015, identified by the Class Action plaintiffs, were Penicillin v Potassium Oral Solution (91% WAC increase), Danazol Capsules (90% WAC increase), Methyldopa Tablets (90% WAC increase), and Carbidopa/Levodopa Tablets (50% WAC increase).

91.    The inflated profits helped boost the price of Teva ADSs to nearly $60, placing Defendants Teva, Vigodman, Desheh, and Olafsson in the position to capitalize on their plan to use the ADS as "currency" for a "transformational" M&A transaction.  J.P. Morgan noted on February 5, 2015: "We believe that Teva is looking at assets of all sizes, and will not rule out transformational M&A if the opportunity presents itself." On March 10, 2015 Susquehanna similarly commented that "TEVA is increasingly focusing attention on its financial capacity and appetite for M&A."  On April 16, 2015, Leerink wrote that Teva had an "urgency to diversify via M&A."

92.     Though not disclosed at the time, by late 2014, Teva had actually approached Allergan about a potential deal (Actavis was Allergan's generics business). Vigodman would later admit, on July 27, 2015, that Actavis "was basically the highest priority" for an acquisition. Indeed, according to the Class Action allegations, Olafsson told employees assembled at an August 2014 meeting soon after arriving at Teva (from Actavis), that he had never joined a company that did not eventually acquire his previous employer.[7]

93.     With Allergan rejecting Teva's advances, the Company planned a hostile offer for Mylan, Teva's longtime rival. On April 21, 2015, Teva filed a Form 6-K with the SEC, announcing Teva's unsolicited offer to acquire all of Mylan's outstanding shares. Mylan's board rejected the offer.

94.     On April 30, 2015, Teva again announced favorable financial results that were driven by the generic segment, including YOY profit increase of $296 million, or 59%, that the Company misleadingly attributed to a reduction in expenses, a new product launch, and higher profitability in Europe.  Analysts continued to react favorably and credit  Teva's statements.  J.P. Morgan noted, "Teva continues to make progress on generics profitability … we remain encouraged by the recovery in Teva's generic business." Cowen commented that Teva's "outperformance was a result of better than expected U.S. generic sales."  Teva ADSs closed at $60.42 that day, an increase of 5% from their price at the start of 2015.

95.     In the weeks that followed, Defendants Vigodman, Olafsson, and Desheh continued to extoll the turnaround in Teva's generics business.  For example, on May 13, 2015, at a Bank of America Conference, Desheh declared that Teva's improved generic business was "***nothing short of a revolution***," explaining that "[i]n 2013 our gross margin of generic business was 41.3%. And

---

[7] Olafsson's statement was recounted by Teva's former Senior Product Operations Manager.

it's 46% in Q1 2015. Our operating margin was 16.7%. It is 27%, this is a full 10 percentage points," i.e., a *$1 billion improvement*. During a June 10, 2015 Goldman Sachs Global Healthcare Conference, Vigodman declared that: "we started 2014 with a clear message, clear focus, getting the house in order first, solidifying the foundation of Teva. You see the *profound change* in the generic business. These are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014." Vigodman falsely attributed *all* of this success to legitimate business practices, including "cost reduction" and "[f]ull transformation of our operational network."

96.     As Olafsson had foretold months earlier, on July 27, 2015, with Teva's ADS price reaching an all-time high of $72, Teva announced the transformational acquisition it had been seeking—the Company had entered into a definitive agreement to acquire Allergan's worldwide generics business, Actavis, for $40.5 billion in cash and stock, the largest acquisition in Teva's 100-year operating history.

## F.     The Price-Hike Strategy Nears Its End In Late 2015

97.     Teva needed to raise over $30 billion to pay for the Actavis acquisition. Teva did not have the cash, and the price tag amounted to roughly twenty years of Teva's historical earnings. To consummate the deal, Teva would pay Allergan $7 billion in ADS and raise cash from a $7 billion secondary public offering of ADS and an initial public offering of Preferred Shares in early December 2015, and $15 billion from a bond offering set for 2017.

98.     On July 30, 2015, following the announcement of the Actavis deal, Teva issued highly favorable Q2 2015 results. The Price-Hike Strategy contributed at least $236 million in inflated profit in the quarter. Without these inflated profits, generic profit would have fallen. Teva, and Defendant Desheh specifically, falsely attributed the inflated generic profits primarily to reduced expenses and new product launches.

37

99.    The AGs noted that the "significant results" Teva announced on July 30, 2015 "were obtained largely as a result of the anticompetitive conduct" detailed in their complaint. By this time, Teva had conspired with competitors to raise prices on at least 85 drugs between July 2013 and January 2015, and the "impact of these price increases on Teva's profitability was dramatic."

100.    In July 2015, Teva implemented another seven price increases, four of which were executed in unison with other manufacturers' price increases, following Cavanaugh's and Griffin's review and approval and as would be reflected in the scorecards, LBEs, and work plan circulated to Defendants Vigodman and Desheh. As set forth in the Class Action complaint, these increases were as follows:

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| **July 29, 2015** | |
| Fluoxetine HCL Oral Solution | 275% |
| Dipyridamole Tablets | 98% |
| Trazodone Tablets | 77% |
| Loperamide HCL Capsules (2nd of 2) | 68% |
| Clotrimazole Topical Solution (2nd of 2) | 65% |
| Cimetidine Tablets (3rd of 3) | 54% |
| Estazolam Tablets (2nd of 2) | 50% |

101.    By the end of Q3 2015, these seven price increases, along with the earlier price hikes, would yield as much as $218 million in inflated profits. Given the timing of the increases, the expected profits would have been incorporated into the 2016 work plan that Olafsson, Cavanaugh, and Griffin would have been finalizing for presentation to Vigodman and Desheh later in the summer, per the routine schedule.

38

102.    On October 29, 2015, Teva reported its Q3 2015 financial results, including $20 million YOY increase in generics profits.  Teva, again, falsely attributed the increase primarily to lower expenses. In reality, the Price-Hike Strategy contributed as much as $218 million, nearly *eleven times* the reported improvement in profit. On the earnings call, Vigodman hailed the "huge opportunities in the United States" for generics. Olafsson underlined that generic drugs "continued to drive growth" during the quarter, adding that "[w]e really have been improving the profitability over time" including increased margins of "16.8% in 2013, 22.1% in 2014, and year-to-date … 28.9%."

103.    Analysts continued to credit Defendant Teva's, Olafsson's, and Vigodman's statements. Piper Jaffray reported that while "top-line growth for the generics segment has been anemic, margins have continued to expand." Jefferies similarly commented that "Generic Drug Margins Continue to Improve," noting that "on the live Q3 presentation, management highlighted the significant improvement in profitability from its core generics business."

104.    By the Fall 2015, public attention toward perceived abuses in drug pricing had taken hold.  Legislation was introduced in Congress that would penalize generic manufacturers for increasing prices at rates exceeding inflation, and the AGs and DOJ continued their investigations, including a DOJ subpoena issued to Allergan concerning generic pricing on June 25, 2015.

105.    Given this landscape, during the 3Q 2015 earnings call, analysts directly questioned Defendants Vigodman and Olafsson whether Teva was exposed to the potential legislation. Vigodman and Olafsson responded to these specific questions with equally specific denials.  On the October 29, 2015 call, following a series of questions on the sustainability of the generics division's success, Vigodman reaffirmed the lie that Teva generics profits were attributable solely

39

to sustainable, ordinary business practices, and not price increases—underscoring that this was "very important" for investors to understand:

> We're very … responsible in ***everything that portends to prices on the Generics side…. And I would even put it another way, all the improvement you see in our – in margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message.***

Moreover, when a Barclays analyst asked for management's thoughts on the proposed legislation's "potential limit to generic drug price increases," Olafsson denied that Teva was exposed:

> In terms of the proposed legislation on pricing control on generics, … we have told you that overall on our whole portfolio, we have a decline in price. ***The talk about the inflation in generics when you have a big portfolio is really not there.***

The only price increases Olafsson acknowledged were those "due to some abnormalities in the market," like supply shortages.

106.    Analysts continued to credit Defendants Vigodman and Olafsson's false denials. That same day UBS reported that "[management] highlighted that the [generic business] improvement was not driven by price, but by volume, mix, and efficiency."

107.    Defendants Vigodman's and Olafsson's fraudulent denials concealed the Price-Hike Strategy and that Teva had already made 114 price increases—none of which were caused by benign "market abnormalities" like ordinary supply shortages. Moreover, a huge portion, if not all, of the margin improvement Vigodman touted was driven by as much as $1.6 billion in inflated profit reported since the start of the Relevant Period, including, over $690 million in 2014, and over $680 million in the first three quarters of 2015.

108.    Teva's, Vigodman's, Desheh's, and Olafsson's misstatements, which were necessary to maintain the ADS price and raise funds for the Actavis deal, concealed an ever-

40

increasing risk. The growing public scrutiny into the generics industry had begun to undermine Teva's ability to carry out and maintain the Price-Hike Strategy. In 2014, Teva made 57 increases. In contrast, in 2015, Teva made a total of only 23 price hikes; 16 in January, and 7 in July. By the end of 2015, inflated profit – *i.e.*, profits on generic drugs attributable solely to the undisclosed Price-Hike Strategy – had diminished quarter over quarter for the first time since the start of 2014.

109.    With the $7 billion ADS and Preferred Shares offering just weeks away, Teva executives attended a November 19, 2015 Jefferies conference. When pressed by the moderator about "everyone's favorite topic the last 2 months … pricing, is it an issue? …. Where do you go on pricing?," Desheh acknowledged the growing public concern over pricing and legislative actions, but claimed that "***Teva was not associated with any of that***," and specifically, with respect to legislative initiatives to cap price increases, Teva's exposure "***is as a small as anybody can have***." In reality, the opposite was true.

110.    On November 30, 2015, Teva filed a Registration Statement with the SEC for Teva's ADS and Preferred Share offerings. On December 3, Teva filed two prospectus supplements and issued the subject ADS and Preferred Shares. The offering documents included numerous false and materially misleading statements attributing Teva's profits to legitimate sources and omitted any mention of the Price-Hike Strategy. Through these securities offerings, Teva raised approximately $7.2 billion in capital.

111.    Although the Price-Hike Strategy would soon draw to a close, Teva's continued rising generics profits in 2015 propelled the prices of the Company's securities to higher-and-higher levels. Teva's ADS would close 2015 at a price of $65.64 per share, a nearly 15% increase from the $57.51 per share price at the start of the year.

41

**G.      Teva Is Forced To End The Price-Hike Strategy In Early 2016, But Denies It Is Facing Any Pricing Pressure**

112.     As 2015 came to a close, the effects of industry-wide pressure on generics pricing spurred by public, regulatory, and law enforcement scrutiny came to the fore as a number of industry participants reported downward pricing pressure.  On January 11, 2016, one of Teva's major wholesaler customers, McKesson, announced that it "now expect[ed] that operating profit from generic pharmaceutical pricing trends will be significantly weaker" through the second half of its fiscal year, ending on March 31, 2016.

113.     That same day, J.P. Morgan held a healthcare conference.  Given McKesson's announcement, a J.P. Morgan analyst asked Olafsson to comment "on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?"  Olafsson responded by fraudulently asserting that Teva was not involved in "big price increases":

> There's *a lot of headlines of examples of big price increases in generics*. But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – *there is a decline*.

Later in the conference, Olafsson fraudulently claimed that, because Teva had not taken "big price increases," its generics portfolio was not exposed to price deflation:

> The generic pricing – we need to keep in mind *there's a lot of talk about inflations in generic pricing*.  But what we see is there's – overall on our total portfolio of 270 products, *there is a slight decrease in pricing*. … [O]n 95% of our portfolio, we experience price decline.  And then on 5%, we might be *flat or a slight increase*….

114.     These statements were completely false.  Teva had raised prices on at least 104 drugs, or 37% of the 270-drug portfolio Olafsson cited, generating by that point as much as $1.7 billion in inflated profits.  Further, the drugs driving Teva's profits were massively inflated, making Teva acutely vulnerable to the pricing pressure that other industry players reported.

42

Olafsson was well aware of these facts, since the price increases would have been reflected on the daily scorecards and intra-quarter LBE reports the Executive Defendants received.

115.   On February 11, 2016, Teva reported its Q4 and full year 2015 financial results, including a $500 million YOY increase in generic profits.  The reported financials concealed over $848 million in inflated profit for the year, attributing the increased profits to purported lower expenses and new product launches.

116.   On the earnings call that day, Olafsson again touted a "$1 billion improvement in operating profit over 24 months period," pointing to generics profits increasing from "$1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue." Olafsson, again, attributed the increase to legitimate sources and flatly rejected that the profits were the result of price hikes: "So how did we do this?  *Not by pricing* but by portfolio mix, new products, and efficiency measures."  Olafsson denied even the mere existence of price inflation, let alone having engaged in 114 price hikes: "on pricing . . . we and the generic industry overall *don't see price inflation of generics as it sometimes is portrayed in the media*."

117.   In truth, the surreptitious Price-Hike Strategy had generated as much as $1.5 billion in increased profits over the 24-month period cited by Olafsson.

118.   Given the growing public scrutiny into generics pricing, additional price hikes had become more difficult, if not impossible, for Teva to implement.  As a result, Teva reported a meager 1% YOY increase in generic profits during Q4 2015.  Analysts, in turn, grew more concerned as more firms reported pricing pressure during the quarter. Guggenheim asked Olafsson, "some of your competitors have talked about pricing pressure in the generics business during the quarter. Curious if you saw that, and if so what might be driving that." Olafsson fraudulently responded:

[L]et me start on the pricing. ***As I mentioned in the beginning, we didn't see anything change in fourth quarter.*** We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.

119.    Guggenheim credited Olafsson's representation and expressed relief, reporting that "[u]nlike its generic competitors, ***TEVA did not experience any increase in pricing pressure this quarter, which highlights the strength of the company's platform***." Jefferies also credited Olafsson's false distinction between Teva and other companies reporting pricing pressure: "Mgt noted that smaller generics players may have realized outsized gains from price increases on individual drugs – and are thus now exposed to faster price erosion – and stressed that its portfolio breadth and optimized supply chain/cost structure allow the co to maintain solid profitability."

120.    Defendants Teva and Olafsson's misrepresentations thus concealed from investors the true reason for the flattening of the generics division's profit growth: the Price-Hike Strategy had begun to falter.  The 104 drugs on which Teva had increased prices were facing renewed pricing pressure. As such, the quarterly change in inflated profit had begun to decrease.  This trend would continue throughout the Relevant Period.

121.    The following table reflects Teva's overall inflated profit for 2015, according to an analysis by the Class Action:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Inflated Profit | $228 | $236 | $218 | $166 | $848 |

122.    As investors became increasingly concerned about the pricing environment, Defendants continued to deny any vulnerability to pricing pressure. At a March 8, 2016 conference, a Cowen analyst asked Olafsson to "discuss what you're seeing" on "generic pricing." Olafsson replied that Teva "***never saw***" price increases and that "inflation ***never really happened*** in the generics business."  He added, "overall the pricing hasn't changed that much," was "***stable***,"

44

and there had been no "big changes in the pricing environment" since 2015. In reality, Teva's inflated profit had fallen 24% in Q4 2015, from $218 million to $166 million, compared to the prior quarter.

123. As the public and regulatory scrutiny intensified, and pricing pressure increased, the Price-Hike Strategy fizzled. Teva could not make significant additional price hikes, implementing only five during all of 2016. All five increases were made on April 6, 2016, and all were on generic drugs that Teva had hiked before and in markets where Teva had generic drug monopoly power.

124. According to the Class Action, those price increases were as follows:

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| April 6, 2016 | |
| Anagrelide HCL Capsules (2nd of 2) | 27% |
| Penicillin v Potass. Oral Sol. (2nd of 2) | 26% |
| Nefazodone Tablets (2nd of 2) | 25% |
| Tolmetin Sodium Capsules (3rd of 3) | 25% |
| Cromolyn Sodium Inhalant (2nd of 2) | 24% |

125. The declining generics profits pressured Teva's ability to finance the Actavis acquisition. To close the deal, Teva needed to raise $20 billion in additional cash through a bond offering. On May 9, 2016, on the Q1 2016 earnings call, Defendants Desheh and Olafsson announced that Teva planned to move up the bond offering to September 2016.

126. That day, Teva also announced its Q1 2016 financial results, including a $215 million YOY decline in generics profits. Defendant Olafsson misleadingly attributed the decline to higher expenses, lower sales, lower European profit, and fewer product launches. As pricing pressure reduced the impact of the Price-Hike Strategy, Teva generated $104 million less in

inflated profits attributable to the Price-Hike Strategy during Q1 2016 compared to Q1 2015. The decrease in inflated profits accounted for half of the generics division's reported profit decline.

127.    Even as additional generic drug makers truthfully reported poor results due to pricing pressure, Defendant Olafsson continued to staunchly deny that pricing pressure had any impact on Teva. On the May 9, 2016 earnings call, Olafsson noted that "the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate." However, he again denied that Teva had exposure to price deflation, and blamed other manufacturers' difficulties on their divergent business models:

> Throughout the ***ongoing debate*** this year about the level of generic price erosion in the United States, ***Teva has been very consistent and clear with investors. Teva has not seen any fundamental change or worsening in the pricing environment***… What this boils down to is each individual company's business model.… ***Nothing has happened in the last two quarters that has changed the pricing environment***.

Olafsson instead blamed Teva's decline in generic profits entirely on issues other than pricing, mainly the lack of new product launches. He misleadingly asserted that Teva's prior success had come from legitimate and sustainable sources such as "portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products … and sales force effectiveness."

128.    The empirical facts internal to Teva and available to Olafsson through the scorecards, LBE reports, work plans, and the Oracle Database would have shown otherwise. Like its competitors, price deflation was substantially damaging Teva's profits. According to an analysis conducted by the Class Action, since the fall of 2015, Teva's inflated profit plummeted from as much as $236 million in 2Q 2015, to $218 million in 3Q 2015, to a mere $124 million in the first quarter of 2016.

129.    Analysts continued to credit Olafsson's false denials. J.P. Morgan wrote, "Reassuring Generics Outlook Ahead of [Actavis] Deal Close … ***Teva does not see any major***

*changes in the price environment.*" Jefferies wrote "Generic pharmaceutical bellwether TEVA has *not witnessed a deterioration in the pricing environment*, according to mgt. This *directly contrasts* with what has been stated by a number of competitors over the past few months."

130. With Teva's critical $20 billion debt offering approaching, the Company needed to keep investors optimistic about its prospects. Defendants Olafsson and Vigodman thus continued to deny that Teva was experiencing any increase in pricing pressure:

- May 10, 2016 (Olafsson): "I know many of the competitors in the generic space … are *talking about a lot of pricing pressure*, but it shouldn't be. There is *nothing that has happened* over the last two quarters which has changed fundamental the market."

- June 3, 2016 (Vigodman): "So we are very consistent. Our message was conveyed, and we will continue to convey. What we see is a 4% to 5% erosion. That's what we see. *That's not something which is different from what we said during 2015*. By the way, we continue saying it in 2016."

- June 8, 2016 (Olafsson): "[R]eally, the *environment hasn't changed*. When we signed that [Actavis] deal in July [2015], we talked about 4% price erosion in the US generic business. And we are *still talking about the same number*, what we see in the base business."

131. In truth, the rapid collapse of the Price-Hike Strategy continued into Q2 2016. According to an analysis by the Class Action, inflated profits would decline 52% YOY.

132. Only days after Olafsson's June 8 statements, on June 21, 2016, Teva received a subpoena from the DOJ demanding information relating to generics pricing. And on July 12, 2016, Teva received a subpoena from Connecticut's AG. Tellingly, Teva did not make any more generic price increases after receiving the subpoena.[8]

---

[8] Nor did Teva promptly disclose its receipt of the subpoenas to investors, unlike several of its co-conspirators that received similar subpoenas from the DOJ or Connecticut AG, including Impax Laboratories (subpoena disclosed day after receipt), Lannett Company (same), Par Pharmaceuticals (subpoena disclosed five days after receipt), and Allergan (subpoena disclosed eleven days after receipt).

133.    Only one day after receiving the Connecticut AG subpoena, on July 13, 2016, Defendant Vigodman announced that Teva was considering moving up its $20 billion debt offering from the September 2016 timeframe it had announced just weeks earlier. To support this surprise announcement, Olafsson, Vigodman, and Desheh issued bullish guidance to investors for the end of 2016 through 2019.  Again, given the growing reports of pricing pressure in the industry, a Citigroup analyst asked Olafsson on an investor call that day to "comment on the generics pricing assumptions that you have baked into your forecast," to which Olafsson responded: "we are assuming and now forecasting for the guidance for the remainder of the year *same pricing assumption* as we have had for the first half of the year" because "*we saw no change in the pricing*. We saw a *stable environment* … from first quarter into second quarter."

134.    Far from being "stable," the pricing environment for Teva's generics portfolio had been rapidly deteriorating.  According to an analysis in the Class Action, inflated profit flowing from the Price-Hike Strategy was down $122 million, or 52%, for Q2 2016 compared to Q2 2015. Given the increasing public scrutiny, Teva was unable to offset this price deterioration with additional price increases.   The pricing assumption Teva "baked into" the guidance was accordingly false and disprovable.

135.    Without the true facts, investors were falsely reassured that Teva did not face the downward trend in generics industry pricing.  Piper Jaffray noted, "management stated that it did not see further pricing pressure on the overall generics business," which "may *ease recent worries* regarding the near-term trajectory of the business." Morgan Stanley wrote that "pricing and LT Guidance [was] *encouraging*" as management "sees US pricing environment as *unchanged*."

48

136.    On July 18, 2016, Teva completed the $20 billion bond offering to pay for the Actavis transaction, approximately $15 billion of which were U.S. dollar denominated and sold to investors.

### H.    The Truth Begins To Emerge

137.    The truth about Teva's surreptitious Price-Hike Strategy and unlawful collusion with "competitors" began to slowly, but only partially, leak into the market beginning in August 2016.  Between August 2016 and May 2019, when the AGs filed their highly detailed 524-page complaint placing Teva at the center of an industrywide price-fixing conspiracy, a series of partially corrective disclosures and events gradually revealed the truth and removed the artificial inflation from the price of Teva securities.  Throughout this time, Defendants Teva, Olafsson, Desheh, and Vigodman continued to issue materially false and misleading statements that had the effect of, at least temporarily, concealing the full scope of their fraud and preventing the price of Teva securities from declining to their true value.

138.    On August 4, 2016, Teva announced disappointing Q2 2016 results, including a $115 million YOY decline in generics profits, and disclosed the Company's receipt of subpoenas from the DOJ and AGs.  However, Teva falsely attributed the decline primarily to increased expenses, the loss of exclusivity on certain products, and lower sales on products for which Teva had not executed price increases.  On the earnings call held that same day, Defendant Olafsson scrambled to mitigate the bad news, making a series of false statements to reassure investors that Teva was still immune to the swelling pricing pressure.  For example, when a Citigroup analyst asked whether decreased U.S. generic revenues had impacted Teva's views on pricing stability, Olafsson falsely claimed that "the pricing is stable to the same degree as before … *very stable* from the first quarter."  This was belied by the daily scorecards, LBEs and work plan that Olafsson

49

shared with his fellow Executive Defendants, which would have indicated dramatically decreasing inflated profit.

139.    When a J.P. Morgan analyst asked whether Teva might increase prices following the Actavis acquisition, Olafsson fraudulently implied that Teva had never increased prices to drive profits, and that opportunities to do so were transitory and limited to times of shortage, stating, "***pricing comes with shortages in the market*** … if there's some kind of dysfunction in the market, there might be a ***small pricing opportunity that usually comes in and comes out***." The concealed truth was that Teva had made 119 price increases on well over 100 drugs—none resulting from shortages.  And now, with those inflated prices under pressure, the inflated profit was declining.

140.    The false statements mollified analysts. J.P. Morgan wrote, "[Teva's] US generics business [was] modest[ly] below expectations but generic pricing environment remains stable." Morningstar analysts similarly wrote that Teva's "Management also noted underlying price erosion remains consistent in the mid-single digits at approximately 4%."

141.    The table below reflects the change in Teva's profits as reported in the first half of 2016, as well as the change in inflated profits for the same period, based on an analysis done by the Class Action.

| 2016 ($ millions) | Q1 | Q2 | Half Year |
|---|---|---|---|
| Reported YOY Change in Generics Profit | -$215 | -$115 | -$330 |
| (Unreported) YOY Change in Inflated Profit | -$104 | -$122 | -$227 |

142.    On September 9, 2016, Teva held its "Generics Day" for investors, during which the Defendants touted the supposed opportunities of the combined Teva/Actavis business. Olafsson issued more misleading, categorical claims that Teva had never inflated its prices for generics drugs: "[t]here is no inflation in the generic pricing"; "people that say that … there's a

50

big generic price inflation, *are simply wrong*." He falsely reiterated that price increases occurred only with market "abnormalit[ies]" like "shortages."

143. Olafsson then falsely explained that Teva had a purported "secret sauce" that protected the Company from pricing pressure. In reality, Teva had no "secret sauce"; it was suffering from pricing pressure on its drug portfolio which in reality had "big generic price inflation" from years of large price hikes made pursuant to the Price-Hike Strategy.

144. On November 3, 2016, *Bloomberg* published an article titled, "U.S. Charges in Generic-Drug Probe to Be Filed by Year End." The article revealed that "according to people familiar with the matter," "U.S. prosecutors are bearing down on generic pharmaceutical companies in a criminal investigation into suspected price collusion" as the "antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs," and "the first charges could emerge by the end of the year." *Bloomberg* additionally reported that "Connecticut Attorney General George Jepsen … is seeking to lead a group of states … seeking damages." The article specifically mentioned Teva as one of the companies. Accordingly, for the first time, Teva was reported as a potential target of criminal and civil enforcement actions. On this news, the price of Teva ADS plummeted by 9.5%.

145. On November 6, 2016, the first securities class action lawsuit arising out of the price-fixing conspiracy was filed against Teva. However, at the time, evidence or information linking Teva to any price collusion or price-fixing in the generic drug industry was sparse. Neither the DOJ and AG subpoenas Teva disclosed in August 2016, nor the November 2016 *Bloomberg* article discussed above, provided any indication of the size, scope, or pervasiveness of the underlying anticompetitive conduct in the generic drug market that would be gradually emerge over the course of, and after, the Relevant Period. For example, the August and November 2016

51

disclosures did not provide any indication of the identity or number of Teva generic products that were subject to collusive or anticompetitive price increases, the amount of any price increase, the amount of revenues or profits attributable to such price increases, or pervasiveness and severity of the alleged misconduct.

146.    On November 15, 2016, Teva reported disappointing Q3 2016 results, including substantial YOY declines in generics revenues.  In response, the price of Teva ADS fell by 8.4%.

147.    Teva, however, once again falsely attributed the disappointing generics performance to causes such as divestments and lost sales from certain drugs.  Olafsson went further, falsely assuring investors that "like previous quarters, there hasn't been any fundamental change in the US drug pricing."  A Wells Fargo analyst expressly asked Olafsson whether the reported increase in price erosion to 7% was a "result of having to tame previous price increases, or give back some of those?"  Olafsson fraudulently, and flatly, answered: "No."  He instead claimed the number increased because of divested drugs, and thus was a one-time event.  A puzzled J.P. Morgan analyst pressed him, observing that "anyone that look[s] at the industry as a whole, it feels like this [is] a broader issue than [a] one off market disruption." Olafsson was adamant that "there hasn't again been any fundamental change" in pricing.  Analysts were comforted by Defendants' continued misrepresentations.    Deutsche Bank, for example, reported that "management continue[d] to expect mid-single digit price erosion in 4Q and over the longer term."

148.    Less than three weeks later, on December 5, 2016, Teva surprised investors by announcing Olafsson's "retirement" at age 48.  In truth, Olafsson, was fired.  On this news, Teva's ADS price fell by 5.4%.

149.    Shortly after Olafsson's firing, on January 6, 2017, Teva provided 2017 guidance a month early.  Teva surprised analysts and investors by significantly lowering guidance, which

52

Vigodman attributed, in significant part, to an "EBITDA gap of $1.2 billion emanating from our US generics business."  On this news, the price of Teva ADS declined by 7.5%

150.    Vigodman concealed that the "majority" of the EBITDA "gap" was attributable to the collapse of Teva's Price-Hike Strategy and the resultant decline in inflated profit.  In 2016, Teva had generated no more than $420 million in inflated profit attributable to the Price-Hike Strategy, compared to $848 million in 2015.

151.    In each quarter of 2016, inflated profit declined at least 45% YOY. In 2016, Teva made only five relatively modest (~25%) price increases, on drugs that had already been hiked.

152.    The following chart based on the Class Action analysis reflects the YOY reduction in inflated profit on a quarterly basis from 2015 to 2016:

| Inflated Profit ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
| --- | --- | --- | --- | --- | --- |
| 2015 | $228 | $236 | $218 | $166 | $848 |
| 2016 | $124 | $114 | $97 | $86 | $421 |

153.    Notwithstanding, Vigodman continued to fraudulently claim that Teva's profitability since 2014 was accomplished due to legitimate business practices, including "a strong emphasis on the cost of goods sold, product mix, and the overall cost structure," and "not by price." SWIB purchased substantial amounts of Teva securities throughout 2016, including over 2.2 million Teva ADS and 2023 Notes with an aggregate face value of $5 million, at fraud inflated prices.

154.    On February 6, 2017, Teva surprised investors by announcing Vigodman's termination, effective immediately and without any permanent replacement.  On this news, the price of Teva ADS declined by 6.3%.

155.    On February 13, 2017, Teva announced its Q4 and full year 2016 financial results. The Company disclosed that, without the Actavis revenue, Teva would have reported a $233

million YOY decline in quarterly U.S. generics revenues, but concealed that as much as $80 million of that YOY decline resulted from the decline in inflated profit attributable to the Price-Hike Strategy.  As to the full year 2016, without Actavis, Teva would have reported a YOY U.S. generic revenue decline of $1.4 billion.  Teva misleadingly attributed the decline to a loss of exclusivity, lower sales of certain drugs, and the loss of revenues from divested product.  In truth, as much as $427 million of the revenue decline resulted from the decline in inflated profit.

156.    By April 2017, when the Lead Plaintiff was appointed in the Class Action, public information about Teva's role in any generic drug price-fixing or price collusion was still limited. The complaint filed by the State AGs in December 2016 asserted that Teva engaged in anticompetitive conduct with respect to only one generic drug.  Moreover, as of the time of the Lead Plaintiff's selection, media reports and enforcement actions focused almost entirely on Heritage Pharmaceuticals ("Heritage") – a small player in the generics market – as the "principal architect and ringleader" of the conspiracy.[9]  In stark contrast to the State AGs' relatively thin and heavily redacted 56-page December 2016 complaint, the AGs' 524-page May 2019 Complaint placed Teva at the center of industrywide price-fixing and price collusion involving hundreds of drugs, contained abundant evidence gleaned from the AGs' ongoing five-year investigation, and named four Teva employees personally as defendants.  Similarly, the only co-conspirators charged by the DOJ at this time were two executives from Heritage.

157.    On June 8, 2017, Teva announced the nomination of four new directors to its Board in an attempt to restore credibility with shareholders.  Before the month was over, Desheh was out too, leaving Teva for another job.

---

[9] *State of Connecticut et al. v. Aurobindo Pharma USA, Inc. et al.*, No. 2:17-cv-03768 (E.D. Pa.), ECF No. 1-1.

158.    On August 3, 2017, with Desheh, Vigodman, and Olafsson (the principal architects of Teva's Price-Hike Strategy) gone and a significantly reconstituted Board, Teva took a $6.1 billion charge against its U.S. generics business, a permanent reduction in the entire business's valuation and a dollar-for-dollar hit to the Company's bottom line.  In addition, Teva reported a loss of $5.94 per share, slashed its dividend by 75%, and drastically revised the guidance issued in January 2017 (which revised the July 2016 guidance).  With the collapse of the Price-Hike Strategy, Teva's inflated profits quickly evaporated, which at this point amounted to only $53 million per quarter.

159.    On this news, the credit rating agencies, concerned about Teva's ability to service over $30 billion in debt, downgraded Teva to just one notch above "Junk" rated debt. Investors fled Teva's debt, and the price of Teva's ADS plunged by 24%.

160.    With Teva securities in free-fall and facing intensifying governmental investigations, the Company repeatedly made false and misleading statements and/or failed to disclose material adverse facts regarding Teva's anticompetitive practices.  For example, on August 3, 2017, Teva described the various antitrust matters it faced, including the Connecticut AG and DOJ subpoenas and the December 2016 AG lawsuit referenced above, and staunchly denied "having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and civil suits."

161.    Revelations of Teva's unlawful collusion continued to emerge on December 9, 2018, with the publication of a *The Washington Post* article.  In it, Connecticut's Assistant AG, Joseph Nielsen, declared that the State AG investigation had exposed "the largest cartel in the history of the United States," which had grown to encompass at least 16 companies and 300 drugs. The article noted Teva's continued denial of engaging in any anticompetitive conduct, and its

statement in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts."

162.    On May 10, 2019, after market close,[10] the Attorneys General of 44 U.S. States and territories filed a bombshell complaint revealing previously undisclosed facts regarding Teva's central role in a sweeping price-fixing conspiracy in the generic drug industry.  The AG's 524-page complaint detailed Teva's price-fixing with regards to at least **86** different generic drugs, compared to just 7 drugs in the AG's previously filed action.  Additionally, the AG's May 2019 Complaint alleged that Teva implemented significant price increases for approximately **112** generic drugs, including extraordinary price hikes of over 1,000%.  The May 2019 Complaint disclosed facts of Teva's price-fixing with regards to a significant portion of those generic drugs, and detailed Teva's role as a "consistent participant" and a central player in the conspiracy.  Moreover, the AG's May 2019 Complaint names four Teva employees ***personally*** as defendants, including (1) Maureen Cavanaugh, Teva's former Senior Vice President and Chief Commercial Officer, North America; (2) Kevin Green, Teva's former Director of National Accounts; (3) Nisha Patel, Teva's former Director of Strategic Customer Market and Director of National Accounts; and (4) David Rekenthaler, Teva's former Vice President, Sales U.S. Generics.

163.    The scope and severity of the misconduct detailed in the May 2019 Complaint— "one of the most egregious and damaging price-fixing conspiracies in the history of the United States," in the words of government prosecutors—was far more egregious and damaging than foreseeable to investors when the AGs filed their first enforcement action in December 2016, and

---

[10] By the end of 2019, an additional nine AGs from U.S. states and territories would join the lawsuit bringing the total number of AGs to fifty-three.

flew in the face of Teva's repeated and staunch denials of having engaged in *any* conduct that could give rise to antitrust liability.

164.    Teva's repeated and staunch denials of having engaged in any unlawful collusion continued to prop up the prices of Teva securities, causing Plaintiff to suffer substantial damages. From 2017 through the end of the Relevant Period, SWIB continued to purchase significant amounts of Teva securities, including over 2.7 million Teva ADS, 2023 Notes with an aggregate face value of $9.15 million, and 2026 Notes with an aggregate face value of $2 million, at fraud inflated prices.

## I.    Teva's Collusion With Other Generic Drug Manufacturers

165.    The operative Class Action identifies at least 17 sudden and aberrational price increases undertaken by Teva that show strong indicia of collusion. These price increases relate to at least 16 drugs (the "Collusive Drugs"), which collectively generated almost $1.23 billion dollars in inflated profit for Teva.

166.    These examples garnered by the Class Action analysis are just the tip of the iceberg. As set forth above and in the relevant pleadings, even more evidence of parallel price increases is disclosed in the AGs Action and the DOJ's criminal action against Teva (the "Criminal Action").

167.    In each instance, the drug's major manufacturers, including Teva, enacted large price increases at or around the same time, raising prices to exactly, or nearly exactly, the same level. For some, Teva was the first to raise prices, and others followed; other times, Teva followed another manufacturer's lead. The Class Action's investigation identified, in addition to these parallel price increases, corroborating indicia of collusion, detailed below, including: (i) motive and opportunity to increase prices; (ii) price increases against apparent self-interest; and (iii) inter-firm communications.

168.    Companies and individuals involved in generic drug pricing, sales, and marketing

57

are, as in any other industry, motivated to increase the profit earned on their products. In the generic drug industry specifically, the natural profit motive may bend toward a motive to collude, due to the cold realities of marketing products that are, despite their scientific sophistication, a commodity. Because federal law requires generic drugs to be "readily substitutable," price is the only meaningful mechanism by which generic drug manufacturers may differentiate their products, a circumstance which over time, and absent collusion, drives prices down to a point just above the manufacturers' marginal costs of production. Each of the Collusive Drugs is a long-established generic in a mature market in which prices had leveled off to a steady equilibrium. The manufacturers of the Collusive Drugs, therefore, had a common motive to increase their profits by conspiring to raise prices in tandem, overriding the natural downward pressure on prices.

169.    Each Collusive Drug's market is characterized by factors that present the motive and opportunity to collude, including

- High Concentration. The market for each Collusive Drug was an oligopoly by a handful of manufacturers who collectively controlled substantially all of the market.

- High Barriers to Entry. Entering a generic pharmaceutical market requires significant lead time for development and regulatory approval. The cost is significant; the process of obtaining regulatory approval alone can cost millions. Further, there is financial risk that the recoupment of any investment could be delayed or never happen. Regulatory approval, known as an "ANDA" approval, could be denied or delayed for months or years due to technical failures or other factors. According to the GAO and others (including Teva), during the Relevant Period the FDA was significantly "backlogged," and thus potential market entrants could have to wait years for approval. It has been reported that in 2015 ANDA approvals often took 40 months or more.

- Demand Inelasticity. The Collusive Drugs are all important, and in many cases absolutely critical, to the end-consumer's health and well-being. As a general matter, demand for such drugs is inelastic, *i.e.*, the quantity demanded does not vary significantly as price changes, as the consumer cannot simply walk away as prices rise. Another factor contributing to demand inelasticity is that health insurance plans typically will pay for

medications regardless of price, so long as the drug is on the plan's approved list. The Class Action undertook statistical analysis of the market for each of the Collusive Drugs, and confirmed inelasticity for each drug and empirically observed that volume did not change as the price increased.

- Lack of Alternative Products. Doctors choose to prescribe specific drugs to their patients for reasons related to the specific pharmacological distinctions among the drugs in a particular class and, consequently, they cannot simply substitute one product for another when price varies. This is true of the Collusive Drugs.

- Inherent Fungibility of Generic Drugs. Each manufacturer's version of each of the Collusive Drugs is, by nature, interchangeable with any other manufacturer's. By law, all generic drugs must be readily substitutable for another generic of the same brand drug.

170.    In a competitive market, Teva's price increases on the Collusive Drugs would also have been against its self-interest.  There was no reasonable commercial or economic justification for the price increases in the Collusive Drugs.  In no case was a shortage reported during the Relevant Period for any of the Collusive Drugs, nor any sudden significant increase in demand. Thus, absent a collusive understanding among competitors, a manufacturer that acted alone to enact significant price increases ran a tremendous risk of losing all, or most, of its market share if competitors undercut the suddenly inflated price. As an empirical fact, each manufacturer was able to substantially increase, and maintain increases on, the prices for the Collusive Drugs within a short period of time; no competitor sought to seize increased market share by undercutting the other market participants with even a slightly smaller price increase. Without a deliberate strategy, such price increases would have been against Teva's self-interest.

171.    The "risk" Teva would have undertaken without collusion was particularly acute with respect to drugs for which Teva was the first to increase the price, such as Ketoconazole (cream and tablets), Nystatin, Theophylline, Diclofenac, Propranolol, and Estradiol.  The fact that Teva was so often willing to expose its market share to predation by other manufacturers whose

59

prices sat many multiples below Teva's plausibly supports that, in truth, there was no risk at all – Teva had reached a collusive understanding that other market participants would themselves raise prices soon thereafter, and/or that Teva's "fair share" of the market would remain untouched despite its extraordinary price increase.  Indeed, the AGs noted several instances where Teva took the "lead" regarding a price increase, meaning it was the first member of the cartel to raise prices, while others in the industry "followed" the price increase.

172.    The AG's May 2019 Complaint includes extensive evidence of collusion drawn from a nearly five-year investigation that included: (i) thousands of documents produced by dozens of companies and individuals throughout the generic drug industry; (ii) a phone call database consisting of more than 11 million phone call records from hundreds of individuals at the defendant companies and other generic manufacturers; and (iii) information provided by confidential informants. The graphic below illustrates the sprawling nature of the conspiracy, showing the interlocking web of communications and relationships between individuals employed by Teva and its key competitors.  Each line in the graphic below indicates that at least one phone call or text message was sent between those individuals (identified by their initials) while they were competitors.  For many individuals, there were hundreds of calls and texts with competitors.



60

173.    Indeed, the May 2019 Complaint alleges that over 2,300 communications occurred between certain of Teva's "senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs" and employees at eight other generic drug companies in 2013 and 2014, as shown below.  However, as the AGs note, the tables below are "conservative because [they are] based on phone and text message records from only some of the executives and salespeople at issue, and therefore only show[] some of the phone calls and text messages between" the co-conspirators during the subject periods.

**Table 1**
**Teva phone/text communications with other Defendants (by month)**
**January 1, 2013 – December 31, 2013**

|  | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 2 | 2 | 0 | 7 | 27 | 1 | 17 | 12 | 15 | 40 | 13 | 47 | 183 |
| Glenmark | 0 | 3 | 0 | 0 | 26 | 9 | 6 | 8 | 1 | 12 | 14 | 16 | 95 |
| Greenstone | 2 | 0 | 20 | 1 | 4 | 5 | 6 | 1 | 0 | 2 | 7 | 11 | 59 |
| Lupin | 10 | 5 | 9 | 3 | 33 | 9 | 19 | 9 | 5 | 13 | 6 | 0 | 121 |
| Mylan | 31 | 47 | 32 | 37 | 33 | 26 | 26 | 16 | 1 | 1 | 0 | 11 | 261 |
| Sandoz | 17 | 5 | 4 | 4 | 12 | 16 | 18 | 14 | 3 | 0 | 9 | 2 | 104 |
| Taro | 0 | 0 | 0 | 0 | 2 | 1 | 8 | 11 | 0 | 11 | 1 | 1 | 35 |
| Zydus | 13 | 23 | 42 | 20 | 30 | 40 | 59 | 21 | 34 | 148 | 58 | 43 | 531 |
| Totals | 75 | 85 | 107 | 72 | 167 | 107 | 159 | 92 | 59 | 227 | 108 | 131 | 1389 |

Source: AG's May 2019 Complaint, ¶119

**Table 2**
**Teva phone/text communications with other Defendants (by month)**
**January 1, 2014 – December 31, 2014**

|  | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 31 | 17 | 47 | 42 | 76 | 9 | 38 | 24 | 36 | 23 | 8 | 14 | 365 |
| Glenmark | 4 | 11 | 11 | 7 | 7 | 2 | 9 | 6 | 1 | 6 | 3 | 3 | 70 |
| Greenstone | 17 | 3 | 13 | 3 | 1 | 1 | 6 | 1 | 9 | 0 | 0 | 0 | 54 |
| Lupin | 11 | 5 | 13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| Mylan | 6 | 1 | 1 | 1 | 7 | 2 | 0 | 10 | 13 | 5 | 2 | 9 | 57 |
| Sandoz | 5 | 10 | 7 | 10 | 0 | 1 | 28 | 7 | 4 | 1 | 6 | 3 | 82 |
| Taro | 1 | 1 | 7 | 4 | 17 | 16 | 5 | 2 | 1 | 0 | 0 | 1 | 55 |
| Zydus | 18 | 36 | 44 | 24 | 37 | 14 | 19 | 15 | 5 | 5 | 4 | 4 | 225 |
| Totals | 93 | 84 | 143 | 95 | 145 | 45 | 105 | 65 | 69 | 40 | 23 | 34 | 941 |

Source: AG's May 2019 Complaint, ¶121

174.    The Class Action's investigation further identified a multitude of trade shows and conferences that afforded individuals responsible for Teva's generic drug prices an opportunity to interact with their counterparts at other manufacturers during the Relevant Period, many of which occurred in close proximity to price increases that Teva and/or other manufacturers implemented

on the collusive drugs.  A list of such events by senior Teva executives, including Olafsson, Oberman, and Cavanaugh, as well as Galownia and Patel is attached as Appendix B.    In all instances identified in Appendix B, representatives of at least one other manufacturer – and typically many more – also attended.  Indeed, the AGs have stated in their May 2019 Complaint Teva and its co-conspirators "exploited their interactions at various and frequent industry trades shows, customer conferences, and other similar events, to develop relationships and sow the seeds for their illegal agreements."

175.    Trade shows and conferences provided opportunities for one-on-one meetings between Teva personnel, including several of Executive Defendants, and those of other manufacturers. For instance, at both the 2013 and 2014 annual meetings of the National Association of Chain Drug Stores ("NACDS"), Teva reserved a "strategic exchange" bungalow. NACDS advertised "strategic exchange" bungalows as "opportunities to meet and discuss strategic issues with key trading partners." In essence, Teva paid for a secluded area where its personnel could meet privately with others, including other manufacturers.

176.    On June 30, 2020, the DOJ charged Teva by confidential Information with conspiring to fix prices, rig bids, and allocate markets for various generic drugs in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  On August 25, 2020, the grand jury returned the operative charging document, the DOJ's Second Superseding Indictment of Teva ("SSI").

177.    The SSI's allegations substantiate and bolster those of the AG's Action and the Class Action.  The SSI names Teva as a criminal defendant on three separate conspiracies to engage in anticompetitive activity.  Each count involves different co-conspirator generic drug manufacturers and different specified generic drugs.  Specifically, Count one charges Teva with conspiring with Glenmark and Apotex Corp. ("Apotex") with respect to the generic drug

pravastatin.  Count two charges Teva with conspiring with Taro Pharmaceuticals U.S.A., Inc. ("Taro") with respect to the generic drugs carbamazepine, clotrimazole, etodolac ER and IR, fluocinonide, and warfarin. Finally, count three charges Teva with conspiring with Sandoz Inc. ("Sandoz") with respect to the generic drugs etodolac IR, nadolol, temozolomide, and tobramycin. Trial in the criminal action is scheduled to take place in May 2024.

178.    As alleged, all three conspiracies began in approximately May 2013 and continued until at least December 2015.  According to the DOJ: "[A]ll three conspiracies occurred simultaneously; involved some of the same co-conspirators and witnesses; were carried out through substantially similar means and methods; violated the same statute, Section 1 of the Sherman Antitrust Act; and had similar, yet discrete, objectives."  More specifically, all three counts allege that Teva, Glenmark, and their co-conspirators (1) exchanged non-public prospective pricing for generic drugs; (2) agreed to increase those prices; (3) in fact did so; (4) refrained from submitting competitive bids to customers; and (5) accepted payments for generic drugs at collusive and non-competitive prices.  All three counts include allegations regarding the gain to conspirators, and the loss to victims: count one alleges that the gain/loss was at least $200 million and counts two and three each allege that the gain/loss was at least $75 million.

179.    The SSI identifies former executives of Teva, Glenmark, and Taro, respectively, as confidential informants.  The government has stated in court filings that it expects to prove the charges through both witness testimony and documentary evidence.  The following excerpt of a July 23, 2021 filing by the DOJ details how it plans to prove the charges against Teva using the extensive evidence collected by government as of such date:

> Soon after CW-1 began working for Teva in or around late April 2013, Glenmark executive CW-2 approached CW-1 to discuss Glenmark's anticipated price increase on certain generic drugs that Teva also sold, not only pravastatin (also sold by Apotex), but also other products

63

including adapalene (also sold by Taro) and nabumetone (also sold by Sandoz). Glenmark planned to increase prices in mid-May 2013, and CW-1 provided assurances that Teva would follow shortly after. CW-1 used her extensive industry contacts to speak with other competitors, including Taro and Sandoz, to obtain their support for the anticipated price increase, including as follows:

- CW-1 and Ara Aprahamian, a Taro executive charged elsewhere, reached an understanding that Taro would also increase its price of adapalene.

- CW-1 and CW-3, a Sandoz executive, discussed nabumetone, which was one of the drugs covered by their understanding that Teva and Sandoz would not take each other's customers when one of them increased the price of a drug they both sold. When CW-3 expressed concern about other competitors in the market, CW-1 told CW-3 not to worry because, based on her understanding with CW-2, Glenmark would also increase prices on nabumetone.

  CW-1 then told CW-2 that she had talked with competitors about the price increases, which CW-2 understood would contribute to the success of the price increases. After these conversations with executives at Glenmark, Sandoz, Taro, and others, CW-1 put pravastatin, adapalene, and nabumetone, among other drugs, on a list of high priority products for price increases, and emailed that list to another Teva executive. CW-1 placed these products on that list because of the understanding with CW-2 and the other companies.

  The companies all took steps to ensure that the price increases were effective, including as follows: Glenmark increased its price for drugs including pravastatin, adapalene, and nabumetone on or about May 16, 2013. Taro followed Glenmark's price increase on adapalene in late May 2013. Sandoz followed Glenmark's price increase on nabumetone in or about July 2013. Teva followed the price increase on adapalene and nabumetone in July 2013 and on pravastatin in or about August 2013. Immediately after these price increases, Glenmark, Teva, Taro, Sandoz, and their co-conspirators began declining to submit bids to each other's customers.

180. As the DOJ's Criminal Action approaches trial, it has evidently expanded significantly in scope. According to the DOJ's filings, "evidence will establish a common thread among all three conspiracies" – including in regard to no less than 29 generic drugs, 19 of which

64

are not mentioned in the SSI, and additional confidential informants also not mentioned in the SSI. Moreover, the DOJ has indicated that this expanding list of generic medications is not exhaustive and it "may also introduce evidence relating to other drugs." According to the DOJ, its case in chief alone will last fifteen trial days. Teva's co-defendant, Glenmark, asserts that the government is preparing to present at trial "*a broad attack on the generics industry writ large*." As recently as August 16, 2021, the DOJ reiterated in court filings in its criminal case against Teva that the Government continues to investigate "*widespread antitrust violations in the generic drug industry*."

## V.   FALSE AND MISLEADING STATEMENTS AND OMISSIONS

181.   Defendants' materially false and misleading statements and omissions during the Relevant Period are quoted above and summarized forth below. These misrepresentations can be broken into four categories.

182.   *First*, Defendants Teva, Vigodman, Olafsson, Desheh, and Griffin misrepresented and concealed Teva's Price-Hike Strategy and the inflated profits it generated. These statements were made while the Price-Hike Strategy was in effect and continued after it fell apart, when Teva concealed the collapse of the strategy and the Company's resulting inability to make additional price increases or sustain the inflated profits. These statements were highly misleading given that the Defendants touted, and investors were highly focused on, the sources of the generic segment's purported success. Yet, Defendants misled investors by falsely attributed the changes in Teva generic revenues and profits to sources other than price hikes.

183.   *Second*, Defendants Teva, Vigodman, Desheh, and Olafsson falsely represented that Teva's generic business operated in competitive and functioning markets. In truth, Teva made dozens of coordinated price increases with competitors, colluded to fix prices and allocate

65

customers, and deliberately did not compete with other generic manufacturers on price.  Indeed, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.

184.    *Third*, Teva consistently and staunchly denied the Company's participation in collusive conduct with other generic manufacturers and industry participants.  In truth, Teva was the central actor in an industry-wide scheme to fix prices and allocate customers.  Four Teva executives were so extensively involved in the unlawful conspiracy that they were named personally as defendants in the AGs' May 2019 Complaint.

185.    *Fourth*, Defendants violated their statutory duty to disclose material trends under Item 5 of Form 20-F, including the material trend of massive and increasing inflated profits generated from the Price-Hike Strategy, and then the material trend of massive declines in inflated profit as the Price-Hike Strategy unraveled and came to an end.

### A.    Misrepresentations Regarding Pricing

186.    As set forth below, Defendants made numerous statements during the Relevant Period to conceal their Price-Hike Strategy and its effects.

### 1.    2013 Q4 and Full Year Financial Disclosures

187.  On February 6, 2014, Teva issued a press release disclosing its Q4 2013 financial results and held an earnings conference call. On February 10, 2013, Teva filed its annual report with the SEC on Form 20-F, reporting Teva's full-year 2013 results. The Q4 2013 press release announced U.S. generics revenues of $1.2 billion for the fourth quarter, a YOY increase of $144 million, or 14%, and attributed the increase "mainly from the exclusive launches of [niacin ER and temozolomide] … in the third quarter of 2013, and launches of [duloxetine and tobramycin] … in the fourth quarter of 2013, as well as higher sales of budesonide inhalation."

188.  The statements above were false and misleading.  Having attributed the source of

the revenue increase, Teva had a duty to disclose the Price-Hike Strategy, whereby the Company made at least 34 systematic price hikes in July and August 2013, contributed materially to the results. These price increases generated as much as $147 million ininflated profit in Q4 2013, comprising the entire YOY increase in U.S. generic revenues.  The above statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement the July and August 2013 price hikes, and a significant part of the Company's reported generics revenues were generated by such anticompetitive practices.

189.   The 2013 20-F disclosed a YOY decline in generic profit of $400 million, or 20%, "primarily" attributed to "lower revenues and lower gross profit, which were partially offset by a reduction in selling and marketing expenses," and "by sales of higher profitability products in the United States."

190.   The statements above were false and misleading.  Having attributed the sources offsetting the decline, Teva had a duty to disclose the Price-Hike Strategy, whereby the Company made at least 34 systematic price hikes in July and August 2013, contributed materially to the results. These price increases generated as much as $250 million in inflated profit in 2013 and, without that inflated profit, Teva would have reported a $650 million YOY decline in generic profit, or a 32% decrease, rather than the 20% decline reported by the 2013 20-F. The contribution of the inflated profit was significant, particularly in comparison to the attributed reduced S&M expenses, which declined only $26 million compared to 2012.  The above statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement the July and August 2013 price hikes, and a significant part of the Company's reported generics revenues were generated by such

anticompetitive practices.

### 2.    2014 Q1 Financial Disclosures

191.  On May 1, 2014, Teva held an earnings conference call. On May 2, 2014, Teva filed its Q1 2014 financial statements on Form 6-K with the SEC.  The Q1 2014 6-K disclosed a YOY increase in generic profit of $117 million, or 31%, which was purportedly "primarily" due to: "[H]igher revenues, higher gross profit and a reduction in selling and marketing expenses," with higher gross profit attributed to "thechange in the composition of revenues in the United States and Europe, mainly products launched during the first quarter of 2014and in the United States in the second half of 2013."  During the May 1, 2014 earnings call, Desheh attributed the growth in U.S. generic revenues to "new product launches": Teva's generics division "experienced significant growth in the United States market, with 17% year-over-year growth, to a total of $1 billion with a number of new product launches."

192.  The statements above were false and misleading.  Having attributed the sources of the revenue and profit increases, Teva and Desheh had a duty to disclose the Price-Hike Strategy, whereby Teva made at least 34 systematic price hikes implemented in July and August 2013, contributed materially to the results.  The price increases generated as much as $120 million in inflated profit in Q1 2014 that accounted for all the increase in generic profit, and nearly all of YOY growth in U.S. generic revenues. The inflated profit amounted to nearly three times the $42 million YOY reduction in S&M expenses. The above statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement the July and August 2013 price hikes, and a significant part of the Company's reported generics revenues were generated by such anticompetitive practices.

### 3.    2014 Q2 Financial Disclosures

193.  On July 31, 2014, Teva filed its Q2 2014 financial statements on Form 6-K with

the SEC and held an earnings conference call. The Q2 2014 6-K disclosed a YOY increase in generic segment profit of $156 million, or 41%, "primarily" attributed to: "[A] significant reduction in selling and marketing expenses, higherrevenues and higher gross profit," which was attributed to "higher revenues in the United States, specifically of products launched during the first half of 2014 and in the second half of 2013, and higher revenues in Canada as well as … the change in the composition of revenues in Europe." On the July 31, 2014 earnings call, Desheh similarly attributed the "better results" in Teva's generic segment to: The launches of "generic Xeloda in March and generic LOVAZA this quarter in the U.S. market." (together with the July 21, 2014 statements, the "July 2014 Statements").

194.   The July Statements were false and misleading.  Having attributed the source of the profit increase, Teva had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 62 systematic price hikes since July 2013, 24 of which were made in April 2014, contributed materially to the results. These price increases generated as much as $160 million in inflated profit in Q2 2014 that comprised all of the YOY increase in generic profit, and amounted to more than one and a half times the $101 million YOY reduction in S&M expenses to which the Defendants attributed the generic profit increase.  The July 2014 Statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all of the price hikes since July 2013 and a significant part of the Company's generics revenues and profits were generated by such anticompetitive practices.

#### 4.    2014 Q3 Financial Disclosures

195.   On October 30, 2014, Teva filed its Q3 2014 financial statements on Form 6-K with the SEC and held an earnings conference call.  The Q3 2014 6-K disclosed a YOY increase in generic profit of $160 million, or 40%, which was purportedly "primarily" from "higher gross

profit and a significant reduction in selling and marketing expenses," with higher gross profit attributed to "lower expenses related to production, higher revenues from our API business as well as higher gross profit due to the change in the composition of revenues."  During the Oct. 30, 2014 earnings call, Vigodman also attributed Teva's results to new products: "I think overall, we have a good revenue of the new launches this year – capecitabine, the generic Lovaza, Omega-3 and entecavir. Entecavir was a new launch for us in the quarter. I think all these three products have been very significant contributors to the year."

196.  The 2014 Q3 statements above were false and misleading.  Having attributed the source of the profit increase, Teva and Vigodman had a duty to disclose that the Price-Hike Strategy, whereby Teva made at least 91 systematic price hikes since July 2013, 32 of which were made in Q3 2014, contributed materially to the results. These price increases generated as much as $193 million in inflated profit in Q3 2014, a YOY increase of $90 million.That YOY increase accounted for over half of the YOY increase in generic profit, and was more than the entire $81 million YOY reduction in S&M expenses to which Teva attributed the generic profit increase.  The statements above were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all of the price hikes made since July 2013, and a significant part of the Company's generics revenues and profits were generated by such anticompetitive practices.

197.  By the time of the October 30, 2014 earnings call, Congress had sent a letter to Vigodman requesting information regarding price increases, Lannett and Impax had both disclosed subpoenas from the Connecticut AG, and articles had highlighted increased drug prices on certain drugs Teva did not sell. In this context, on the October 30, 2014 earnings call, a UBS analyst asked Vigodman, "could you talk about Generics a little bit in the U.S. … whether there

70

were price increases in some of your base business and whether that impacted some of" Teva's financial performance? Vigodman denied that Teva was engaged in any price increases, particularly any that had resulted in hundreds of millions of dollars in inflated profit: "I think that pricing – I've said it before, there's never a price increase on the base business as a whole. Like any other business, if there's a pricing opportunity that comes in the market, we look for that. But the base business itself has been eroding overall because of the consolidation of the customers." Vigodman then explained that the market was functioning under normal conditions, i.e., that prices increase only where there are shortages or market dynamics: "When there's an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business. But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business."

198.   Vigodman's statements were false and misleading.  Far from price increases only occurring when there are shortages or market dynamics so dictate, Teva had adopted the Price-Hike Strategy. Vigodman concealed that Teva had implemented 91 price hikes on 87 drugs and that those concealed increases—the very subject of the UBS analyst's question—resulted in as much as $720 million in inflated profit reported since the start of the Relevant Period, and as much as $193 million in Q3 2014 alone, on drugs for which there were no shortages.  Vigodman's statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly 91 price hikes since July 2013, and the Company generated significant generics revenues and profits from such anticompetitive practices.

### 5.   December 11, 2014 Guidance Call

199.   On December 11, 2014, Teva held a guidance call to discuss Teva's 2015 business outlook. On the call, and in light of increased reports of price hikes on generic drugs, a Morgan

Stanley analyst asked, "with respect to generic inventory in the channel, both for Teva and for other generic manufacturers, I'm assuming that wholesalers have been seeing extraordinary price increases in recent years and has been buying inventory ahead of tremendous price increases?" In response, Olafsson flatly denied even the existence of price increases, and minimized the possibility that Teva had engaged in large price increases: "So first let me correct. I have to disagree that they have experienced tremendous price increase. I think, overall, the pricing in the U.S. of generics has been flat to a slight down. There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products."

200. The statements above were false and misleading. In responding to a direct question regarding price hikes, Olafsson had a duty to disclose but concealed the full truth of the Price-Hike Strategy, whereby Teva made at least 91 systematic price hikes since July 2013, with 57 in 2014, contributed materially to the results. Far from a limited issue involving "a few products," by Q3 2014, Teva's dozens of increases generated a total of as much as $720 million in pure profit, which would increase to as much as $943 million by the end of 2014. Olafsson's statement that pricing had been "flat to a slight down" across the U.S. generics market concealed the full truth that Teva's business model since 2013 had generated 30% of Teva's overall profit from drastic price increases on generics drugs. Olafsson's statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all of the price hikes since July 2013, and the Company generated significant generics revenues and profits from such anticompetitive practices.

### 6. 2014 Q1 and Full Year Financial Disclosures

201. On February 5, 2015, Teva filed a press release with the SEC that reported the Company's Q4 2014 and full year 2014 financial results. Also that day, Teva filed its 2014 20-F with the SEC reporting Teva's FY 2014 financial results, and held an investor earnings

conference call.  The false statements in the 2014 20-F are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus, and the Preferred Final Prospectus.

202.  The Q4 2014 press release disclosed a YOY increase in generic profit of $47 million, or 9%, attributed "primarily" to "our lower S&M expenses and lower R&D expenses."

203.  The statements in February 2015 above were false and misleading.  Having attributed the source of the profit increase, Teva had a duty to disclose that the Price-Hike Strategy, whereby the Company made at least 91 systematic price hikes since July 2013, 57 of which were made in 2014, contributed materially to the results. These price increases generated as much as $219 million in inflated profit in Q4 2014, a YOY increase of as much as $72 million. That increase accounted for the entire YOY increase in generic profit. In contrast, Teva attributed the increased generic profit to a $113 million YOY reduction in S&M expenses, and an $8 million YOY reduction in R&D expenses.  The statements above were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all of the price hikes since July 2013, and the Company generated significant revenues and profits from such anticompetitive practices.

204.  The 2014 20-F disclosed a YOY increase in generic profit of $480 million, or 29%, attributed to "lower S&M expenses and higher gross profit," which was purportedly "mainly a result of higher revenues in the United States, specifically of products launched during 2014 and in the second half of 2013, and higher revenues in Canada, which led to higher gross profits, as well as higher gross profit from API sales to third parties."

205.  The statements in the 2014 20-F were false and misleading.  Having attributed the source of the profit increase, Teva had a duty to disclose the Price-Hike Strategy, whereby Teva

73

made at least 91 systematic price hikes since July 2013, 57 of which were made in 2014, contributed materially to the results. These price increases generated as much as $693 million in inflated profit in 2014, a YOY increase of as much as $443 million, which increase accounted for nearly the entire YOY increase in generic profit and was more than the entire $337 million reduction in sales & marketing expenses to which Teva attributed the increase in generic profit. These statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all of the price hikes since July 2013, and Teva generated significant generics revenues and profits from such anticompetitive practices.

206.   The table below reflects Teva's improved profits as reported in 2014, as well as the YOY change in inflated profits for the same period:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $117 | $156 | $160 | $47 | $480 |
| (Unreported) YOY Change in Inflated Profit | $120 | $160 | $90 | $72 | $443 |

### 7.      Q1 2015 Financial Disclosures

207.   On April 30, 2015, Teva filed its Q1 2015 financial statements on a Form 6-K with the SEC and held an investor earnings conference call. The false statements in the Q1 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

208.   The Q1 2015 6-K disclosed a YOY increase in generic profit of $296 million, or 59%, attributed "primarily" to "higher gross profit and lower selling and marketing expenses as well as lower research and development expenses," with higher gross profit purportedly "mainly a result of the launch of esomeprazole in the United States during the quarter and improved

profitability of our European business." On the April 30, 2015 earnings call, a Bank of America analyst asked Olafsson "how much more potential exists to increase generic segment margins purely from organic gains and operational efficiency?" Olafsson claimed that the "1,000 basis points improvement over a two years period" in "operating profit in the generic segment" was attributable to "probably three or four things," namely "significant improvement in our cost of goods," "the portfolio offering … [including] exclusive complex generics of offering," and "the cost infrastructure."

209. The April 2015 statements above were false and misleading. Having attributed the source of the profit increase, Teva had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby the Company made at least 107 systematic price hikes since July 2013, 16 of which were made in January 2015, contributed materially to the results. These price increases generated as much as $228 million in inflated profit in Q1 2015, a YOY increase of as much as $108 million, which accounted for over a third of the YOY increase in generic profit. The inflated profit increase also amounted to more than double the $43 million YOY reduction in S&M expenses, and nine times the $12 million YOY reduction in R&D expenses, to which Teva attributed the increased generic profit. Olafsson's statements on the call were also misleading. Olafsson concealed that the Price-Hike Strategy was a fundamental part of Teva's improvement. Indeed, by the end of Q1 2015, Teva had generated as much as $1.1 billion in inflated profit on the price increases since July 2013. The statements above were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all of the price hikes since July 2013, and Teva generated significant generics revenues and profits from such anticompetitive practices.

### 8.    June 10, 2015 Investor Conference

210. As investors, analysts, and Teva's senior management 75ere focused on the

75

Company's outstanding offer to acquire Mylan, during a June 10, 2015 Goldman Sachs conference, Vigodman touted "the profound change in the generic business," since 2014, stating:

> These "are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014," and attributing this success solely to "[t]he execution of the cost reduction program: $600 million net savings, 2014; $500 million, 2015," and a "[f]ull transformation of ouroperational network," claiming that "[w]e closed or divested 11 plants during the last 12 months[;] [w]e centralized procurement.…So everything that was done during 2014 was based on organic … moves only."

211. The statements above were false and misleading. Having attributed the source of the profit increase, Vigodman had a duty to disclose that the Price-Hike Strategy, whereby Teva made at least 107 systematic price hikes since July 2013, which generated over $1.1 billion in inflated profit by the close of Q1 2015, contributed materially to the results. Indeed, the excess profit of as much as $1.1 billion generated by the price increases accounted for *all* of the improved operating profit that Vigodman touted. Vigodman's statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all of the price hikes since July 2013, and the Company generated significant generics revenues and profits from such anticompetitive practices.

### 9.    Q2 2015 Financial Disclosures

212. On July 30, 2015, Teva filed its Q2 2015 financial statements on a Form 6-K with the SEC and held an investor earnings call regarding the financial results and the Actavis transaction. The false statements in the Q2 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

213. The Q2 2015 6-K disclosed a YOY increase in generic profit of $193 million, or 36%, attributed "primarily" to "higher gross profit as well as lower selling and marketing

76

expenses," while claiming that higher gross profit was "mainly a result of higher gross profit in the United States, due to the launches of aripiprazole in the second quarter of 2015 and of esomeprazole during the first quarter of 2015, and lower production expenses."

214.   The statements above were false and misleading.  Having attributed the source of the profit increase, Teva had a duty to disclose that the Price-Hike Strategy, whereby the Company made at least 107 systematic price hikes since July 2013, contributed materially to the results. These price increases generated at least $236 million in inflated profit in Q2 2015, a YOY increase of $76 million, which increase accounted for 39% of the YOY increase in generic profit, and amounted to over one and a half times the $53 million YOY reduction in S&M expenses to which Teva attributed the increased generic profit.  The statements above were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all of the price hikes since July 2013 and the Company generated significant generics revenues and profits from such anticompetitive practices.

### 10.   Q3 2015 Financial Disclosures

215.   On October 29, 2015, Teva filed its Q3 2015 financial statements on a Form 6-K with the SEC and held an investor earnings call. The false statements in the Q3 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

216.   The Q3 2015 6-K disclosed a YOY increase in generic profit of $20 million, or 4%, attributed "primarily" to "lower selling and marketing expenses, partially offset by lower gross profit," which in turn was partially offset "by higher gross profit of our API business."

217.   The statements above were false and misleading.  Having attributed the source of the profit increase, Teva had a duty to disclose the Price-Hike Strategy, whereby Teva made at least 114 systematic price hikes since July 2013, 7 of which had been implemented in July 2015,

contributed materially to the results. These price increases generated as much as $218 million in inflated profit in Q3 2015, a YOY increase of $25 million, which accounted for all the YOY increase in generic profit.  The statements above were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes since July 2013, and the Company generated significant revenues and profits from such anticompetitive practices.

218.   During the Oct. 29, 2015 earnings call, Vigodman disavowed that any of the improvement in Teva's results over the previous years were driven by generics pricing:

> We're very – and are very responsible in everything that portends to prices on the Generics side and on the Specialty side. And I would even put it another way, all the improvement you see in our – in margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message.

219.   The statements above were false and misleading.  By this time, Teva's Price-Hike Strategy had increased prices 114 times to 104 drugs since July 2013, often increasing them by well over 100%.  These undisclosed price hikes generated over $1.6 billion in inflated profit as of the time the statements were made, including at least $690 million in 2014 and $680 million in the first three quarters of 2015 alone. Thus, the inflated profit contributed significantly to improving Teva's generic profit margin, as that inflated profit was devoid of any material corresponding costs, directly contradicting Vigodman's statements. Vigodman's statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes since July 2013, and the Company generated significant generics revenues and profits from such anticompetitive practices.

220.   In light of the legislative proposals at the time that would penalize generic

manufacturers for raising prices above the rate of inflation, an analyst from Barclays asked for management's thoughts on "the potential limit to generic drug price increases." In response, Olafsson minimized the extent and effect of Teva's practice of increasing prices and implied that Teva was not dependent on profit from generics and, thus, was immune to the effects of the proposed legislation:

> In terms of the proposed legislation on pricing control on generics, first of all we don't really know what it's going to be. But let me give you an example. So Teva has the largest portfolio on the U.S. market. We are offering approximately 275 products. And we have told you that overall on our whole portfolio, we have a decline in price. The talk about the inflation in generics when you have a big portfolio is really not there. 95% of our portfolio is declining due to the consolidation of the customers I talked about. There might be 5% of the portfolio that is either flat or increasing in pricing due to some abnormalities in the market.

221.    The statements above were false and misleading. By this time, Teva had made at least 114 systematic price hikes, 7 of which Teva implemented on July 29, 2015, and many of which increased particular prices by more than 100%. The more-than 100 drugs subject to these price increases made up over 37% of Teva's generic drug portfolio, and none of these price increases were due to "some abnormalities in the market" like shortages or increases in demand. By the end of Q3 2015, the Price-Hike Strategy had generated over $1.6 billion in inflated profit. Olafsson's statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes since July 2013, and the Company generated significant generics revenues and profits from such anticompetitive practices.

### 11.    November 19, 2015 Investor Conference

222.    On November 19, 2015, Jefferies held a conference at which Desheh was pressed by the Jefferies analyst, who asked, "[L]et's talk about everyone's favorite topic the last 2 months,

79

pricing and specialty pharmacy. Could you just give us your 20,000 foot view on pricing, is it an issue? Your particular products, where do you go on pricing?" Desheh minimized the extent of Teva's policy and practice of making price increases and its financial dependence on profit therefrom:

> Now there's a lot of noise around pricing issues. Some of it's coming from politicians who are driving agenda, which is very, very legitimate. Our exposure to all these things is very minimal …. And Teva was not associated with any of that. So we're playing a competitive game. We're playing it fairly. We of course play by the book and by the rule. And we believe that our exposure to any initiative on price reduction in the United States is as a small as anybody can have.

223. The statement above was false and misleading. Teva was critically dependent on inflated profit from price increases and the ability to make additional price increases to inflate profits, including to meet its financial projections. Thus, Teva was greatly exposed to any initiative that addressed generic drug price inflation, such as granting Medicare the ability to negotiate prices, which could lead to price deflation. Relatedly, these statements implied to investors that Teva was not engaging, and had not engaged, in any practice of increasing prices, which was simply untrue. The statement above was also false and misleading because it omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes since July 2013 and the Company generated significant revenues and profits from such anticompetitive practices.

### 12.    Offering Materials For Secondary ADS And Preferred Share Offerings

224. On November 30, 2015, Teva filed with the SEC a Registration Statement on Form F-3, signed by Vigodman, Desheh, and Griffin (the "ADS/Preferred Registration Statement"). Teva also filed two preliminary prospectus supplements pursuant to Rule 424(b)(5), which disclosed certain details regarding Teva's intention to offer additional ADSs and newly created Mandatory Convertible Preferred Shares ("Preferred Shares") to the public. On December 3,

2015, Teva filed two prospectus supplements with the SEC (referred to hereafter as the "ADS Final Prospectus" and the "Preferred Final Prospectus," respectively).

225.   The ADS/Preferred Registration Statement, the ADS Final Prospectus, and the Preferred Final Prospectus each incorporated by reference the 2014 20-F, Q1 2015 6-K, Q2 2015 6-K, and Q3 2015 6-K, which contained false and misleading financial disclosures as discussed above.

### 13.   January 11, 2016 Investor Conference

226.   At a January 11, 2016 J.P. Morgan conference, a J.P. Morgan analyst asked Olafsson, "McKesson this morning announced some maybe challenging pricing on the generics side or an expectation of that going forward. Could you just comment a little bit on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?"  In answering the question, Olafsson responded:

> The generic pricing – we need to keep in mind there's a lot of talk about inflations in generic pricing. But what we see is there's – overall on our total portfolio of 270 products, there is a slight decrease in pricing. It's low single digit, but year on year we see a low single-digit decrease because on 95% of our portfolio, we experience price decline. And then on 5%, we might be flat or a slight increase. So, overall, we see that in the business. There's a lot of headlines of examples of big price increases in generics. But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – there is a decline.

227.   The statements above were false and misleading.  The statements minimized the impact of price increases – which by the end of Q3 2015 had generated as much as $1.7 billion in inflated profit – on Teva's bottom line since July 2013, and, thus, Teva's potential exposure to price deflation that its competitors and wholesalers were already reporting. By this time, Teva had increased the prices of over 100 generic drugs, many of which were increased by more than 100%, and certain of which were increased by more than 1,000%. The drugs underlying the Price-Hike

Strategy comprised over 37% of Teva's generic drug portfolio, flatly contradicting Olafsson's claim that 5% of Teva's generic portfolio "might be flat or a slight increase." Moreover, McKesson was one of Teva's major wholesalers and, thus, would presumably be experiencing issues in pricing similar to those faced by Teva. Olafsson's statements were also false and misleading because he omitted the highly material facts that Teva colluded and conspired with other manufacturers in implementing nearly all of these price hikes, and the Company generated significant revenues and profits from such anticompetitive practices.

### 14.   2015 Q4 and Full Year Financial Disclosures

228.   On February 11, 2016, Teva filed with the SEC a press release reporting the Company's Q4 and full year 2015 financial results. The same day, Teva filed its Form 20-F for the fiscal year ended December 31, 2015 with the SEC reporting the Company's FY 2015 financial results and held an investor earnings conference call. The false statements in the 2015 20-F are also incorporated by reference into the Notes Registration Statement and the Notes Final Prospectus.

229.   The Q4 2015 press release disclosed a YOY increase in generic profit of $7 million, or 1%, attributed "primarily" to "the reduction in S&M expenses, partially offset" by "lower sales of budesonide (Pulmicort®) in the United States."

230.   The statements above were false and misleading. In explaining that generics profits were offset by reduced sales, Teva had a duty to disclose that profit had declined from as much as $219 million in Q4 2014 to $166 million in Q4 2015, a decline of $53 million or 24% because the Price-Hike Strategy was unsustainable and under increasing investigation by governmental agencies and, thus impairing Teva's ability to make further price increases. The statements above were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly 100 price hikes since July 2013 and

82

the Company's financial performance suffered as the conspiracy collapsed and Teva could no longer generate significant revenues and profits from such anticompetitive practices.

231. The Teva 2015 20-F disclosed a YOY increase in generic profit of $500 million, or 24%, attributed "primarily" to "lower S&M expenses and higher gross profit," which was purportedly "mainly a result of higher revenues from new products launched in the United States during 2015, lower other production expenses and higher gross profit from API sales to third parties."

232. The statements above were false and misleading. Having attributed the source of the profit increase, Teva had a duty to disclose the Price-Hike Strategy, whereby Teva made at least 114 systematic price hikes since July 2013, contributed materially to the results. The price increases generated as much as $848 million in inflated profit in 2015, a YOY increase of $155 million that amounted to 31% of the YOY increase in generics profit. The statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes since July 2013, and the Company generated significant revenues and profits from such anticompetitive practices.

233. The table below reflects Teva's improved profits as reported in 2015, as well as the YOY change in inflated profits for the same period:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $296 | $193 | $20 | $7 | $516 |
| (Unreported) YOY Change in Inflated Profit | $108 | $76 | $25 | -$53 | $155 |

234. On the February 11, 2016 earnings call, Olafsson touted during his opening statements that "2015 was a very good year for Teva Generics" while explicitly denying that pricing had played *any* role in that supposed success. Specifically, Olafsson stated:

> We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% ofrevenue. This is $1 billion improvement in operating profit over 24 months' [sic] period. So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures.

235. The statement above was false and misleading. Contrary to Olafsson's statement, in 2014 and 2015 Teva made over $1.5 billion in profit from price increases – well in excess of the $1 billion improvement touted by Olafsson, which he attributed to factors other than pricing. Olafsson's statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes since July 2013 and the Company generated significant revenues and profits from such anticompetitive practices.

236. Later in the call, and repeated in his slide presentation, Olafsson minimized Teva's participation in price increases, and thus their impact on the Company's bottom line:

> Briefly, on pricing. As I've previously stated, we and the generic industry overall don't see price inflation of generics as it sometimesis portrayed in the media. On the contrary, for 2015, we saw a mid-single-digit price decline for the overall business.

237. The statements above were false and misleading. Teva had made at least 114 price increases since July 2013, many of over 100%. The inflated profit from the increases implemented as part of the Price-Hike Strategy was the bedrock of Teva's purported financial success during that time. Olafsson's statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes since July 2013 and the Company generated significant revenues and profits from such anticompetitive practices.

238. In that same call, Olafsson denied that Teva was seeing any change in its pricing environment:

84

> In the US, our largest market, we saw approximately 4% price erosion…. We expect to see the same in 2016. Nothing today points to a significant change in the generic pricing environment.

A Guggenheim Securities analyst asked: "some of your competitors have talked about pricing pressure in the generics business during the quarter. Curious if you saw that, and if so what might be driving that." Olafsson responded:

> As I mentioned in the beginning, we didn't see anything change in fourth quarter. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.

The slides Olafsson presented during the call echoed these statements:

> Also do not see the sharp drop in prices other competitors have seen recently[;] Mid-single digit decrease in 2015[.]

239. These statements were false and misleading. While Olafsson claimed not to have seen any changes in the pricing environment, Olafsson knew or recklessly disregarded that (i) Teva's profits from price increases had decreased precipitously, from as much as $236 million in Q2 2015, to $218 million in Q3 2015, to $166 million in Q4 2015, a decline of $70 million, or 30%, in two quarters, and (ii) Teva was largely unable to implement further price increases, as it had in the past. Olafsson's statements were also false and misleading because he omitted the highly material facts that Teva colluded and conspired with other generics manufacturers in implementing nearly 100 price hikes since July 2013, and the collapse of the conspiracy was already resulting in increasing pricing pressure and price erosion in Q1 2016 – precisely the opposite of Olafsson's statement that there was no "significant change in the generic pricing environment."

### 15.    March 8, 2016 Investor Conference

240. During a March 8, 2016 Cowen conference, Olafsson touted the increased profitability of Teva's generics segment, attributing it to sources other than price increases:

> In terms of growing the profitability, from 2013 to 2015, we grew the operating profit of the generic business from 17% in 2013, and we exited for the full year of 2015 we were at 28.1%. So it's about 1,100 basis points we improved the profitability on approximately $10 billion in revenue. So it was a significant improvement over a 24-month period. Part of that was due to the improvement in our cost of goods sold, very important in consolidation of plants and looking for the money there. But also part of it was due to portfolio selection and the cost infrastructure.

241. The statements above were false and misleading. Once Olafsson chose to speak on this subject and having attributed the source of the profit increase, Olafsson had a duty to disclose that Teva had by then generated over $1.7 billion in profit from price increases on dozens of generic drugs from 2013 through 2015, pursuant to the Price-Hike Strategy; far more than the $1.1 billion in improved generics profit touted by Olafsson, which he attributed to factors other than price increases. Olafsson's statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes since July 2013, and the Company generated significant generics revenues and profits from such anticompetitive practices.

242. Later during the conference, a Cowen analyst asked Olafsson: "Can you discuss what you're seeing" in generics pricing, "what you're observing, and then maybe in the context of what you're hearing from others, both US and ex-US?"  In response, Olafsson declared:

> So we came out in our fourth quarter results, and told the market that we had seen approximately 4% price decline in the US market in 2015.… I think overall the pricing hasn't changed that much. There was a lot of talk about inflation in generic[s] pricing. But we never saw that…. [I]nflation never really happened in the generic business.… I don't see any big changes in the pricing environment.  It's relatively stable. 4% is worse than maybe two years ago. But it's similar to what we saw in 2014.

243. The statements above were false and misleading. The truth was that the Price-Hike Strategy, whereby Teva had increased the prices of over 100 drugs in the Company's

generics portfolio from July 2013 through Q1 2016, had generated well over $1.7 billion in profit from the beginning of the Relevant Period through the end of 2015. By this time Olafsson knew that Teva was largely unable to implement any further price hikes, and inflated profits flowing from prior price hikes had drastically fallen amid pricing pressure. Thus "the pricing" had changed and was not like it had been in 2014; Teva implemented at least 57 price increases that year alone as compared to making only 5 such increases in 2016, all of which were on prices of drugs that had been previously increased. Olafsson's statements were also false and misleading because they omitted that Teva colluded and conspired with other manufacturers to implement widespread and substantial price hikes from July 2013 through Q1 2016. Olafsson's statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly 100 price increases since July 2013, precisely the opposite of Olafsson's statement that "inflation never really happened in the generic business. Moreover, the collapse of the conspiracy was already resulting in increasing pricing pressure and price erosion in Q1 2016, directly contradicting Olafsson's statement that there were not "any big changes in the pricing environment."

### 16.     2016 Q1 Financial Disclosures

244.    On May 9, 2016, Teva filed its Q1 2016 financial statements on Form 6-K with the SEC and held an investor earnings call. The false statements in the Q1 2016 6-K are also incorporated by reference into the Notes Registration Statement and the Notes Final Prospectus.

245.    The Q1 2016 6-K disclosed a YOY decline in generic profit of $215 million, or 27%, attributed "primarily" to "lower gross profit, as well as higher R&D expenses," with lower gross profit purportedly "mainly a result of lower sales of high gross profit products in the United States, higher production expenses and lower gross profit in our European markets."

246.    The statements above were false and misleading. Having attributed the source of

the profit decline, Teva had a duty to disclose that inflated profit declined from as much as $228 million in Q1 2015 to $124 million in Q1 2016, a decline of $104 million or 46%. That YOY decline comprised as much as 48% of theYOY decline in generic segment profit and was more than four times the $25 million YOY increase in R&D expenses to which the Defendants attributed the results.  The above statement further concealed that the Price-Hike Strategy was unsustainable, as Teva was largely unable to implement any further price hikes, and inflated profits flowing from prior price hikes had drastically fallen amid pricing pressure. The statements were also false and misleading for omitting the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly 100 price hikes since July 2013, and that the collapse of the conspiracy was a principal cause of the Company's declining generics profits.

247.   During his opening remarks on the May 9, 2016 earnings call, Olafsson explained away the decline in generic profit margin by blaming it on issues other than pricing:

> When compared to first quarter 2015, the operating profit declined by 360 basis points, fully explained by the exclusive launch of generic Nexium, esomeprazole, in the first quarter 201[5]. Excluding the exclusivity period of esomeprazole in first quarter, the profit margin of the generic segment was 24.4%.

248.   The statements above were false and misleading.  The statements entirely excluded the decline in Teva's inflated profit from the unsustainable Price-Hike Strategy, including the steep decline of $42 million in inflated profit from Q4 2015 to Q1 2016, and the $104 million YOY decline compared to Q1 2015. That YOY decline comprised 48% of the decline in YOY generic profit that Olafsson attributed to a decline in sales of generic Nexium, reflecting that the Teva could no longer maintain the inflated profit generated by the price increases implemented since July 2013, nor could Teva make further price increases. The statements were also false and misleading because they omitted the highly material fact that Teva colluded and conspired with other manufacturers to implement nearly 100 price

88

hikes since July 2013 and that the collapse of the conspiracy was a substantial cause of the Company's declining generics profits.

249.   Also on that call, Olafsson, while asserting he would "do my best to provide you with as much color as possible," claimed that Teva was immune from downward pricing trends:

> Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year. Teva experienced approximately 4% price erosion in the United States last year, and our guidance for this year is that it will remain the same …. From where I sit today, there is nothing that changes my mind about that. Nothing has happened in the last two quarters that has changed the pricing environment. What this boils down to is each individual company's business model….

250.   The slides presented by Olafsson during the conference call echoed Olafsson's statements: "What has changed in the US pricing environment since Q4 2015? The short answer is…nothing[.]… There is no change in the pricing environment[.]   It all comes down to each company's  business model…. Why is Teva generics performance better than most Gx companies? Portfolio optimization …. [and] [n]ew products…."

251.   These statements above were false and misleading.  Far from not seeing "any fundamental changeor worsening in the pricing environment," Teva's Price-Hike Strategy of generating billions in profits from price increases was collapsing.  In Q3 2015, Teva earned as much as $218 million in inflated profit from price increases, while in Q1 2016 it earned $124 million; and while, in 2015, Teva made 23 price increases on generic drugs, in 2016 it would implement only 5, all of which were on prices of drugs which had previously been increased.  The statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly 100 price hikes since July 2013, and that the collapse of the conspiracy and the accompanying pricing pressure and erosion had fundamentally changed the "pricing environment."

252. During the May 9, 2016 earnings call, Olafsson also offered the supposed reasons why Teva's generics division had achieved success over several years, and thus was differently positioned compared to its competitors which were reporting increased pricing pressure:

> We have taken a significant step to transform our generic[s] business, solidify our foundation, increase our profitability, and to better position us to generate sustainable long-term growth. These many steps have included portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products, regaining a leading position in submission on first-to-files,enhancing our go-to-market, and sales force effectiveness capabilities, and much, much more. These are the very capabilities that companies must possess in order to thrive at the global level. We have created a unique and differentiated platform, positioned to extract significant value in the global growing generic space.

253. This statement above was false and misleading. While attributing Teva's supposed past success to other factors, Olafsson had a duty to disclose that Teva had generated as much as $1.9 billion in inflated profit from price hikes reported since the start of the Relevant Period. The inflated profit, however, had significantly declined due to the unsustainability of the Price-Hike Strategy and the materialization of the risks concealed by Teva, Vigodman, Desheh, Olafsson, and Griffin – namely the risk that heighted public, Congressional, and regulatory scrutiny of generic drug price increases – would result in increased competition, price erosion, and the inability to implement further price increases. The statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes during the Relevant Period, and such anticompetitive practices were the bedrock of Teva's extraordinary generics performance, rather than a "unique and differentiated platform," as Olafsson claimed.

### 17. Investor Conferences In The Build Up To The $20 Billion Debt Offering

254. On May 10, 2016, Olafsson participated in a Bank of America investor conference

90

where he claimed that Teva was immune from pricing pressure:

> [T]here's nothing I have seen which shows a worsening pricing environment. We saw a price erosion in the US last year of approximately 4%. …
>
> I know many of the competitors in the generic space, and in the specialty space, are talking about a lot of pricing pressure, but it shouldn't be. There is nothing that has happened over the last two quarters which has changed fundamental the market. And I feel that we are blaming the environment on individual company's business model more than anything else because as long as you have the right portfolio, you have had the right investment in R&D, you really have a strong opportunity.

255. Similarly, during a June 3, 2016 Sanford C. Bernstein investor conference, in response to an analyst question regarding pricing pressure, Vigodman stated Teva was not facing increased pricing pressure:

> So we are very consistent. Our message was conveyed, and we will continue to convey. What we see is a 4% to 5% erosion. That's what we see. That's not something which is different from what we said during 2015. By the way, we continue saying it in 2016. I think our results in Q1 demonstrated that.

256. Then, during a June 8, 2016 Goldman Sachs Global Healthcare Conference, Olafsson conveyed a similar response to a question from a Goldman Sachs analyst regarding pricing pressure:

> But really, the environment hasn't changed. When we signed that deal in July, we talked about 4% price erosion in the US generic business. And we are still talking about the same number, what we see in the base business.

257. The statements above were false and misleading. In truth, Teva was experiencing a drastic decline in inflated profit from the cessation of the Price-Hike Strategy, and, in the past two quarters, a rapidly deteriorating pricing environment. The Price-Hike Strategy was proving to be unsustainable, with inflated profit declining by $104 million in Q1 2016 as compared to Q1 2015, as the risks concealed by Defendants' strategy began to

materialize – namely increased pricing pressure, erosion, and the inability to implement further price increases due to increased public, legislative, and regulatory scrutiny of the high costs of generic drugs. The statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all of the price hikes during the Relevant Period (and nearly 100 price hikes since July 2013), and Teva experienced significant pricing pressure and price erosion as the conspiracy collapsed.

### 18.    July 13, 2016 Guidance Assumption

258. In a July 13, 2016 call held by Defendants Teva, Vigodman, Desheh, and Olafsson to announce the acceleration of Teva's debt offering to the end of July, which, on the May 9, 2016 investor call, had been scheduled to occur in September 2016 or in Q4 2016, a Citigroup analyst asked about pricing: "[C]an you comment on the generics pricing assumptions that you have baked into your forecast? Following on that, Siggi, maybe you could just comment on the generics pricing environment, more broadly, that you are currently seeing in the marketplace." In response, Olafsson indicated that Teva had still not seen any change in the pricing environment, and that this stable pricing was incorporated into the assumptions underlyingTeva's guidance and projections:

> Our assumption and what we assume is basically approximately 5% organic growth that we see year on year.… In terms of generic pricing in the second quarter, we saw no change in the pricing. We saw a stable environment, as we talked about, from first quarter into second quarter. Obviously, in second quarter, as we have highlighted to investors, there was no significant new launches that we saw in Teva, which obviously impacts the overall generic numbers. The pricing has remained stable.… Our assumption for the rest of the year is basically assuming the same pricing erosion. It is difficult to say; but as I'm sitting here today, with the information I have in hand, we are assuming and now forecasting for the guidance for the remainder of the year same pricing assumption as we have had for the first half of the year.

259.    These statements were false and misleading.  Teva's price erosion assumption was not based on "stable" pricing in which there was "no change" in the second quarter or the "first half of the year."  In truth, Teva was at that time experiencing a drastic decline in inflated profit from price increases, the inability to make additional price increases, and, over the past year, increasing pricing pressure and price deterioration.  Teva generated $10 million less in inflated profits from the first quarter of 2016 to the second quarter of 2016, which was part of a trend of steep decline. Teva generated $122 million less inflated profit in the second quarter 2016 than it had in the   second quarter of 2015.  In the first half of 2015, Teva had made 16 price increases.  In the first half of 2016, Teva only made 5, generating less than $12 million of increased profit by the end of the Relevant Period. The statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other generics manufacturers to implement nearly all of the price hikes during the Relevant Period (including nearly 100 price hikes since July 2013), Teva experienced significant pricing pressure and price erosion as the conspiracy collapsed, and the collapse of the conspiracy was a substantial cause of the Company's declining generics performance.

### 19.    The Offering Materials For The $20 Billion Debt Offering

260.    On July 13, 2016, Teva filed with the SEC a Post-Effective Amendment No. 1 to Form F-3 (the "Notes Registration Statement") signed by Defendants Vigodman, Desheh, and Griffin.  On July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final prospectus (the "Notes Final Prospectus") for its planned  offering of an aggregate of $15 billion in senior notes (the "Notes Offering"). The Notes Registration Statement and the Notes Final Prospectus incorporated by reference the 2015 20-F and the Q1 2016 6-K. The incorporated 2015 20-F and Q1 2016 6-K contained false and misleading financial disclosures, as described above.

93

### 20.     2016 Q2 Financial Disclosures

261.   On August 4, 2016, Teva filed its Q2 2016 financial statements on Form 6-K with the SEC and held an investor earnings conference call.  The Q2 2016 6-K disclosed a YOY decline in generic profit of $115 million, or 16%, attributed "primarily" to "lower gross profit," which in turn was purportedly "mainly a result of loss of exclusivity on certain products as well as increased competition on other products in the United States … and higher production expenses . . . . "  During the Aug. 4, 2016 earnings call, Desheh attributed the poor performance of the Company's generics segment to factors other than a decrease in inflated profit:

> Revenues of our US generics business was impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide which were the major drivers of our generic business in the US in the second quarter last year.

262.   The statements above were false and misleading.  Having attributed the source of the profit decline, Teva had a duty to disclose but concealed the full truth that inflated profit declined from as much as $236 million in Q2 2015 to $114 million in Q2 2016, a decrease of $122 million or 52%. That YOY decline in inflated profit comprised nearly all the YOY decline in generic profit.   The statements further concealed that the Price-Hike Strategy was unsustainable, as Teva was at that time experiencing a drastic decline in inflated profits, an inability to implement additional price hikes, and an increasingly deteriorating pricing environment.  The statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all of the price hikes during the Relevant Period (and nearly 100 price hikes since July 2013), Teva experienced significant pricing pressure and price erosion as the conspiracy collapsed, and the collapse of the conspiracy was a substantial cause of the Company's declining generics performance.

263.   Also during that call, and in response to a Citigroup analyst's inquiry regarding

pricing stability, Olafsson denied seeing any change in the pricing environment:

> [T]he pricing is stable to the same degree as before. We saw approximately in the US, 4% price erosion in the business, in a way very stable from the first quarter. And the global pricing impact we saw in the business, in the generic business was approximately 5%. So we are pleased with the environment.

Olafsson then reiterated the same false and misleading sentiment later in the call:

> So overall, the business itself is fairly stable. As I mentioned in the beginning, we are seeing exactly the 4% price erosion…. 4% price erosion in the US.

264. The statements were false and misleading. In Q2 2016, Teva suffered a $122 million YOY reduction in inflated profit from price increases compared to Q2 2015, and an increasing inability to implement further price hikes. The statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all of the price hikes during the Relevant Period (and nearly 100 price hikes since July 2013), and Teva experienced significant pricing pressure and price erosion as the conspiracy collapsed, rather than a "fairly stable" pricing environment, as Olafsson claimed.

265. In response to a question from a J.P. Morgan analyst regarding whether Teva could implement price hikes following the Actavis acquisition, Olafsson stated:

> I think the pricing comes with shortages in the market. If you have an exclusive product, if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out. But overall, the size, and being a combined company doesn't play into that.

266. These statements were false and misleading. The statements minimized Teva's Price-Hike Strategy when, in reality, Teva made 119 price increases on over 100 drugs, most of which were for 100% or more (and certain of which were over 1,000%), that were not associated with any such shortage or dysfunction. This left Teva highly exposed to the pricing

pressure facing the industry.  The statements were also false and misleading because they omitted that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes during the Relevant Period (and nearly 100 price hikes since July 2013), and the Company's financial performance suffered as the conspiracy collapsed and Teva could no longer take advantage of the significant revenues and profits generated from such anticompetitive practices.

### 21.    2016 Q3 Statements Continuing To Deny Price Inflation and Increased Pricing Pressure

267.    On September 7, 2016, Desheh participated in a Wells Fargo conference where he was asked by the Wells Fargo analyst, "Teva has said during this whole, the last couple years, that you're not really seeing the same generic erosion, pricing erosion that some of the other companies have mentioned or blamed.  Is that still the case?"  Desheh responded by claiming that Teva was not experiencing increased pricing pressure:

> Now, with talking about prices of the base business, product that we've been selling more than two years already, the prices are very stable there.… [Y]ou don't see -- there you don't see the erosion. Where we see erosion is … [when] you have six months exclusivity, you start with the high price, and then obviously more competitors go into the market and the price goes down. But when we look at the base, there's no – there's no pressure on prices.

On Teva's September 9, 2016 Generic Medicines Business Overview call with analysts, the slides presented echoed that Teva was not experiencing a change in pricing pressure:

> Price erosion is nothing new[.]… Diverse portfolio and competitive cost structure allows for long-term value creation.

268.    The statements above were false and misleading.  While Desheh claimed that Teva's base business was experiencing "no pressure on prices," and the slides claimed that "price erosion is nothing new," Teva was suffering massive declines in inflated profit and the inability to implement further hikes due to increased pricing pressure that was itself the

materialization of the risks concealed by Defendants Teva, Vigodman, Desheh, Olafsson, and Griffin.  Most recently, in Q2 2016, Teva suffered a massive $122 million YOY reduction in inflated profit from price increases compared to Q2 2015, and Teva implemented only 5 price hikes of about 25% in 2016, compared to 23 hikes in 2015, and 57 hikes in 2014, with several price hikes in excess of 100%, and certain hikes over 1,000%, demonstrating the unsustainability of the Price-Hike Strategy.  The statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly 100 price hikes since July 2013, and the Company experienced significant pricing pressure and price erosion due to the collapse of the conspiracy.

269.  During the September 9, 2016 call, Olafsson categorically denied that Teva had increased prices on its generic drugs: "There is no inflation in the generic pricing, which I will talk about."  Later during that same call, in response to a Bank of America analyst's question regarding the impact of specialty drug pricing on generics, Olafsson responded:

> [S]o first of all, we need to differentiate generics from branded pricing.
> And people that say that the generic – there's a big generic price
> inflation, are simply wrong.

Olafsson even claimed that Teva had a "*secret sauce*" that immunized the Company from price fluctuations.

270.  The statements above were false and misleading.  Each of these statements minimized (i) Teva's practice of making price increases pursuant to the Price-Hike Strategy, often by raising the price over 100% above the pre-inflation price, on over 100 drugs or at least 37% of its portfolio; (ii) the importance of the inflated profit from those price increases to the Company, (iii) the unnatural price inflation in Teva's book of generic drugs caused by those increases and the attendant risks associated with such inflation; and (iv) that Teva was at the time experiencing a dramatic drop in inflated profit from those price increases and an inability

97

to implement further increases as a result of the materialization of the risks concealed by Defendants Teva, Vigodman, Olafsson, Desheh, and Griffin.  The statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes since July 2013, and Teva experienced significant pricing pressure and price erosion as the conspiracy collapsed, resulting in declining generics performance.

271.  During the September 9, 2016 call, Olafsson also responded to a question as to whether Teva would be taking price increases following the Actavis acquisition, stating:

> So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics. When price increases are taken, there's some kind of abnormality in the business. There are shortages.

272.  The statements were false and misleading.  The statements implied that because Teva only increased prices in limited circumstances, it was not exposed to price deflation.  The truth was that Teva had raised the prices of over 100 drugs, or 37% of its portfolio, via 119 price increases frequently by more than 100% of the original price (and in certain instances by more than 1,000%), and thus had enormous price inflation in its portfolio. Moreover, none of those price increases related to shortages.  Olafsson's statements were also false and misleading because they omitted the highly material fact that Teva colluded and conspired with other manufacturers to implement nearly 100 price hikes since July 2013, none of which related to shortages.

### 22.    2016 Q3 Financial Disclosures

273.  On November 15, 2016, Teva filed its Q3 2016 financial statements on Form 6-K with the SEC and held an investor earnings conference call.  The Q3 2016 6-K disclosed a YOY increase in U.S. generic revenue of $261 million, or 25%, attributed to increased revenues from

Actavis. But, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's

U.S. generic revenues from its legacy business suffered a YOY decline of $277 million, or 27%.

In discussing the increased revenues that were due to Actavis, Teva disclosed that those revenues

were:

> partially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in sales of budesonide … due to increased competition and the loss of exclusivity on esomeprazole.

274.    The statements above were false and misleading. Having attributed the sources

offsetting the increased revenues from Actavis, Teva had a duty to disclose but concealed the full

truth that inflated profit declined from as much as $218 million in Q3 2015 to $97 million in Q3

2016, a decline of $121 million or 56%. That YOY decline in inflated profit comprised as much

as 44% of the YOY decline in U.S. generic revenue from Teva's legacy business, excluding the

impact of Actavis. It further concealed that the Price-Hike Strategy was unsustainable, as the

inflated profit from the associated price increases was drastically declining, and Teva was

increasingly unable to implement further hikes. The statements were also false and misleading

because they omitted the highly material facts that Teva colluded and conspired with other

manufacturers to implement nearly 100 price hikes since July 2013, Teva experienced significant

pricing pressure and price erosion as the conspiracy collapsed, and the collapse of the conspiracy

was a substantial cause of the Company's declining generics performance.

275.    During the November 15, 2016 earnings call, a Credit Suisse analyst asked, "you

mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the

mid single-digits going forward…. [W]hat's going to happen in the coming quarters [that] will

be different than what you saw this quarter?"  Olafsson responded:

> Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing. And what

> we saw in the difference between the 5% or mid single- digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product.

Olafsson doubled down on this explanation when pressed by an incredulous analyst from J.P. Morgan, who asked how Teva was sure that the decline was not the same pricing pressure seen throughout the market. Olafsson reiterated:

> [W]here I sit here today, experiencing the market, there hasn't again been any fundamental change.

276.    The statements above were false and misleading. In truth, Teva was experiencing a sustained and material erosion in the pricing environment, particularly with regard to the drugs subject to the Price-Hike Strategy. Olafsson's flat denials in answer to specific questions were particularly misleading given that Teva had inflated prices on over 100 drugs, profited by as much as over $2.1 billion since the start of the Relevant Period, and was now suffering from drastic YOY reductions in inflated profit due to the cessation of the Price-Hike Strategy. The statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other generics manufacturers to implement nearly 100 price hikes since July 2013, Teva experienced significant pricing pressure and price erosion as the conspiracy collapsed, and the collapse of the conspiracy was, in fact, a "fundamental change" in the pricing environment and a substantial cause of the Company's declining generics performance.

277.    During the same November 15, 2016 earnings call, a Wells Fargo analyst asked whether the stated 7% price erosion experienced that quarter was a "result of having to tame previous price increases, or give back some of those?" Olafsson denied the existence of a pricing trend beyond that caused by Actavis-acquisition related divestitures:

> No, basically, the main reason … was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it. What our customers did, as they do, is that there is a new player in the market that took over those products, and that became a pricing pressure

100

on roughly about 60 molecules of -- and these were one of our top -- the top molecules we had in our portfolio. So there was an instability that happened in the market during the month of August, when the new owners were taking market share. It didn't change the fundamental of the market. It didn't change the structure of the market, or the chemistry of the market, but we saw the impact on the divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

278.    The statements above were false and misleading.  The inflated profit from price hikes had declined drastically, contributing just $97 million in Q3 2016, a YOY reduction of $121 million, or 56%. The sharp decline in inflated profit was a result of the materialization of the risks that Defendants Teva, Vigodman, Olafsson, Desheh, and Griffin concealed as they implemented their Price-Hike Strategy – namely increased pricing pressure resulting from increased public, legislative, and regulatory scrutiny of generics drug pricing, which in turn resulted in increased competition and the inability to implement further price hikes. Those were not single-quarter issues related to divested products, as suggested by Olafsson, but rather a long-term trend with no end in sight.  The statements were also false and misleading for omitting the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly 100 price hikes since July 2013, Teva experienced significant pricing pressure and price erosion as the conspiracy collapsed, and the collapse of the conspiracy was, in fact, a "fundamental" change in the "structure" of the market and a substantial cause of the Company's declining generics performance.

### 23.    The January 6, 2017 Guidance Call

279.    During a December 8, 2016 Citi Global Healthcare Conference, Vigodman announced that Teva would provide 2017 guidance early in January 2017.  During the conference call, Vigodman claimed Teva's past success was not due to inflated profit from price hikes,

stating:

> Since the start of 2014, one of our greatest priorities has been to increase the profitability of our generics business. In the first three years of this great effort, we have been able to improve significantly the margins of Teva's standalone generics business. This has been accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure.

The statement was false and misleading. Having attributed the source of the profitability increases, Vigodman had a duty to disclose but concealed that the Price-Hike Strategy, whereby Teva made at least 119 price hikes since July 2013, many of which were in excess of 100% of the prior price, contributed over $2.2 billion to Teva's profit from the start of the Relevant Period through the end of 2016. Vigodman's statement was also false and misleading because it omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly all the price hikes since July 2013, and such anticompetitive practices drove the turnaround in Teva's generics performance and profitability since 2014.

### 24.    2016 Q4 And Full Year Financial Disclosures

280. On February 13, 2017, Teva filed with the SEC a press release reporting the Company's Q4 2016 and full year 2016 financial results and held an investor earnings conference call. Two days later, on February 15, 2017, Teva filed its Form 20-F for the fiscal year ended December 31, 2016 with the SEC reporting the Company's full year 2016 financial results. The 2016 20-F disclosed a YOY 5% decline in U.S. generic revenues of $200 million. When removing the impact of Actavis' $1.168 billion in U.S. generics revenues, Teva's U.S. generic revenues from its legacy business suffered a YOY 29% decline of $1.4 billion. Per the 2016 20-F this decline purportedly:

> "resulted mainly from the loss of exclusivity on esomeprazole … and aripiprazole …, a decline in the sales of budesonide … due to increased competition, loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition and the

102

decline in sales of capecitabine."

281.   The statements above were false and misleading.  Having attributed the source of the increased revenues, Teva had a duty to disclose but concealed the full truth that inflated profit declined from as much as $848 million in 2015 to $421 million in 2016, a 50% decline of $427 million. That YOY decline in inflated profit comprised 31% of the YOY decline in U.S. generics revenue from Teva's legacy business, excluding the impact of Actavis.  Even giving Teva the benefit of Actavis' 2016 revenues, the YOY decline in inflated profit was more than double the $200 million YOY decline in U.S. generics revenues.  This statement further concealed that the Price-Hike Strategy was unsustainable, as inflated profit resulting from price increases was drastically declining, Teva was unable to implement further price hikes, and there was increasing pricing pressure and price erosion.  The statements were also false and misleading because they omitted the highly material facts that Teva colluded and conspired with other manufacturers to implement nearly 100 price hikes since July 2013, Teva experienced significant pricing pressure and price erosion as the conspiracy collapsed, and the collapse of the conspiracy was a substantial cause of the Company's declining generics performance.

**B.      Misrepresentations Regarding Price Competition**

282.   Throughout the Relevant Period, Defendants Teva, Vigodman, Olafsson, and Desheh made materially false and misleading statements concerning purported "intense" or "fierce" competition on price in the U.S. market for generic drugs. These statements, which were made in conference calls and SEC filings, gave investors the false impression that the markets for generic drugs were functioning as intended.  Given that generics drugs are undifferentiated commodities, the only way that generics manufacturers can compete is on the price of their products.  This competition is the very purpose of the generics market, which was created to drive the price of generic drugs towards their marginal cost of production, opening patient access to

essential medications.

283. Defendants' statements about purported price competition by generics manufacturers were false and misleading because Teva was not in fact competing on price. Instead, Teva and its competitors, on nearly 100 occasions, raised their prices in unison, often by large amounts in excess of 100% of the previous prices, rather than lowering prices to increase market share. Moreover, Teva also raised the price of drugs on which it had a monopoly, while other generics manufacturers stayed on the sidelines instead of entering the market. In short, Teva was profiting from a lack of competition. The markets for many of Teva's generic drugs were not functioning competitively; rather than compete, generics drug manufacturers deliberately and intentionally agreed not to compete. Defendants' statements about purported price competition by generics manufacturers were also false and misleading because, in truth, Teva colluded and conspired with other generics manufacturers to allocate market share and fix prices for hundreds of generic drugs. Indeed, Teva was a central participant in industrywide collusion and price-fixing. *See infra* Sections IV.I, V.C.

### 1. False Statements On Conference Calls

284. On July 27, 2015, during Teva's investor conference call to discuss the Actavis acquisition, Olafsson responded to a question concerning the competitive landscape of the generic drug market, stating: "the U.S. generic market is very competitive … [T]here's fierce competition on most of the portfolio, if not all of the portfolio." On that same call, Vigodman added: "we promise to do everything in our power to basically take the company to be able to continue the improvement that we have been witnessing here. We believe in competition, and we'll do what is needed in order to win in all the markets we operate."

285. On October 29, 2015, during Teva's Q3 2015 earnings call, Olafsson falsely stated: "So on the pricing, I think pricing is obviously based on the competition. We have talked about

that the overall pricing trend is down."

286. On November 19, 2015, during an investor conference hosted by Jeffries, Desheh falsely stated that Teva was fiercely competing in generics markets:

> Generic prices. There is – there are no – I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States … So it is a highly competitive environment with players coming from all over the world with a very fierce price competition. The price of generic went down 50% over the past 10 years .… So we're playing a competitive game. We're playing it fairly. We of course play by the book and by the rule … And we are in short playing in a very competitive market.

287. These statements were false and misleading. Contrary to Olafsson's July 27, 2015 statement, by that time there was not "fierce competition on most of … if not all of" Teva's generic drug portfolio. Since July 2013, Teva had made, pursuant to the Price-Hike Strategy, 107 price increases without any competitor competing on price. Most of those price increases were made in unison with Teva's supposed competitors. Vigodman's July 27, 2015 statement that "we believe in competition" was also false as a result, and due to the fact that Teva had adopted and participated in the Price-Hike Strategy, the success of which depended on a lack of competition. Olafsson's October 29, 2015 declaration that "pricing is obviously based on competition" was false because, by then, the opposite was true: pricing for the drugs subject to the Price-Hike Strategy was based on a distinct lack of competition. Desheh's November 19, 2015 statements that Teva was "playing a competitive game…by the rule" in the generics markets was false and misleading for all the reasons that the other statements were. Each statement was particularly misleading given the importance of the concealed price increases to Teva's bottom line, and because the profits from this concealed source were in fact the foundation of Teva's supposed turn-around and success.

### 2. False Statements In Teva's SEC Filings

105

288.    In each of the Forms 20-F that Teva filed for the years 2013, 2014, and 2015, Teva made substantively identical false and misleading statements (adopted by reference in each quarterly filing) that (i) warned investors that "intense" competition was a primary risk Teva faced in the U.S. generic drug market, and that competition would force the price of generic drugs down, as would be expected; and (ii) described how Teva's competitive advantage was a "competitive pricing strategy" and the ability to launch new generics:

> Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter themarket for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

> In the United States, we are subject to intense competition in the generic drug market from other domestic and foreign generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.

289.    Each of these statements was materially false and misleading because, while Teva represented that the U.S. generic drug market was working effectively as designed by forcing rival generic drug manufacturers to compete for market share by underbidding each other on price, the opposite was true.  Teva had made over a hundred price increases over this time, most of which were done in unison with competitors.  The statements to the effect that that "price typically declines, often dramatically" because of competition, resulting in "margin pressure," and that Teva's means to combat the purported effects of competition were through launches and

a "competitive pricing strategy," were false and misleading because they concealed that in 2013, 2014, and 2015 Teva implemented the Price-Hike Strategy and undertook, respectively, 34, 57, and 23 systematic increases of generic drug prices to generate billions in inflated profits, by deliberately taking advantage of markets that lacked competition, mostly due to collusion.

### C.    False Denials of Participation in Collusive Conduct

290.   Teva repeatedly, and falsely, denied the Company's participation in collusive conduct.  In Teva's August 3, 2017 Form 6-K, Teva described the various antitrust matters it faced, including the Connecticut AG and DOJ subpoenas and the December 2016 AG lawsuit, and fraudulently stated that "Teva denies having engaged in any conduct that would give rise to liability with respect to the above- mentioned subpoenas and civil suits." Teva made materially identical false and misleading statements in each of its periodic reports filed with the SEC between August 3, 2017, and May 10, 2019, including Teva's Form 6-K filed on November 2, 2017; Teva's Form 10-K for the year ended December 31, 2017, filed on February 12, 2018; Teva's Form 10-Q for the period ended March 31, 2018, filed on May 3, 2018; Teva's Form 10-Q for the period ended June 30, 2018, filed on August 2, 2018; Teva's Form 10-Q for the period ended September 30, 2018, filed on November 1, 2018; and Teva's Form 10-K for the year ended December 31, 2018, filed on February 19, 2019.

291.   Further, on October 31, 2017, in response to media reports issued after the AGs filed a proposed amendment expanding their first antitrust complaint, a Teva spokeswoman stated to *Courthouse News* that "Teva denies these allegations and will continue to defend itself vigorously in court." The Company further falsely assured investors that "[i]n accordance with our values, Teva is committed to complying with all applicable competition laws and regulations. To this end, we have a robust compliance program designed to ensure that our employees are aware of competition laws, regulations and internal policies, and their obligations to abide by

107

them."

292. Teva issued further denials in a December 19, 2018 statement to *Business Insider*, in which Teva denied the AGs' allegations and said it "will continue to vigorously defend itself."

293. On January 18, 2019, Teva stated to *Law360*: "Overall, we establish prices to enable patient access, maintain our commitment to innovative and generic medicines and fulfill obligations to shareholders." Teva added that it is "committed to complying with all applicable laws and regulations and is dedicated to conducting business with integrity and fairness. Litigation surrounding U.S. generic pricing of several companies, including Teva, continues to be the subject of inaccurate media stories."

294. On February 19, 2019, in response to media reports discussing an unredacted version of the first State AG complaint that had recently been made public, Teva stated to *Bloomberg* that it would "vigorously defend itself against these unfounded allegations."

295. In addition to the foregoing denials, each of Teva's Forms 10-Q and 10-K during the Relevant Period contained certifications pursuant to Section 302 of the Sarbanes- Oxley Act of 2002 ("SOX Certifications") signed by Defendant Schultz, stating that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

296. The market credited Teva's public denials of engaging in any collusive activities or other anticompetitive conduct. For example, in November 2016, after Teva denied involvement in the scandal amid flurry of media reports discussing the conspiracy, analysts at Guggenheim listed the fact that Teva "does not believe there is anything that should give rise to exposure," as a "positive" that supported Guggenheim's investment thesis. In a Q&A with management, a May

108

2018 Credit Suisse report states that the "Latest on Generic Drug Pricing Probe" is "Currently all just noise in the media." In June 2018, analysts at Wells Fargo stated after a meeting with the Company's senior management, "[a]s for the price collusion allegations, Teva does not think that it did anything wrong." Wells Fargo's report noted that Teva's CEO was "forthright and sharp when discussing the issues and answering our questions." Evercore ISI stated in December 2018 that "we know several large generics manufacturers don't feel there is solid evidence [of price-fixing]." On May 2, 2019, just days before nearly every State AG in the country accused Teva of being the ringleader of the price-fixing conspiracy, analysts at Credit Suisse issued a report noting that the Company's management emphasized that "internal reviews have not demonstrated any collusion."

297. These statements were false and misleading because, as alleged herein, Teva had in fact engaged in the collusive conduct the AGs alleged. Moreover, Teva was not merely a participant, but the central actor in an industry-wide scheme to fix prices and allocate customers; and four Teva executives were so extensively involved in the unlawful conspiracy that they were named personally as defendants in the AGs' May 2019 Complaint. The evidence against Teva is so strong that, in August 2020, the DOJ's Antitrust Division brought criminal charges against Teva. The DOJ's Second Superseding Indictment details Teva's central role as a co-conspirator in industrywide price-fixing and collusion from as early as May 2013 through December 2015, relying on documentary and testimonial evidence provided to the DOJ and the grand jury, including the testimony of a former Teva executive and multiple other cooperating witnesses. Indeed, Teva is the seventh company charged by the DOJ in connection with the conspiracy, and five of Teva's corporate co-conspirators have already pled guilty or otherwise admitted to the government's criminal charges and agreed to pay fines and civil settlements totaling nearly $900

million.

**D.**     **Defendants Violated Their Duty To Disclose Trends In Pricing**

298.   During the Relevant Period, Teva was under a statutory duty of disclosure pursuant to Item 5 of Form 20-F ("Item 5"), which require the same disclosures as Item 303 of Regulation S-K ("Item 303").  Specifically, a foreign issuer like Teva must, in the Management Discussion and Analysis ("MD&A") section of its Forms 20-F, describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or, unfavorable impact on net sales or revenues or income from continuing operations. The failure to disclose a material trend or uncertainty in violation of Item 303 (or Item 5) is an actionable omission under the securities laws.

299.   According to the SEC's interpretive release regarding Item 303, disclosure is necessary where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations. Even if Teva was not certain about the likely effect of the event or trend on its future revenues, the Company was still required under Item 303 to disclose the manner in which that then-known trend, event, or uncertainty might reasonably be expected to materially impact its future revenues.  Moreover, SEC Staff Accounting Bulletin No. 104 explains that management is required to disclose in the MD&A section the impact of artificial or collusive price increases: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the *reasons and factors* contributing to the increase or decrease."

300.   During the Relevant Period, Teva violated Item 303 by failing to disclose at least two trends related to the pricing of Teva's generic drugs. First, Teva failed to disclose the trend that Teva's financial success was driven in a material respect by the Price-Hike Strategy. These

110

price increases, as discussed, generated as much as $2.3 billion in inflated profit for Teva over the Relevant Period. Yet, the Price-Hike Strategy and the inflated profits it generated were risky and unsustainable as the Price-Hike Strategy was susceptible to actual competition, as well as public scrutiny, and scrutiny by legislatures, regulators and criminal investigators.

301.    Second, starting no later than the beginning of 2016, Teva failed to disclose the by-then known trend that the Price-Hike Strategy was beginning to fail. Teva could not maintain the inflated profits as industry-wide pricing pressure, which Defendants Vigodman, Desheh, and Olafsson consistently denied, was reducing the inflated prices on Teva's generics portfolio. Teva was also finding it increasingly difficult, if not impossible, to make additional price increases because of the scrutiny from the public, Congress, and the DOJ and AG investigations.  Indeed, Teva effectively could not make any price increases after the DOJ subpoena was issued on June 21, 2016.

302.  SEC Release No. 33-8350 provides MD&A disclosure guidance that is directly applicable to the facts here:

> [I]f a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should analyze the ***reasons underlying the decline in sales*** when the reasons are also material and determinable. The analysis should reveal underlying ***material causes*** of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.

303.    Instead, in violation of its duties under Item 303, Teva only disclosed trends that did not relate to the issue of price inflation (through price increases), or price erosion. Teva's failure to disclose the pricing trends was particularly misleading given that: (i) price increases were a core but concealed business strategy; (ii) management concurrently denied that pricing had impacted Teva's bottom line and that Teva made price increases simply for profit; (iii)

111

management consistently minimized the positive impact of price increases on Teva's profits; (vi) management consistently denied that price increases had resulted in price inflation, and (v) management denied that price deflation was materially affecting Teva, even as revenues from the former price increases cratered.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

304.    As set forth above, numerous facts demonstrate that Defendants acted with scienter in that each knew, or recklessly disregarded, the true facts in making the materially false and misleading statements alleged herein.   The following additional facts further demonstrate Defendants' scienter.

305.    Extensive Government Investigations and Teva's Obstruction. Governmental authorities have been investigating price fixing in the generic drug industry since at least 2014.  In the ensuing years, there have been Congressional hearings, calls for drug pricing legislation, and a growing number of governmental probes and enforcement actions. The first governmental investigation was initiated by Connecticut's AG in July 2014.  Shortly thereafter, Congress launched a probe into generic pricing in October 2014, and the DOJ's Antitrust Division followed suit in November 2014, levelling criminal charges against Teva.

306.    Unbeknownst to Plaintiff and other investors, Teva has been implicated in non-public governmental investigations for years.  For example, Teva's involvement in the DOJ's investigation began in 2015, when federal prosecutors contacted a Teva employee who forwarded the inquiry to Teva's in-house counsel.  On and after June 21, 2016, the DOJ's Antitrust Division executed search warrants at Teva's corporate headquarters and at the homes of Teva employees. Contemporaneously, the DOJ served a broad and far-reaching grand jury subpoena on Teva, effectively seeking all documents and communications relating to all generic drugs, whether

112

marketed, sold, or manufactured by Teva or not.

307.    Similarly, the Connecticut AG and other state AGs have for years been conducting an ongoing non-public investigation of Teva.  The AGs filed their initial antitrust enforcement action on December 15, 2016. However, their initial complaint, as well as an amended complaint filed in October 2017, were relatively limited in scope and details.  For example, the AG's initial action alleged that Teva engaged in price-fixing with respect to just seven drugs—less than 3% of Teva's generics portfolio—did not place Teva at the center of the conspiracy, did not name any Teva executives as defendants, and included far less collusive communications and other inculpatory evidence.

308.    Then, in May 2019, the AGs filed a bombshell 524-page complaint against Teva and 19 other generic drug companies. The May 2019 Complaint expanded the scope of the AG's enforcement action from 15 drugs to include over 100 drugs, placed Teva at the center of the anticompetitive conspiracy and collusion, and personally named as defendants four former Teva executives.  The May 2019 Complaint set forth, in great detail, how for years Teva and other generic drug manufacturers operated pursuant to an understanding – which "permeated every segment of the industry" – that generic drug manufacturers would not compete on price and avoid any meaningful competition.   At the height of the conspiracy, from 2013 to 2015, Teva implemented significant price increases for approximately 112 drugs—approximately one-third of the Company's entire generics portfolio—including by colluding with competitors regarding at least 86 of them.  As alleged in the May 2019 Complaint, by 2012, Teva and its co-conspirators "decided to take this understanding to the next level… embark[ing] on one of the most egregious and damaging price-fixing conspiracies in the history of the United States."

309.    The AGs' enforcement action against Teva (and four of its former executives) is

113

supported by extensive evidence collected through the AGs' broad investigatory powers. Based on this evidence – including thousands of documents, a phone call database consisting of more than 11 million call records, and information provided by confidential informants – the AGs specifically determined that the sweeping price-fixing conspiracy and collusion in generic drug industry implicated Teva's "senior-most executives" who "participated in a wide-ranging series of restraints with more than a dozen generic drug manufacturers." Although many of the allegations focus on Nisha Patel, according to the AGs' Action, "high-level executives at Teva were aware that [antitrust] laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva had reached with its competitors." The AGs' Action thus confirms that the Price-Hike Strategy was carried out at the direction of Teva's senior executives, and that Patel was acting at their behest.

310.    Moreover, many of the Collusive Drugs were major sellers for Teva and the profits from the price hikes were extraordinary, reinforcing that the Executive Defendants each knew, or recklessly disregarded, that in order to generate the high level of inflated profits regularly reported to them, Teva would have to (and did) coordinate, communicate, and reach anticompetitive agreements with other generic drug manufacturers. The Collusive Drugs generated at least $1.2 billion for Teva over the relevant period. As discussed above, the financial ramifications of the price increases would have been reflected in the analysis that Griffin and Cavanaugh undertook in deciding whether to take the price increase, and when. These financial implications would also have been reflected in the forecasts, scorecards, and other financial reporting for which they and Oberman and Olafsson were responsible, and which were presented to Vigodman and Desheh. The information was also available to the Executive Defendants on the Oracle ERP System.

311.    Further demonstrating an intent to deceive, Teva employees and other members of

the cartel often took "overt and calculated" steps to destroy evidence of written communications, and frequently discussed unlawful activity over cell phones or during in-person meetings to avoid creating a written record. During a 2013 meeting in which Patel discussed her communications with certain competitors about price increases, Cavanaugh even smiled, put her hands over her ears, and pretended that she could not hear discussions of such illicit conduct. When the DOJ executed a search warrant against Patel in June 2017, she immediately called Rekenthaler, who immediately spoke to Cavanaugh and a senior executive identified by the AGs as "C.B." Rekenthaler spoke several times to Cavanaugh before calling Patel to coordinate her response to the government.

312.    Ultimately, in August 2020, after settlement discussions failed, the DOJ filed criminal charges against Teva. The SSI details Teva's central role as a co-conspirator in industrywide price-fixing and collusion from as early as May 2013 through December 2015, relying on documentary and testimonial evidence provided to the DOJ and the grand jury, including the testimony of a former Teva executive and multiple other cooperating witnesses. Notably, Teva is the seventh company charged by the DOJ in connection with the conspiracy, and five of Teva's corporate co-conspirators have already pled guilty or otherwise admitted to the government's criminal charges and agreed to pay fines and civil settlements totaling nearly $900 million.

313.    The Accounts of Former Teva Employees Interviewed In The Class Action. Several former Teva employees interviewed by the counsel to the Class Action plaintiffs (verified with class counsel by Plaintiff's counsel herein) reinforce the allegations in the AGs' Action and DOJ's Criminal Action, including that the Price-Hike Strategy was directed by senior Teva executives. Below is a summary of information provided by four of these former Teva employees.

314.   According to a Senior Product Operations Manager who was employed at Teva between 2005 and 2016 and was responsible for supply chain and inventory management of Teva's base-line generics business:[11] (i) Teva stored drug-by-drug pricing, sales, and revenue data on the Company's Oracle ERP System; (ii) the Company's long-range "work plan" forecasting 3-5 years of revenue on a granular level, and prepared annually following a predetermined scheduled, was reviewed and approved by Teva's U.S and Israeli executives; (iii) daily or weekly "scorecards" that tracked generic drug revenues and informed Teva executives of any "holes" or "red flags" were distributed to Teva's top U.S. executives, including Griffin, Cavanaugh, Olafsson, and Oberman; (iv) quarterly Latest Best Estimates ("LBEs") comparing results to work plan forecasts were sent to U.S. and Israeli executives; and (v) Teva increased prices when other companies did, when it had a monopoly, and when there was a shortage.

315.   According to an Associate Manager of Customer Marketing who was employed at Teva from September 2014 until May 2016 and was responsible for evaluating requests for proposals and asserting market pricing for generic drugs:[12] (i) members of the Pricing Group could only lower prices of generic drugs after undertaking an extensively researched and documented analysis; (ii) when prices were increased, the Pricing Group was "told" to increase the price in a meeting or via email, often from Galownia; (iii) Galownia did not have the authority to raise prices – decisions to raise prices came from higher-level management; (iv) customers were informed of price increases; (v) even a small change in price (*e.g.*, $0.25) could have a "huge impact" on

---

[11] The former Senior Product Operations Manager started with Teva in 2005, and, until 2011, worked in new generic drug forecasting.  From 2011 to July 2014, the former employee was a manager, responsible for forecasting and analysis of a product group, before serving as Product Manager and Senior Product Manager from July 2014 through April 2016.  The former Senior Product Operations Manager reported to Bryan Bart, who in turn, reported to Galownia.

[12] The Associate Manager of Customer Marketing was a member of the pricing team and reported to an individual who reported to Galownia.

revenues; (vi) a shared Excel file, kept on a shared electronic drive, contained pricing information and was readily accessible to the Pricing Group and top Teva executives; (vii) the Company stored pricing and revenue data on the Oracle system "down to the NDC code"; and (viii) senior Teva executives, including Cavanaugh, Oberman, and Olafsson, had access to the Oracle ERP System, and were routinely updated on sales numbers.

316.    According to a Manager of Customer Operations who was employed at Teva from April 2008 to April 2014 and was responsible for, among other things, managing the process for customer calls to Teva regarding generic drugs[13]: (i) in the early part of 2013, at a quarterly marketing group "all-hands" meeting that the employee attended, along with additional pricing, sales, finance, and customer service employees at Teva's North Wales U.S. headquarters, Galownia informed attendees that Teva was implementing a strategy to increase the prices of generic drugs; (ii) Galownia could not approve price increases, as Cavanaugh, or an executive above her made these decision; (iii) after a price increase, Teva would send letters to customers informing them of the increase; the letters were also emailed to Teva employees whose work was impacted by price increases; (iv) Teva regularly raised prices on generics from 2013 onward and was "getting more aggressive with pricing" by raising prices more frequently up until the time of the employee's departure in April 2014; and (v) consumer complaints would rise following price increases, and the complaints were logged and sent to Christine Baeder, Teva's VP Commercial Operations, on a monthly basis.

317.    Defendants Vigodman, Olafsson, and Desheh Were Motivated to Use Teva's ADS as "Currency" for a "Transformational" Acquisition.    Defendants Vigodman, Olafsson, and

_____

[13] The Manager of Customer Operations reported directly to Christine Baeder until 2012, and later Michelle Osmian, Teva's Director, Customer Operations.

Desheh not only knew, or were reckless in not knowing, of Teva's Price-Hike Strategy and collusion with other generic manufacturers, they were also strongly motivated to misrepresent and conceal the sources of Teva's generics profits to inflate the price of Teva securities in order to enable a "transformational" acquisition. Once the Price-Hike Strategy was implemented and had generated sizeable profits, Desheh publicly affirmed this motive, stating in early 2014 that Teva's "stock price will go up and we'll be able to use our share [sic] as a currency . . . to fund transactions."

318. Teva was focused on acquiring Actavis as early as mid-2014. Soon after joining Teva from Actavis in August 2014, Olafsson announced at an "all-hands" quarterly meeting at Teva's U.S. headquarters in North Wales that he had never joined a new company that did not thereafter purchase his former employer. By the end of 2014, with the strategy resulting in numerous batches of systematic price hikes, involving 91 price increases, and generating at least $943 million in inflated profit, Teva's ADS was trading in the mid-$50s. By then, as Vigodman would later acknowledge on July 27, 2015, Teva had developed a list of acquisition targets and Actavis was at the top. Indeed, Teva had already approached Actavis, but was rejected.

319. By the end of the first quarter 2015, the Price-Hike Strategy resulted in another batch of hikes, involving 16 drugs. All told, over $1.1 billion in inflated profit had been generated, and Teva's ADSs were trading near $63. Defendant Vigodman, Desheh, and Olafsson's "willingness" to perform a "'transformational' acquisition in the generics space" was well-known to analysts, as was their "urgency to diversify via M&A" as Barclays and Leerink wrote on April 7 and 16, 2015, respectively. On April 21, 2015, Teva attempted to purchase Mylan. Mylan's Board dismissed the offer on April 27, 2015.

320. By July 27, 2015, the price of Teva's ADSs reached an all-time high of $72. That

day Teva announced the $40 billion acquisition of Actavis from Allergan. Vigodman explained that the improvement in generics was a "precondition" for accomplishing a deal.  Without the inflated securities as a "currency," Teva did not have the cash; the $40 billion price tag was roughly twenty years of Teva's average annual income from 2013 to 2015.  Instead, Teva raised the cash from their investors.

321.    By the second quarter of 2015, the Price-Hike Strategy had peaked. Teva started to experience pricing pressure and was increasingly unable to make large price hikes. Inflated profits began to deteriorate while Teva still needed to raise the capital necessary to pay Actavis's $40 billion price tag. When investors and analysts asked questions regarding the deteriorating pricing environment and Teva's weakening financials, Defendant Vigodman, Desheh, and Olafsson flatly denied Teva was making profits from price increases, or that Teva was facing pricing pressure. It was not until Teva had completed over $27 billion in public offerings by July 28, 2016, and closed the Actavis deal on August 2, 2016, that it disclosed the Company's generics business was the subject of government subpoenas.

322.    <u>Teva's Senior Management Oversaw The Implementation And Execution Of The Price-Hike Strategy.</u>  In early 2013, Teva adopted the Price-Hike Strategy in order to turn the Company around by rejuvenating its floundering generics business. This strategy was announced by Kevin Galownia, then-Senior Director of Marketing, at a quarterly "all-hands" meetings at Teva's U.S. headquarters that was attended by members of the sales, customer service, finance, and pricing groups. At that meeting, Galownia, explained that Teva would raise prices on its generic drugs in a systematic manner. This marked a sharp break from the Company's prior strategy of focusing on branded drugs, set by then-CEO Levin in 2012. This significant change in direction could only have been directed by Teva's highest-level executives, and could not have

been decided by Galownia alone.

323. Indeed, carrying out the price increases required the explicit approval of the senior executives at the U.S. headquarters. The inflated profits would be captured by the daily and weekly reports circulated to Cavanaugh, Griffin, Oberman and later Olafsson. They were also reflected in the intra-quarter reports that Olafsson, Oberman, Griffin, and Cavanaugh assembled and sent to Teva's senior executives in Israel.

324. The execution of the Price-Hike Strategy similarly required that senior executives personally approved each price increase.

325. The members of the Pricing Group would routinely engage in a bottom-up analysis in deciding to lower prices. This required them to conduct and provide senior executives with detailed analysis and documentation justifying their decisions to reduce prices. Price increases, in contrast, came from the top down. When prices were increased, the Pricing Group was simply told by email or in a meeting, to raise the prices of certain drugs, without conducting any analysis justifying the increase. Members of the Pricing Group did not have authority to implement price increases. According to a former Teva employee interviewed in the Class Action, Teva became "more aggressive with pricing" by frequently increasing prices from 2013 onward. The empirical evidence, described above, confirms this observation.

326. As was the case during the Relevant Period, and as the empirical evidence confirms, approved price increases would often be grouped together and announced on the same day. Once a price increase was made, Teva would send letters to affected customers informing them of the price increase. Galownia or his team would also email these letters to all Teva employees whose work would have been impacted by price increases.

327. Given this formalized process involving Defendant Griffin and Cavanaugh, there

is a strong inference that Teva's senior management, including the Executive Defendants, were aware of, or at least recklessly disregarded, the more than 100 substantial price increases, ranging from 50% to 1500%, between 2013 and 2016, that generated over $2 billion in inflated profit.

328.    These facts are corroborated by the AG Action, which asserts that Teva's "strategy" of "leveraging Teva's collusive relationships with high-quality competitors" was "understood and authorized by individuals at much higher levels [than Patel] at Teva," including Cavanaugh.  These facts are also corroborated by the DOJ's Criminal Action, which asserts that executives at Teva, Glenmark, and Sandoz "all played a role" in carrying out price increases—and "a former Teva executive identified in the SSI as CW-1 features prominently in the allegations supporting all three" conspiracies alleged in the criminal case.

329.    The Executive Defendants Had Access To Contemporaneous Documents And Information Tracking The Inflated Profits.  The Executive Defendants were given documents that tracked the financial impact of the Price-Hike Strategy against the detailed revenue goals for Teva's U.S. generics business, as often as on a daily basis. They also had access to Company-wide databases with detailed drug-by-drug information about the price, sales, and profits of each drug on a real-time basis. Given the close attention paid to revenue and its sources, and the readily available information concerning these topics, there is a strong inference that the Executive Defendants knew or recklessly ignored that billions of dollars in inflated profit were generated through the Price- Hike Strategy, and its collapse caused the later short-falls in profits.

330.    Among the documents the Executive Defendants received was a long-range work plan, generated annually, that included generic revenue forecasts for three to five years, and that contained granular pricing details down to the NDC level. The employees preparing the work plan would receive feedback from executives over the course of a pre-established schedule. The process

121

began around March each year, with the U.S.-based executives, including Oberman and Olafsson reviewing and approving the work plan over the late summer. The U.S.-based executives would then present the work plan to Teva's executives in Israel, including Vigodman and Desheh, each year.

331.    Weekly or daily scorecards were circulated among Teva's top executives, including Olafsson and Oberman. These scorecards provided these executives with regular access to U.S. sales and revenue data for generic drugs. The scorecards also compared Teva's actual revenue figures to longer-term revenue goals. The executives used the scorecards to track "holes" between the actual revenues and forecasts, including the work plan.

332.    Teva's U.S. executives also tracked, and would report to the executives in Israel, U.S. generic performance on a quarterly basis through the LBEs which showed how a current financial quarter compared to long term forecasts. The LBEs would also be circulated to the executives in Israel.

333.    Teva housed its pricing, revenue and sales data of its generic drugs on its Oracle ERP System, a Company-wide database. Through this system, pricing, sales and revenue information for each generic drug was readily and easily available at the granular level, "down to the NDC code." Teva executives, including Griffin, Cavanaugh, Oberman, and Olafsson all had access to the Oracle Database. Oracle was the source for the data used for the scorecards, work plan and the LBEs.

334.    According to the AGs, Teva maintained an internal database, referred to as Delphi, where it catalogued nearly every decision it has made regarding the products it sells, including those decisions that were made collusively – which Teva often referred to as "strategic" decisions. For example, in June 2014 when Teva decided to concede business to another co-conspirator, at

Cavanaugh's direction, Teva's internal database noted that the customer had been conceded to a "Strategic New Market Entrant." Through its review and investigation of certain Delphi reports,[14] in combination with the phone records, the AGs have identified over 300 instances of collusion where Teva spoke to competitors shortly before or at the time it made what the company referred to as a "strategic" market decision.

335.    <u>Defendants Vigodman, Desheh, and Olafsson Claimed To Be Knowledgeable About Generics Pricing And Spoke Repeatedly And Specifically About The Sources Of Teva's Generics Profits.</u>    Defendants Vigodman, Desheh, and Olafsson claimed to have intimate knowledge of whether Teva had taken price increases and whether those price increases contributed to the increased profitability of Teva's generics division. For example, on October 29, 2015, Vigodman claimed awareness that "all the improvement . . . in our . . . margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015." Similarly, on February 11, 2016, Olafsson claimed he knew that the "$1 billion improvement in operating profit over 24 months period," was achieved "[n]ot by pricing but by portfolio mix, new products, and efficiency measures." On November 19, 2015, when asked about industry price increases, Desheh claimed that "Teva was not associated with any of that." These defendants also claimed knowledge of when Teva would take price increases, limiting them to instances with shortages. For example, on August 4, 2016, Olafsson claimed that Teva would increases prices only where there were "shortages in the market," then "there might be a small pricing opportunity."

336.    Vigodman, Olafsson, and Desheh further claimed they were aware of the rate of

---

[14] The State AGs noted that while they have not been provided with full access to the Delphi database from Teva, they have obtained static images of the database that were internally disseminated over time by Teva, which were referred to as Market Intel Reports.

123

pricing decline that Teva was experiencing in 2016, and how it compared to prior years. For example, on May 9, 2016, Olafsson asserted awareness that despite "a tougher pricing environment or price deflation," "Teva has not seen any fundamental change or worsening in the pricing environment…. What this boils down to is each individual company's business model.… Nothing has happened in the last two quarters that has changed the pricing environment." On June 3, 2016, Vigodman asserted he knew that "[w]hat we see is a 4% to 5% erosion. . . . That's not something which is different from what we said during 2015." Similarly, on September 7, 2016, Desheh claimed that the pricing environment for Teva's base generic business was "very stable," and that "there's no pressure on prices."

337.    Vigodman, Olafsson, and Desheh also claimed knowledge of the competitive landscape in the generic drug industry and of whether Teva was competing in a functional and competitive generics market. For example, on November 19, 2015, Desheh claimed Teva was "playing a competitive game . . . playing it fairly . . . by the book and by the rule." Desheh also stated that "I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States" and that there was "very fierce price competition" in the industry.

338.    This self-proclaimed personal involvement by Vigodman, Olafsson, and Desheh supports a strong inference that they possessed knowledge of the true state of affairs of the business, and thus had knowledge that their representations were misleading, or were reckless in not knowing.

339.    Defendants and Analysts' Focus on Generics Pricing. When industry pricing pressure damaged Teva's competitors, analysts peppered Defendants Vigodman, Olafsson, and Desheh with questions about pricing pressure over the course of several months, which were met

124

with detailed answers. For example, on February 11, 2016, Guggenheim asked Olafsson about "pricing pressure in the generics business," with Olafsson claiming to know that "on the pricing . . . we didn't see anything change in fourth quarter." On September 7, 2016, Wells Fargo asked whether Teva was "seeing the same generic erosion, pricing erosion that some of the other companies" had, to which Desheh asserted he knew that "the base [generics] business . . . the prices are very stable there."

340.    The Magnitude, Importance and Duration of the Fraud Further Supports A Strong Scienter Inference.  The fact that the Price-Hike Strategy generated as much as $2.3 billion in inflated profit supports a strong inference of scienter. Indeed, the inflated profit drove Teva's reported financial turnaround throughout the Relevant Period. According to internal Teva documents, price increases implemented on 23 drugs in July and August 2013 increased Teva's revenue, described internally as "Total Net Upside After Credits," by almost $1 billion per quarter.

341.    In 2014 and 2015, inflated profits comprised an increasingly large portion of Teva's overall net income. As to the generic segment's profits, the inflated profits accounted for at least 15% of segment profits in 2013; at least 32% in 2014; and 32% in 2015. The inflated profits accounted for an even larger portion of the Company's overall net income. In 2013, inflated profits accounted for at least 20% of net income; in 2014, at least 23%; in 2015, 54%, and in 2016, more than all of Teva's overall profit. The stronger inference is that Defendants Teva, Vigodman, Olafsson, Desheh, and Griffin knew of the source of these profits.

342.    Likewise, in 2016, the Price-Hike Strategy deteriorated as Teva began to experience significant pricing pressure and accelerated price erosion, and was no longer able to implement additional price hikes and as a result Teva's generic drug profits plummeted. Indeed, Teva's deteriorating financial condition in 2017 called into question whether it could service its massive

125

$35 billion debt, forced the Company to take a staggering $6.1 billion impairment charge to its generics business, and reduce its dividend. The stronger inference by far is that Teva, Vigodman, Olafsson, Desheh, and Griffin were aware of the source of this decline or were severely reckless in not knowing.

343.   Contemporaneous Red Flags Indicated that Defendants' Statements Were False or Misleading. Contemporaneous red flags alerted the Executive Defendants to the possibility that their statements were false and misleading. At a minimum, Defendants recklessly failed to review or check information that they had a duty to monitor under these circumstances.

344.   On October 2, 2014, Congress sent Vigodman a personal letter seeking answers to "the underlying causes of recent increases in the price of [Teva's] drugs." This should have placed Defendants Vigodman, Olafsson, Desheh, and Griffin on alert to discover whether Teva had taken price increases and to what extent. Similarly, Congress invited Teva to testify at a November 20, 2014 hearing on whether "there was a rational economic reason as to . . . huge price increases."

345.   The fact that the DOJ and the Connecticut AG began investigations into Teva's competitors related to their pricing practices also supports a strong inference of scienter. The fact of those investigations should have triggered an internal inquiry at Teva into the facts of its own pricing practices, including the dozens of price increases that Teva made in unison with its competitors. Teva has produced over one million documents to the DOJ.

346.   On September 12, 2016, the U.S. Government Accountability Office (the "GAO"), which Congress had commissioned over two years earlier, publicly released its report on "Generic Drugs Under Medicare," documenting its audit of Medicare Part D data from June 2015 to August 2016. The GAO found hundreds of unexplained "extraordinary price increases," defined as the price of a particular drug increasing over 100% within a twelve-month period, and that some drug

126

prices increased more than 1,000%. Teva had numerous drugs that showed extraordinary price increases in the GAO report. The facts of the GAO report support the inference that Defendants Teva, Vigodman, Desheh, Olafsson, and Griffin made the alleged false statements with scienter.

347.    On June 21, 2016 and July 12, 2016 Teva received subpoenas from the DOJ and Connecticut AG, respectively, relating to its generics drug pricing.  On August 4, 2016, a month and a half after receipt of the first subpoena (and after Teva raised $15 billion from investors pursuant to the Notes Offering), Teva disclosed the receipt of the subpoenas and in November 2016, Defendant Vigodman stated he was "not aware of any fact that would give rise to an exposure to Teva with respect to the investigation."  As the AGs' and DOJ's investigations expanded, and the AGs filed multiple enforcement actions against Teva and other generic drug makers setting forth detailed evidence of price-fixing and collusion with respect to greater numbers of generic drugs and market participants, Teva continued to issue similar staunch denials of wrongdoing—including in over a half dozen SEC filings and other public statements between 2017 and 2019.    The extensive governmental investigations, facts contained in the AGs' seriatim complaints, and the Company's repeated, specific, and vehement denials in public statements covering a more than 2½ year period support the inference that Defendants Vigodman, Griffin, and Schultz made or approved the Company's false denials with scienter.

348.    Widespread Executive Terminations And Departures Support Scienter.   In late 2016 and early 2017, as the Company's Price-Hike Strategy was deteriorating and the first charges in the antitrust conspiracy were being announced, three of Teva's highest ranking officers abruptly departed. First, Defendant Olafsson "retir[ed] in December 2016.  Teva announced Olafsson's "retirement" despite the fact that Olafsson was only 48 years old at the time.  Indeed, Olafsson is now the CEO of Hikma Pharmaceuticals PLC.  There is a strong inference that the termination of

Olafsson was connected to his fraudulent cover-up of the Price-Hike Strategy and the subsequent decline in Teva's profits as the strategy collapsed.

349. Similarly, Vigodman was fired without a replacement just one month after Teva significantly revised its 2017 guidance downwards, resulting in part from increased price erosion and dwindling generic profits, and one week before Teva reported disappointing financial results for Q4 2016.

350. Finally, less than two months after Desheh left Teva, and in the very first reporting period after he, Vigodman, and Olafsson were all gone, Teva took a $6.1 billion charge against its U.S. generics business, and slashed its dividend by 75%. This supports an inference that it was these Defendants who were blocking the true financial state of the Company from coming to light.

351. <u>Additional Scienter Facts</u>. Numerous additional facts further support a strong scienter inference. *First,* Teva's receipt of subpoenas from the DOJ and the Connecticut AG on June 21, 2016 and July 12, 2016, respectively, supports a strong inference. Particularly, Teva failed to disclose them in the SEC disclosures filed in conjunction with the Notes Offering, but then disclosed them approximately two weeks after completing the offering. Teva's delay in disclosing its receipt of the subpoenas until after the Company raised billions of dollars from investors supports an inference of scienter. Tellingly, many of Teva's competitors disclosed their receipt of similar subpoenas immediately, including within days of receipt and in their very next SEC filing. Moreover, Teva's receipt of these subpoenas triggered a legal duty on the part of the Company's executive officers to inquire into Teva's pricing practices. Yet, Defendants Teva, Vigodman, Olafsson, and Desheh thereafter made materially false and misleading statements about both the validity of the governmental investigations and the Company's exposure to price erosion.

352. *Second*, the November 3, 2016 Bloomberg article revealed that Teva was the

subject of the DOJ criminal inquiry, and that the DOJ and Connecticut AG could bring charges. However, less than two weeks later, Vigodman told investors that he was "not aware of any fact that would give rise to an exposure to Teva with respect to the investigation." A civil suit brought by the Connecticut AG and others, and DOJ charges against Jeffrey Glazer and Jason Malek, Heritage's former CEO and President, respectively, soon followed and, subsequently, those investigations have placed Teva at the center of the conspiracy. The close proximity of Vigodman's statement to the announcement of the charges diminishes the plausibility of innocent explanations or denials from Vigodman.

353.   *Third,* Teva's staunch denials of liability despite overwhelming contrary evidence supports scienter.  As set forth above, Teva repeatedly denied any involvement in collusive conduct during the Relevant Period and continues to do so. For example, on November 7, 2019, Defendant Schultz stated during an investor earnings conference call: "We have, of course, shared more than 1 million documents with [the DOJ]. We have not found any evidence that we were in any way part of any structured collusion or price fixing." On August 5, 2020, three weeks before a grand jury convened by the DOJ returned an indictment bringing criminal charges against Teva, Defendant Schultz stated in an interview with *Bloomberg* "[w]e did not participate in organized price-fixing," and "[t]here is no evidence of anything like that." Schultz added that it did not "make sense" to settle price-fixing charges because "the company has done nothing." During the Company's earnings call held the same day, Schultz stated "[w]e, of course, see a situation where we do not see that the company, in anyway, participated in criminal-organized price-fixing or were a part of creating a cartel or anything like that."  In response to an analyst question about the "potential liability impact" of the government enforcement actions arising out of the price-fixing conspiracy, Schultz stated "it's important to repeat that in our internal investigation, where we've

129

been through more than 1 million documents, we don't see any evidence of organized price fixing, organized cartel or anything involving a structured approach to this by Teva," adding that "we did nothing wrong." Such repeated and unequivocal denials of wrongdoing in the face of reams of evidence to the contrary underscores Defendant Schultz's fraudulent intent.

354.    *Finally*, Teva's corporate scienter is manifest by virtue of the fact that the Executive Defendants, who acted with scienter as set forth above, had binding authority over the Company. In addition, certain allegations herein establish Teva's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements were false and misleading in nature.

355.    For instance, in 2013, Galownia, Teva's Senior Director of Marketing who led Teva U.S.'s pricing department, knew of and discussed Teva's new Price-Hike Strategy at a quarterly "all-hands" meeting of the sales, customer service, finance, and pricing groups. Given the nature of this strategy, that it required the involvement of numerous divisions within Teva to implement, including the Operations department under U.S. COO Cavanaugh and the Finance department under U.S. CFO Griffin, and that it had a material impact on Teva's financial statements, additional unknown executives sufficiently senior to impute their scienter to Teva were also aware of the Price-Hike Strategy.

356.    As yet unidentified employees also approved the false statements despite knowing of their false and misleading nature. As discussed, Teva had in place extensive processes to track its financial performance on a daily, quarterly, and yearly basis. From this, it can be inferred that someone at Teva approved of the false and misleading statements in Teva's financial statements concerning the source of its generics profits, while knowing that the true source was inflated profits

130

from the Price-Hike Strategy. It can also be inferred that someone approved the false and misleading statements that Teva was competing intensely on price, someone who knew of the Price-Hike Strategy, and that it was largely dependent on a lack of competition due to collusion.

## VII.    LOSS CAUSATION

357.    In addition to the allegations herein, Defendants' fraudulent conduct directly and proximately caused Plaintiff to suffer substantial losses as a result of purchasing Teva securities at artificially inflated prices during the Relevant Period.

358.    Defendants, through each category of false and misleading statements and omissions, concealed the truth about Teva's core business strategy that materially contributed to Teva's financial and operational success during the Relevant Period, as well as Teva's collusive conduct. By concealing, among other things, the Price-Hike Strategy, that Teva was not competing on price, that the strategy was driving known material trends, that as the strategy failed and pricing competition increased, Teva's financial condition was deteriorating, that Teva was in fact engaged in collusion and the central actor in an industry-wide conspiracy, and the negative impact of the Actavis acquisition and integration of the acquired business on Teva's financial results and business prospects, Defendants also concealed the numerous and related risks associated with their false statements and omissions, including but not limited to, the risks that:

- the strategy was highly risky and not sustainable, and as the strategy failed, Teva's profits would collapse;

- by their nature, especially when done in unison with competitors, price hikes might appear to arise from anti-competitive and/or collusive conduct and, thus, draw the attention of government investigators and law enforcement agencies, precipitating possible legal actions, civil liabilities, and criminal sanctions;

- should the Price-Hike Strategy come under public, legislative, or law enforcement scrutiny, the viability of sustaining the inflated profits and/or implementing new price hikes would be severely undermined, and would thereby undercut a major driver of the generic segment's profit;

- if pricing pressure or competition increased, Teva would be far more

131

susceptible to a rapid and material decline in inflated profits, resulting in poor financial results and undercutting reported and forecasted profits;

- upon the failure of the Price-Hike Strategy, the Company could be further disrupted by the termination of the senior managers who were responsible for the strategy, and by any increased difficulty in hiring qualified replacements; and

- as the Price-Hike Strategy in fact failed over time, Teva's inflated profits declined, and Teva was prevented from making additional price increases, those trends would continue

359.    The concealed risks bear directly on Teva's ability to generate and sustain its profits and its ability to service its debt.

360.    Beginning in August 2016, the concealed risks began to slowly materialize through a series of negative events and disclosures that revealed, on a piecemeal basis, the false and misleading nature of Defendants' Relevant Period false and misleading statements and omissions. Despite these partially corrective events and disclosures, Teva Securities' prices remained artificially inflated and were prevented from declining to their true value by the Defendants continuing to make materially false and misleading statements that had the effect of, at least temporarily, concealing their fraud. As the relevant truth leaked out into the market from August 2016 to May 2019, Plaintiff suffered losses, which were foreseeable and caused by the materialization of the risks that the Defendants' fraudulent conduct concealed from Plaintiff, as set forth below.

### A.    August 4-5, 2016

361.    After the close of trading on August 4, 2016, Teva filed its Q2 2016 6-K, reporting 2Q 2016 results, which announced (i) poor generics segment earnings, including a $115 million YOY decline in profits for the generics segment; and (ii) that "[o]n June 21, 2015 [sic], Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's

132

generic products and communications with competitors about such products" and "[o]n July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."

362.    On this news, the prices of Teva Securities declined. Between the close of trading on August 4, 2016 and on August 5, 2016, the price of Teva's ADSs fell $1.24 or 2.24% to close at $54.21.

**B.    November 3, 2016, December 13-16, 2016**

363.    On November 3, 2016, during the trading day on the NYSE, *Bloomberg* published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," describing the DOJ's two-year investigation related to the soaring prices of generic drugs and how executives from a number of pharmaceutical manufacturers, including Teva, were suspected of colluding to raise the prices of generic drugs. The article broke the news that the first criminal charges against executives of those companies could emerge by the end of the year, and that AGs were seeking to bring claims against generic manufacturers.

364.    On this news, the prices of Teva Securities declined once again. Between the close of trading on November 2, 2016 and the close of trading on November 3, 2016, Teva's ADS price fell $4.13 or 9.53% to close at $39.20; and the prices of Teva's 2023 and 2026 Notes fell by 1.293 cents on the dollar or 1.31%, and 1.19 cents on the dollar or 1.15%, respectively.

365.    In a November 3, 2016 article titled "News of Charges in Price-Fixing Inquiry Sends Pharmaceuticals Tumbling," *The New York Times* reported that the news that the DOJ's and AGs' investigations found serious evidence of criminal conduct caused significant declines in the price of Teva Securities. On November 4, 2016, S&P Global Ratings lowered its rating of Teva ADSs from "buy" to "hold" and its 12-month price target by $34 to $50 per share, noting that "[w]e think this could pose yet another challenge to an industry that has been hit hard by charges

of high drug prices and will be an overhang on the shares." HSBC in its November 4, 2016 analyst report, downgraded Teva from "buy" to "hold" and lowered its price target from $66 per share to $44 per share, noting "US DOJ investigation into alleged US generic drug price collusion creates significant uncertainty" for Teva and for investors. In a November 10, 2016 article titled "DOJ's price-fixing investigation could lead to sizable liabilities, analyst says," *Fierce Pharma* reported that analysts tracking the generic drug industry believed that liability from the investigations could have a sizeable financial impact on Teva, estimated at $700 million.

366.    Within weeks the expected governmental actions materialized. On December 13, 2016, the DOJ, by means of an Information, charged Malek and Glazer, the top two executives at Heritage, with two felony counts of violating Section 1 of the Sherman Act partly for fixing the price of Glyburide, a drug for which Teva held 75% of the market.

367.    On December 14, 2016, the AGs filed their lawsuit against Teva and several of its peers for civil violations of the antitrust laws, accusing Teva of conspiring to allocate the markets for and fix the prices of generic drugs, including for Glyburide, and of participating in a larger market-wide collusive conspiracy. *Forbes* reported the next day, in an article titled "State Attorneys General Accuse Six Generic Companies Of Fixing Drug Prices," that the AG's complaint revealed new information regarding Teva's potential exposure, made "clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing."

368.    On the news of the DOJ charges and the filing of the AGs' complaint, theprices of Teva Securities continued to decline. Between the close of trading on December 13, and December 16, 2016, the ADS price fell $1.15 or 3% to close at $36.51.

C.    **November 15, 2016**

369.    On November 15, 2016, before trading opened on the NYSE, Teva filed a press release with the SEC reporting its Q3 2016 financial results, which were well below consensus

134

expectations largely due to poor sales in Teva's generics divisions, including a $277 million YOY decline in revenue in Teva's "legacy" U.S. generics segment (*i.e.*, in the pre-Actavis-transaction portion of Teva's U.S. generics business). In the Company's November 15, 2016 earnings call, the Company also revised downward its 2016 guidance and disclosed for the firsttime that the rate of price erosion for its generic drugs has increased from 5% to 7%, although Olafsson falsely claimed that the increase was the result of divestitures from the Actavis transaction, and thus was limited to one quarter.

370.   On this news, the prices of Teva Securities continued to decline. Between the close of trading on November 14 and 15, 2016, the ADS price fell $3.43 or 8.36% to close at $37.60.

371.   Analysts responded negatively to the new information concerning the Company's disappointing financial results. That day, in a report titled, "Are The Wheels Coming Off? Sure Feels That Way," Piper Jaffray lowered its price target from $57 per share to $43 per share, noting that "it appears to us that Teva painted an overly sanguine picture of its generics business at its investor event in September [during the Generics Day]," and describing Q3 2016 as a "credibility-damaging quarter," because, in the face of Olafsson's explanation that the price erosion would be limited, it was "difficult for us to take that assertion at face value." Also that day, Deutsche Bank wrote "TEVA reported 3Q revenue that was below our estimate on lower generic sales … the company saw higher than expected price erosion in 3Q …" and, as a result, lowered its price target for the Company from $68 per share to $54 per share on "lower growth assumptions for generics." Likewise, in a November 16, 2016 report, Morgan Stanley lowered its price target for the Company from $63 per share to $42 per share, as a result of the lower-than-expected generics growth and worse-than-expected price erosion.

D.     **December 5-6, 2016**

372.   After the close of trading on December 5, 2016, Teva filed a Form 6-K announcing

135

that Olafsson would be stepping down as President and CEO of the Company's Global Generic Medicines Group and that, effective immediately, he would be replaced by Bhattacharjee. Teva offered no explanation for Olafsson's departure, instead claiming he was "retiring" even though he was only in his late 40s and quickly obtained other employment.

373.    On this news, on December 6, 2016, the prices of Teva Securities continued to decline. Between the close of trading on December 5 and on December 6, 2016, the ADS price fell $2.01 or 5.43% to close at $35.03.

374.    Analysts tied Olafsson's termination to the disappointing results in Teva's generics segment and concerns over pricing pressure. On December 6, Morningstar reported: "Teva's announcement [that it] will replace Siggi Olafsson as CEO of the generics segment doesnot inspire confidence. *Recent pricing pressure* in the generic drug market … remain[s] significant near-term challenge[] for Teva, which makes the abrupt leadership change a *concerning development at a critical time* for the company." A December 5 BTIG report noted, "[w]ithout Siggi Olafsson at the helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained *focused on price erosion for the [company's] base generic business*" and that "the departure of Mr. Olaffson [sic] creates more uncertainty as we head into 2017."

### E.    January 6, 2017

375.    On January 6, 2017, before the beginning of the trading day on the NYSE, Teva filed a press release on Form 6-K announcing a significant reduction in the 2017 guidance previously released on July 13, 2016.  In the investor conference call that day, Vigodman claimed the "significantly" reduced guidance resulted from "significant headwinds" faced by "[t]he entire healthcare sector" to which Teva "ha[d] not been immune," and "some issues specific to Teva" resulting in "an EBITDA gap of $1.2 billion emanating from our US generics business." In addition to the materialization of the concealed risks described herein, this was the materialization

136

of the risk of Teva using an "assumption" for price erosion in the July 13, 2016 guidance that was empirically false at the time; specifically, Teva assumed a pricing environment that was "stable"—*i.e.*, the 4%-5% erosion rate disclosed in prior years and quarters—when, in fact, pricing pressure was causing a more rapid decline.

376.    As a result of this new negative information, the prices of Teva Securities continued to decline.  Between the close of trading on January 5 and January 6, 2017, the ADS price fell $2.86 or 7.53% to close at $35.10; the price of Teva's 2026 Notes declined 1.096 cents on the dollar or 1.17%.

377.    Analysts tied this disclosure to the fact that the prior guidance was "inflated" as a result of understating generic drug price erosion. In a report dated January 6, 2017, Evercore ISI conducted its own price erosion analysis for the Company and noted that, as a result of its lower than expected revenues and EPS, "I think it's ***pretty clear that mgmt's prior expectation for 2017 were very inflated***." Similarly, the same day, Maxim Group downgraded its rating of the Company from "buy" to "hold" and its price target for the Company from $49 per share to $41 per share and noted "challenges in the near term to the core generic … business are becoming bigger issues." In a January 8, 2017 report, Piper Jaffray stated that "Teva once again provided disappointing guidance, further eroding what in our view was already ***limited management credibility***."

F.    **February 6-7, 2017**

378.    On February 6, 2017, after the close of trading on the NYSE, in a Form 6-K filed with the SEC, Teva announced the termination of Vigodman as CEO, effective immediately and without a permanent replacement, and the conclusion of his service on the Board of Directors.

379.    On this news, the prices of Teva Securities continued to decline. Between the close of trading on February 6 and on February 7, 2017, the ADS price fell $2.16 or 6.29% to

close at $32.19; Teva's 2026 Notes fell by 1.369 cents on the dollar or 1.51%.

380.    Analysts tied Vigodman's abrupt departure to the Company's poor financial performance in its generics business since no later than Q2 2016, as well as sustained difficulties for the generics business ahead. For example, in a February 6, 2017 report titled "CEO Transition Adds Further Uncertainty to Story," J.P Morgan reported "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges. With Teva facing headwinds across both its generics (incremental competition, pricing headwinds) and branded business … we continue to believe a near-term recovery in the company's business is unlikely." Similarly, that day, Wells Fargo concluded that "more investors will be uneasy with the uncertainty of an unexpected and abrupt CEO departure."

**G.    August 3-7, 2017**

381.    On August 3, 2017, before the NYSE opened, Teva filed a press release on a Form 6-K announcing lower-than-expected Q2 2017 financial results. The Company: (i) attributed its poor financial results to poor performance in its U.S. generics business (with reported profits of only $691 million, far below analyst expectations) and "accelerated price erosion"; (ii) was required to take a $6.1 billion accounting charge permanently writing-down the value of the generics business; and (iii) imposed a 75% reduction in the Company's long- standing dividend. The Company also significantly lowered its guidance for 2017, revising downward its earlier-reported guidance from January 2017 for the Company's net revenues, operating income, EBITDA, EPS, and cash flow. On the Company's earnings conference call held that day, Michael McClellan, Teva's interim CFO, explained that the poor results and reduced guidance were partly the result of increased price erosion and price pressure. Importantly, Dipankar Bhattacharjee,

138

Defendant Olafsson's replacement, further noted the "impact of the shelf stock adjustments that [Teva has] done," as a "key element" of the revised outlook. Shelf stock adjustments are contractual provisions that require charge backs to customers when prices decline. It was highly foreseeable that prices would decline on at least the 60 drugs subject to the Price-Hike Strategy which Teva had increased price by at least 50%, and as much as 1543% over the Relevant Period. Teva's $6.1 billion permanent impairment charge directly reduced Teva's bottom line dollar-for-dollar. During the August 3, 2017, earnings call, Teva's Interim President and CEO Yitzhak Peterburg stated that the $6.1 billion charge was "to reduce goodwill associated with our U.S. Generics business unit, which includes both the Teva legacy business and the Actavis Generics business."

382.     Analysts reacted harshly. That day, J.P. Morgan wrote, "Teva reported weaker-than-expected results but more importantly lowered in 2017 sales and EPS guidance … and cut its dividend by 75%.  U.S. *generic weakness appears to be at the heart of these reductions*." Jefferies wrote, "Mgt Had Effectively No Choice but to Cut the Dividend; Maintaining Debt Covenants a Key Concern." Oppenheimer noted, "it may be difficult for Teva's board to attract top talent (meaningful pharma CEO experience) given the company's ongoing challenges," as the CEO and CFO positions remained unfilled. Analysts were further concerned about Teva's ability to sustain its debt and debt rating. Jefferies wrote: "Can It Get Any Worse?," noting that "[a]t present, Teva has a debt covenant that requires a minimum leverage of 4.25 x (net debt/EBITDA) by YE17 … If mgt's ever-shrinking EBITDA guidance … erodes much further, *it is possible Teva may not meet the [debt] obligation*." The reality was that Teva's poor results, guidance reduction, and the risk that it could not satisfy its debt obligations were the materialization of the risks associated with the Price-Hike Strategy and its ultimate demise. There was no realistic prospect that the

139

strategy could be revived, or that it could again generate the same inflated profits. The result was the write down of the generics business by $6.1 billion,and Teva cutting its dividend by 75%.

383.    With the true financial condition of the Company more evident, credit rating agencies immediately issued rating downgrades.  On August 3, 2017, Moody's downgraded Teva's debt rating to Baa3 (one step above "junk"), with a negative outlook, reflecting slower-than-anticipated deleveraging "as Teva contends with weakness in its US generics business." Likewise, on August 4, 2017, Fitch Ratings also downgraded Teva to BBB- (one step above "junk"), with a negative outlook.

384.    Analysts also connected the Company's poor performance to the Actavis deal. For example, on August 3, 2017, Morningstar issued a report stating the Company's "reduced outlook spurred Teva to recognize a $6.1 billion goodwill impairment charge from the Actavis acquisition and cut its dividend by 75%."

385.    As investors digested the news, the prices of Teva Securities dropped.  Between the close of trading on August 2 and August 7, 2017, the price of Teva's ADS fell $12.66 or 40.51% to close at $18.59; and the price of the 2023 and 2026 Notes fell by 3.872 cents on the dollar or 3.95%, and 4.088 cents on the dollar or 4.20%, respectively.

**H.    November 2, 2017**

386.    On November 2, 2017, Teva filed a press release on a Form 6-K announcing lower-than-expected Q3 2017 financial results, including a 9% decline in U.S. generic quarterly revenues compared to Q3 2016. The Company attributed the decrease to "pricing declines resulting from customer consolidation and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta® authorized generic) due to the launch of a competing product."

140

387. As a result of this new negative information, the prices of Teva Securities continued to decline. Between the close of trading on November 1 and on November 2, 2017, the ADS price fell $2.79 or 19.90% to close at $11.23; and the price of the 2023 and 2026 Notes fell by 0.232 cents on the dollar or 2.52%, and 0.462 cents on the dollar or 5.13%, respectively.

388. Analysts reacted negatively. For example, RBC Capital Markets stated that the results were even "below our cautious expectations," and that the "magnitude of weakness in the US generics business in both revenue and margins was surprising." Wells Fargo found Teva's results "especially disappointing."  UBS stated: "The stock keeps fading lower as numbers keep coming down and the significant debt load comes incrementally more into play. Investors have lost confidence in management's ability to execute in this environment."  Raymond James stated that "Teva's U.S. generics business is starting to look like an aging battleship towed to sea for target practice" noting that "[price] erosion is higher than anticipated."  Raymond James stated that the Company suffered from "Never-ending Negative Developments," including "continued difficulty in its U.S. generics business."  Morningstar noted that the "generics segment faced significantly more margin erosion than we anticipated."  Deutsche Bank stated "[f]ollowing TEVA's disappointing 3Q results and 4Q outlook, we materially lowered our estimates in all future periods," adding "[w]e wish we had arrived at this conclusion sooner."  Deutsche Bank further stated it was "disappointed" by Teva's "continued … negative[] surprise[s]."

389. The market also continued to connect the Company's poor performance to the Actavis acquisition. A November 9, 2017 Morningstar report stated that "Teva's purchase of the Actavis generics unit has led to a considerable decline in returns on capital."  In December 2017, *Haaretz* reported that "[t]he acquisition of Actavis . . . is probably the biggest value destroyer in the history of Israeli business," adding that the purchase "is ultimately the reason why Teva value

shrank by 200 billion shekels ($57 billion) in two-and-a-half years." Also in December 2017, *The New York Times* stated that Teva made several deals that were considered "disasters … none more so than the $40.5 billion acquisition of Actavis," noting that "high-profile pundits in Israel have inveighed against Teva's leadership, blaming greed and hubris" for the Company's struggles.

## I.    February 8, 2018

390.    On February 8, 2018, Teva filed a press release on a Form 8-K announcing Q4 2017 and FY 2017 financial results, including a staggering $17.1 billion goodwill impairment "mainly related to our U.S. generics reporting unit."  This figure included a newly disclosed $11 billion impairment charge taken in the fourth quarter of 2017.  Teva stated that the $11 billion write-down was based in part on "further deterioration in the U.S. generics market"—including "[p]ricing challenges due to government regulation"—and Teva's resulting expectation of "larger pricing declines" than previously anticipated.  Teva also disclosed an additional impairment of $3.8 billion, "mainly related to revaluation of generic products acquired from Actavis Generics, discontinued Actavis Generic products …"

391.    As a result of this new negative information, the prices of Teva Securities continued to decline. Between the close of trading on February 7, 2018, and the close of trading on February 8, 2018, the price of Teva's ADS fell $2.21 or 10.6% to close at $18.64; and the price of the 2023 and 2026 Notes fell by 0.075 cents on the dollar or 0.85%, and 0.086 cents on the dollar or 1.07%, respectively.

392.    Analysts reacted negatively. Wells Fargo noted that Teva had missed consensus expectations "by a significant margin," pointed to "commentary about generic pricing worsening in 4Q," and concluded that investors "should see [Teva's $17.1 billion impairment] as reflective of how challenging the situation is." IBI Brokerage noted that the impairment charge was "almost entirely for the generics business in the US," and that Teva's 2018 guidance was "way below

142

market expectations." Jeffries noted that FY 18 guidance as "Well Below Street [estimates]," stating that the "largest deviation[] from consensus rev[enue] forecast looks to be expectations for US generics ($4B vs cons[ensus] $4.46B) … primarily reflecting continued US generic price pressures."  Piper Jaffray noted that the "continued deterioration of the U.S. generics business" presented a "bleak reality in the context of a company that has been the top player in [the] space," adding that the "[r]enegotiation of debt covenants" was "looking pretty likely."

### J.        December 7-10, 2018

393.    On December 9, 2018, *The Washington Post* published an exposé regarding the price-fixing conspiracy. The article quoted comments by Joseph Nielsen ("Nielsen"), an Assistant Attorney General for the State of Connecticut, concerning how the scope of the investigation was far larger, and far more severe, than initially reported. While the AGs initial enforcement action concerned just 15 drugs, Nielsen revealed that the scope of the investigation had expanded to at least 300 drugs and 16 companies—exposing "the largest cartel in the history of the United States." According to *The Washington Post* exposé, Teva continued to deny engaging in any anticompetitive conduct and represented in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts."

394.    Between the close of trading on December 7, 2018 (the last trading day before the announcement) and the close of trading on December 10, 2018, the price of Teva's ADS fell $0.97 or 5% to close at $18.44; and the price of the 2023 and 2026 Notes fell by 0.038 cents on the dollar or 0.44%, and 0.113 cents on the dollar or 1.39%, respectively.

395.    The market reacted negatively to news of the vastly expanded scope of the conspiracy. *MarketWatch* stated that "[s]hares of Teva … fell 5.7%" after "a Washington Post report that an antitrust lawsuit brought by states over two drugs in 2016 has expanded into a major probe of alleged price-fixing across the industry," involving "at least 16 companies and 300

143

drugs."

### K.    May 10-13, 2019

396.    On May 10, 2019, after the market closed, the AGs filed a 524-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy. The AG's May 2019 Complaint details Teva's price-fixing with regards to at least 86 different generic drugs, compared to just 7 drugs in the previously filed action. The complaint further asserts that the Company implemented significant price increases for approximately 112 generic drugs, including extraordinary price hikes of over 1,000%, and details Teva's role as a "consistent participant" and a central player in the conspiracy. Further, the May 2019 Complaint names four Teva employees personally as defendants: Cavanaugh, Patel, Kevin Green (Teva's former Director of National Accounts), and David Rekenthaler (Teva's former Vice President, Sales U.S. Generics).

397.    On this news, the price of Teva's ADS declined by 14.83%, from a closing price of $14.36 on May 10, 2019, to a closing price of $12.23 on May 13, 2019; and the price of the 2023 and 2026 Notes fell by 0.137 cents on the dollar or 1.51%, and 0.178 cents on the dollar or 2.14%, respectively.

398.    Analysts were surprised by the revelations in the AGs' May 2019 Complaint. Bernstein reported that "the price-fixing lawsuit is worse than we expected" and "there seem to be specific cases in the lawsuit that are going to be hard to explain away." J.P. Morgan stated that "[w]e were open to the majority of price spikes being 'explainable' by way of shortages, limited competition (only two or three competitors), and price 'signaling,' a grey area of antitrust law. So we were sorely disappointed by the nature of the direct quotes attributed to Teva employees in the expanded complaint."  HSBC stated that the suit "Amp[ed] up the risk" for Teva, stating that the "new larger litigation on generic drug pricing clearly increases the risk profile for a company that

is highly geared" and would make the challenge of transforming "into a more stable and potentially growing business again" significantly more difficult.  Analysts at Credit Suisse noted that that the new suit "includes a much broader list of products and suggests that Teva was in some ways driving the scheme."  A UBS report noted that the AG's prior "Nov '17 case was much narrower in focus" compared to the "more expansive" May 2019 Complaint, estimating Teva's financial exposure in the new litigation between $900 million and $3.7 billion, compared to $130 million to $520 million in the prior suit.  Further noting the differences between the prior litigation and the May 2019 Complaint, Citigroup stated:

> Allegations of price collusion have been in the headlines on and off since late 2016. What's different in this case? … In this instance, the lawsuit led by the Connecticut AG places TEVA front and center … and also specifically mentions certain named individuals as defendants. In addition, the plaintiffs point to witnesses that have agreed to cooperate with the states. The lawsuit points to >100 generic drugs that were affected by alleged anti-competitive practices.

Citigroup also noted that high "civil fines" were a "concern for companies with levered balanced sheets, including TEVA."

## VIII.  PRESUMPTION OF RELIANCE

399.    Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine. At all relevant times, the markets for Teva's ADS and Notes were efficient for the following reasons, among others:

(a) Teva's ADS met the requirements for listing, and were listed and activelytraded on the NYSE, a highly efficient and automated market;

(b) The average weekly trading volume of Teva Securities was significant;

(c) As a regulated issuer, Teva filed public reports with the SEC and the NYSE;

(d) Teva was eligible to file simplified SEC filings;

(e) Teva regularly communicated with the public through established market

communication channels, including through the regular dissemination of news releases on major newswire services, through communications with the financial press, and through other wide-ranging public disclosures; and

(f) Numerous securities and credit analysts followed Teva and wrote reportsthat were published, distributed, and entered the public domain.

400. Accordingly, the markets for Teva securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Teva securities.

401. Based on these and additional facts, including a regression/event study analyses providing empirical evidence of market efficiency, the Court presiding over the Class Action concluded that the markets for Teva ADS and all of the Notes were efficient throughout the Relevant Period, and thus investors in such securities were entitled to a presumption of reliance. *In re Teva Sec. Litig.*, No. 3:17-CV-558 (SRU), 2021 WL 872156, at *36 (D. Conn. Mar. 9, 2021).

402. Plaintiff purchased Teva ADS and Notes in reliance on the market price of such securities, which reflected all the information in the market, including Defendants' misstatements.

403. In addition, or in the alternative, Plaintiff is entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that the Defendants had a duty to disclose.

## IX.    NO SAFE HARBOR

404. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when

146

made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

405.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Teva who knew that the statement was false when made.

## X.    COUNTS

**COUNT I**
**Violations Of Section 10(b) Of The Exchange Act**
**And SEC Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

406.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

407.    During the Relevant Period, Defendants named in this Count made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

408.    The Exchange Act Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, in that they:

   (a) Employed devices, schemed, and artifices to defraud;

   (b) Made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

147

(c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff in connection with its purchases of Teva Securities during the Relevant Period.

409. Plaintiff has suffered damages in that, relying upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, it paid artificially inflated prices for Teva securities. Plaintiff would not have purchased Teva securities at the prices it paid, or at all, if it had been aware that the market prices of those securities had been artificially and falsely inflated by Defendants' misleading statements.

410. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of Teva securities during the Relevant Period.

411. Taking into account, *inter alia,* tolling of the limitations and repose periods by the filing of the Class Action and Plaintiff's intervention in the Class Action (ECF Nos. 683, 695), Plaintiff has brought the claims asserted in this Count within two years of discovery of the violations alleged by Plaintiff herein, and within five years of the violations alleged by Plaintiff herein. *See supra* at 1. Consequently, the claims asserted in this Count are timely.

**COUNT II**
**Violations Of Section 20(a) Of The Exchange Act**
**(Against the Executive Defendants)**

412. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

413. During the Relevant Period, the Executive Defendants acted as controlling persons of Teva within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

414. Each of the Executive Defendants was a controlling person of Teva within the meaning of Section 20(a) of the Exchange Act.

148

415. By virtue of their positions and their power to control public statements about Teva, the Executive Defendants had the power and ability to influence and control the actions of Teva and its employees, and did in fact influence and control, directly or indirectly, the decision-making of the Company. Teva controlled the Executive Defendants and its other officers and employees.

416. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements of cause the statements to be corrected. In particular, the Executive Defendants each had direct and/or supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

417. The Executive Defendants culpably participated in Teva's violations of Section 10(b) and Rule 10b-5 with respect to the First Cause of Action.

418. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

419. Taking into account, *inter alia,* tolling of the limitations and repose periods by the filing of the Class Action and Plaintiff's intervention in the Class Action (ECF Nos. 683, 695), Plaintiff has brought the claims asserted in this Count within two years of discovery of the violations alleged by Plaintiff herein, and within five years of the violations alleged by Plaintiff herein. *See supra* at 1. Consequently, the claims asserted in this Count are timely.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, prays for judgment as follows:

149

a)   Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein

b)   Awarding Plaintiff compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

c)   Awarding Plaintiff its reasonable costs and expenses incurred in this action; and

d)   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 12, 2023

Respectfully Submitted,

*/s/ Jonathan P. Whitcomb*

Jonathan P. Whitcomb (ct15014)
DISERIO MARTIN O'CONNOR
& CASTIGLIONI, LLP
1010 Washington Blvd. Suite 800
Stamford, CT 06901
Telephone: (203) 358-0800
Facsimile: (203) 348-2321
jwhitcomb@dmoc.com

**SAXENA WHITE P.A.**

David R. Kaplan (*admitted pro hac vice*)
Hani Y. Farah (*pro hac vice forthcoming*)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
hfarah@saxenawhite.com

Maya Saxena (*admitted pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com

Steven B. Singer (*pro hac vice forthcoming*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

*Counsel for Plaintiff State of Wisconsin Investment Board*

151

## APPENDIX A

## <u>Teva Generic Price Increases During the Relevant Period</u>

| Date | Number of Drugs | Drug and Amount of Price Increase<br>*Black = parallel or collusive price increases*<br>*Blue = unilateral price increases* | AGs' May 2019 Complaint | Second Amended Class Action Complaint |
|---|---|---|---|---|
| July 3, 2013 | 21 | • Adapalene Gel Total: 95% Average Selling Price ("ASP")<br>• Cefaclor ER Tablets Total: 25% ASP<br>• Cefadroxil Tablets Total: 25%, ASP<br>• Cefdinir Capsules Total: 122% ASP<br>• Cefdinir Oral Suspension Total: 520-620% ASP<br>• Cefprozil Tablets Total: 55-95% ASP<br>• Cephalexin Tablets Total: 95% ASP<br>• Cimetidine Tablets Total (1st of 3): 200-800% ASP<br>• Fluconazole Tablets Total: 875-1570% ASP<br>• Fluocinonide Cream E Total: 10% ASP<br>• Fluocinonide Cream Total: 15% ASP<br>• Fluocinonide Gel Total: 15% ASP<br>• Fluocinonide Ointment Total: 17% ASP<br>• Methotrexate Tablets Total: 875-1570% ASP<br>• Moexipril HCL Tablets Total: 300-560% ASP<br>• Moexipril HCL/HCTZ Tablets: 70-175% ASP<br>• Nabumetone Tablets Total: 140-160% ASP<br>• Nadolol Tablets Total: 1,200-1,400% ASP<br>• Oxybutynin Chloride Tablets: 1,100 - 1,500% ASP<br>• Prazosin HCL Capsules Total: 30%<br>• Ranitidine HCL Tablets Total: 330-900% | ¶625 | Appx. A |
| July 19, 2013 | 1 | • Enalapril Maleate (1st of 2): 350-450% WAC, 400-650% contract | ¶660 | Appx. A |
| Aug. 9, 2013 | 12 | • Amiloride HCL/HCTZ Tablets: 53%<br>• Clemastine Fumarate Oral Liquids: 7%<br>• Clemastine Fumarate Tablets: 76%<br>• Diclofenac Tablets (1st of 2): 302%<br>• Diltiazem HCL Tablets: 90%<br>• Doxazosin Mesylate Tablets: 1031%<br>• Etodolac ER Tablets: 198%<br>• Etodolac Tablets: 414%<br>• Ketoprofen Capsules (1st of 3): 146%<br>• Ketorolac Tablets: 268% | ¶667 | Appx. A |

152

| Date | Number of Drugs | Drug and Amount of Price Increase<br>*Black = parallel or collusive price increases*<br>*Blue = unilateral price increases* | AGs' May 2019 Complaint | Second Amended Class Action Complaint |
|---|---|---|---|---|
| | | • Pravastatin Tablets: 653%<br>• Tolmetin Sodium Capsules: 80% | | |
| Mar. 7, 2014 | 1 | • Niacin ER: 10% | ¶732 | N/A |
| Apr. 4, 2014 | 23 | • Anagrelide HCL Capsules (1st of 2): 58% WAC<br>• Azithromycin Oral Suspension: unknown<br>• Azithromycin Suspension: unknown<br>• Bumetanide Tablets: 249%<br>• Cephalexin Suspension: 90-185%<br>• Clarithromycin ER Tablets: unknown<br>• Cyproheptadine HCL Tablet: 95% WAC<br>• Dicloxacillin Sodium Capsules: 91% WAC<br>• Diflunisal tablets: 30% WAC, 182%, contract<br>• Estazolam Tablets (1st of 2): 37% WAC<br>• Ethosuximide Capsules: 87% WAC, 322% contract<br>• Ethosuximide Oral Solution: 20% WAC, 81% contract<br>• Hydroxyzine Pamoate Capsules: 165%<br>• Ketoconazole Cream 2%: 110% WAC<br>• Ketoconazole Tablets: 250% WAC, 528% customer prices<br>• Medroxyprogesterone Tablets: unknown<br>• Mimvey (Estradiol/Noreth) Tab: 26% WAC, 393% contract<br>• Nystatin Oral tablets: 110% WAC<br>• Pentoxifylline Tablets: 69%<br>• Tamoxifen Citrate Tablets: unknown<br>• Theophylline Tablets: 75% WAC | ¶¶747, 759, 793, 802, 807, 812, 923 | Appx. A |
| Apr. 15, 2014 | 1 | • Baclofen Tablets: 350 - 477% WAC | ¶824 | Appx. A |
| July 1, 2014 | 1 | • Fluocinonide Cream: 206 - 754% WAC<br>• Fluocinonide E-Cream: 155-255% WAC<br>• Fluocinonide Ointment: 206-483% WAC<br>• Fluocinonide Gel: 160-430% WAC | ¶¶831, 843 | Appx. A |
| By July 9, 2014 | 2 | • Glyburide: unknown<br>• Glyburide-Metformin: unknown | ¶936 | ¶327 |

153

| Date | Number of Drugs | Drug and Amount of Price Increase<br>*Black = parallel or collusive price increases*<br>*Blue = unilateral price increases* | AGs' May 2019 Complaint | Second Amended Class Action Complaint |
|---|---|---|---|---|
| Aug. 28, 2014 | 29 | • Amiloride HCL/HCTZ Tablets: 50% WAC<br>• Amoxicillin/Clavulanate Chew Tablets: 25% WAC<br>• Carbamazepine Chewable Tablets: 270% WAC<br>• Carbamazepine tablets: 1538% WAC<br>• Cimetidine Tablets (2nd of 3): 25% WAC<br>• Clemastine Fumarate Tablets: 45% WAC<br>• Clotrimazole Topical Solution (1st of 2): 208% WAC<br>• Diclofenac Potassium Tablets (2nd of 2): 50% WAC<br>• Desmopressin Acetate Tablets: 75% WAC<br>• Disopyramide Phosphate Capsules: 100% WAC<br>• Enalapril Maleate Tablets (2nd of 2): 230% WAC<br>• Epitol Tablets: 1538% WAC<br>• Flurbiprofen Tablets: 75% WAC<br>• Flutamide Capsules: 140% WAC<br>• Fluvastatin Sodium Capsules: 32% WAC<br>• Hydroxyurea Capsules: 37% WAC<br>• Loperamide HCL Capsules (1st of 2): 25% WAC<br>• Penicillin VK Tablets: 100% WAC<br>• Prazosin HCL Capsules: 21% WAC<br>• Prochlorperazine Tablets: TBD<br>• Topiramate Sprinkle Capsules: TBD<br>• Warfarin Sodium Tablets 10MG 100: 5% WAC<br>• Meperidine HCL Tablets: 110% WAC<br>• Nefazodone Tablets (1st of 2): 90% WAC<br>• Mexiletine Capsules; 90% WAC<br>• Cromolyn Sodium Inhalant (1st of 2): 90% WAC<br>• Fosinopril Tablets: 70% WAC<br>• Megestrol Acetate Tablets: 55% WAC<br>• Tolmetin Sodium Capsules (2nd of 3): 55% WAC | ¶846 | Appx. A |

154

| Date | Number of Drugs | Drug and Amount of Price Increase<br>*Black = parallel or collusive price increases*<br>*Blue = unilateral price increases* | AGs' May 2019 Complaint | Second Amended Class Action Complaint |
|---|---|---|---|---|
| Jan. 28, 2015 | 16 | • Bethanechol Chloride Tablets: "Market Intel"<br>• Ciprofloxacin tablets: 193%<br>• Diltiazem HCL Tablets: 90%<br>• Estradiol Tablets: 90%<br>• Fluoxetine HCL Tablets: 612%<br>• Glimepiride Tablets: 300%<br>• Griseofulvin Suspension: 50%<br>• Isoniazid Tablets: 50%<br>• Ketoprofen Capsules (2nd of 3): 90%<br>• Ketorolac Tromethamine Tablets (2nd of 2): 90%<br>• Nortriptyline HCL Capsules: 90%<br>• Propranolol HCL Tablets: "Market Intel"<br>• Penicillin v Potassium Oral Solution (1st of 2): 90% WAC<br>• Danazol Capsules: 90% WAC<br>• Methyldopa Tablets: 90% WAC<br>• Carbidopa/Levodopa Tablets: 50% WAC | ¶889 | Appx. A |
| July 29, 2015 | 7 | • Fluoxetine HCL Oral Solution: 275% WAC Dipyridamole Tablets: 98% WAC<br>• Trazodone Tablets: 77% WAC<br>• Loperamide HCL Capsules (2nd of 2): 77% WAC<br>• Clotrimazole Topical Solution (2nd of 2): 68% WAC<br>• Cimetidine Tablets (3rd of 3): 54% WAC<br>• Estazolam Tablets (2nd of 2): 50% WAC | N/A | Appx. A |
| Apr. 6, 2016 | 5 | • Anagrelide HCL Capsules (2 of 2): 27% WAC<br>• Penicillin v. Potass. Oral Solution (2nd of 2): 26% WAC<br>• Nefazodone Tablets (2nd of 2): 25% WAC<br>• Tolmetin Sodium Capsules (3rd of 3): 25% WAC<br>• Cromolyn Sodium Inhalant (2nd of 2): 24% WAC | N/A | Appx. A |

155

**APPENDIX B**

**Select Trade Shows and Conferences
Attended By Teva And Co-Conspirators**

| Date | Organization/Event | Teva Attendee(s) |
|---|---|---|
| Feb. 20-22, 2013 | Generic Pharmaceutical Association ("GPhA") Annual Meeting | Oberman<br><br>Olafsson (with Actavis) |
| Apr. 20-23, 2013 | National Association of Chain Drug Stores ("NACDS") Annual Meeting | Oberman<br><br>Cavanaugh |
| Aug. 10-13, 2013 | NACDS Total Store Expo | Cavanaugh<br><br>Galownia<br><br>Oberman |
| Dec. 3, 2013 | NACDS Annual Dinner | Cavanaugh |
| Feb. 19-21, 2014 | GPhA Annual Meeting | Oberman |
| Feb. 26, 2014 | GPhA BOD Quarterly Meeting | Oberman |
| Apr. 1, 2014 | Healthcare Distribution Management Alliance ("HDMA") Roundtable Fundraiser | Cavanaugh |
| Apr. 26-29, 2014 | NACDS Annual Meeting | Cavanaugh<br><br>Oberman |
| June 1-4, 2014 | HDMA Leadership Conference | Patel |
| Aug. 23-26, 2014 | NACDS Total Store Expo | Cavanaugh |
| Sept. 27 – Oct. 1, 2014 | HDMA Annual Board Membership Meeting | Cavanaugh<br><br>Baeder |
| Nov. 19-21, 2014 | International Generic Pharmaceutical Alliance Annual Conference | Oberman |
| Dec. 3, 2014 | NACDS Annual Dinner | Cavanaugh |
| Feb. 9-11, 2015 | GPhA Annual Meeting | Olafsson |
| June 7-10, 2015 | HDMA Leadership Conference | Patel |

156